UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

C. EARL GRANT,

                                        Plaintiff,

    vs.

NATIONAL BOARD OF MEDICAL EXAMINERS and          Civil Action No.
FEDERATION OF STATES MEDICAL BOARD,              7:07-cv-00996
                                                 (TJM-GJD)

                                        Defendants.

_____


# APPENDIX OF CASES


| *CASES* | *TABS* |
|---------|--------|
| *Brown v. Capoziello*, No. 03 Civ. 8712 (LTS) (JCF), 2008 WL 4201636 (S.D.N.Y. September 12, 2008) | 1 |
| *Hunt v. Meharry Medical College*, No. 98 Civ. 7193 (MBM) 2000 WL 739551, *5 (S.D.N.Y. June 8, 2000) | 2 |
| *McKie v. Laguardia Community College*, No. 04-CV-555 (RRM) (MDG) 2008 WL 4489796, fn 2 (E.D.N.Y. Sept. 30, 2008) | 3 |
| *McKinnon v. Hermes of Paris, Inc.*, No. 06 Civ. 1001 NRB, 2007 WL 1098707, at *3 (S.D.N.Y. 2007) | 4 |
| *Michels v. Sunoco Home Comfort Service*, No. Civ. A. 04-1906, 2004 WL 2897945, *2-*3 (E.D. Pa. Dec. 13, 2004) | 5 |
| *Orraca v. Pilatich*, 2008 WL 4443274, fn. 8 (N.D.N.Y. Sept. 26, 2008) | 6 |
| *Shomo v. New York Dept. of Correctional Servs.*, No. 9:04-CV-0910 (LEK/GHL) 2007 WL 2580509, *15 (N.D.N.Y. Sept. 4, 2007 | 7 |
| *Tamondong v. GMAC Commercial Credit LLC*, No. 06 Civ. 770 (SAS) 2006 WL 3377592, *2 (S.D.N.Y. Nov. 17, 2006) | 8 |
| *Tori v. University of Minnesota*, No. A06-205, 2006 WL 3772316, *3 (Minn. App. December 26, 2006) | 9 |
| *Wormer v. Rensselaer*, No. 07-1641-CV, 2008 WL 4326525, *2 (2d Cir. March 22, 2007) | 10 |

**TAB 1**

Westlaw.
Case 7:07-cv-00996-TJM-GJD    Document 38-20    Filed 12/05/08    Page 3 of 36
Page 1
Slip Copy
Slip Copy, 2008 WL 4201636 (S.D.N.Y.)
(Cite as: 2008 WL 4201636 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Michael BROWN, Plaintiff,
v.
James CAPOZIELLO, Deputy Commissioner,
Dept. of Health and Mental Hygiene Et Al; Dr.
Benjamin Okonta M.D. Acting Medical Director
Correctional Health Services, Burton Schall, Esq.,
P.H.D., Director of Risk Management, Correctional
Health Services, Dr. Jean Pierre, North Infirmary
Command, Warden M. Mack/"last" Warden F.
Gonzalez, North Infirmary Command, Defendants.
**No. 03 Civ. 8712(LTS)(JCF).**

Sept. 12, 2008.

*MEMORANDUM AND ORDER*

JAMES C. FRANCIS IV, United States Magistrate
Judge.
**\*1** Michael Brown, a prison inmate, brings this ac-
tion *pro se* pursuant to 42 U.S.C. § 1983. He al-
leges that prison authorities denied him adequate
medical treatment in violation of the Eighth
Amendment to the United States Constitution. He
has named as defendants James Capoziello, Deputy
Commissioner of the Department of Health and
Mental Hygiene; Dr. Benjamin Okonta, Acting
Medical Director of Correctional Health Services
("CHS"); Burton Schall, Director of Risk Manage-
ment of CHS; Dr. Jean Pierre of North Infirmary
Command ("NIC"); Warden Michelle Mack; and
"Last" Warden Fidel Gonzalez ("Gonzalez"). Mr.
Brown now moves pursuant to Rule 15(a)(2) of the
Federal Rules of Civil Procedure to file a Third
Amended Complaint. For the reasons outlined be-
low, the motion is granted in part and denied in part.

*Background*

A. *The Facts*

On December 25, 2001, Mr. Brown injured his
right hand while defending himself when another
inmate at a correctional facility at Rikers Island
("Rikers") attacked him with a knife. (Second
Amended Complaint ("SAC") at 3; TAC at 3). His
injuries were treated at Jamaica Hospital and he
was subsequently transferred to Bellevue Hospital
Center ("Bellevue") for rehabilitation. (SAC at 3;
TAC at 3). After four months of treatment, the hand
specialist at Bellevue, later identified as Dr. Mihye
Choi, recommended surgery on the fifth finger of
the plaintiff's right hand. (SAC at 3; Proposed Third
Amended Complaint ("TAC") at 3). However, this
operation was not performed, and Mr. Brown was
returned to Rikers. (SAC at 3; TAC at 3).

From February 16 to February 18, 2003, Mr. Brown
informed a physician at Rikers identified as Dr.
Gavin that his hand was causing him extreme pain.
(TAC at 3). On February 18, doctors at Bellevue
performed an operation on Mr. Brown's right fifth
finger, where they broke the bone, reset it with
three pins, and placed his hand in a cast. (SAC at 3;
TAC at 3). Dr. Choi told Mr. Brown to return in six
weeks so that the pins could be extracted and the
cast removed. (SAC at 3; TAC at 3). Shortly there-
after, Dr. Gavin went on military duty, and another
medical service provider was assigned to care for
Mr. Brown. (SAC at 3). In his Second Amended
Complaint, the plaintiff identified this person as
"Dr. Jean Pierre," but in his proposed Third
Amended Complaint, Mr. Brown asserts that this
individual was in fact a physician's assistant named
George Jeanty. (SAC at 3; Attachment to TAC
("TAC Addendum")). At the end of March 2003,
Mr. Brown notified Mr. Jeanty that the time by
which he was supposed to return to Bellevue had
passed, but Mr. Jeanty ignored him. (TAC Ad-
dendum). Three weeks later, Mr. Brown com-
plained that his hand was extremely painful and
was beginning to smell; once again, Mr. Jeanty
took no action. (Attachment following page 3 of
SAC ("SAC Addendum"); TAC Addendum). A few

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

days later, on April 23, 2003, Mr. Brown reiterated his complaint to Mr. Jeanty, this time in the presence of a correctional officer "Smith," but Mr. Jeanty continued to ignore him. (SAC Addendum; TAC Addendum).

*2 Later that day, Mr. Brown contacted Dale Wilker, an attorney from the Prisoners' Rights Project at the Legal Aid Society, who spoke with Mr. Jeanty on Mr. Brown's behalf. (SAC Addendum). As a result, on April 24, 2003, doctors at Rikers removed Mr. Brown's cast and discovered that the pins used to set his finger had broken through his skin and fingernail. (SAC Addendum). The finger was badly infected, and pus and blood were seeping out of the holes left by the pins. (SAC Addendum; TAC Addendum). The next day, Mr. Brown returned to Bellevue for another operation on his hand, but the hospital refused to perform the surgery and sent him back to Rikers. (SAC Addendum; TAC Addendum). The following week, Bellevue performed the surgery to remove the pins. (TAC Addendum).[FN1] Upon returning from military duty, Dr. Gavin informed Mr. Brown that he had developed arthritis in the fingers of his right hand. (SAC Addendum; TAC Addendum). On July 25, 2003, Mr. Brown was evaluated at Bellevue by Dr. Lehman, who confirmed that the fingers of Mr. Brown's right hand lacked full range of motion. (TAC Addendum).

> FN1. There are some immaterial inconsistencies between the Second Amended Complaint and the proposed Third Amended Complaint regarding the timing of the surgery.

Mr. Brown alleges that as a result of the surgery and subsequent medical care, the fifth finger of his right hand is deformed, and the third, fourth, and fifth fingers no longer have full range of motion. (SAC Addendum; TAC Addendum).

B. *Procedural History*

Some of the underlying procedural history is set forth in greater detail in the Court's decision on the defendants' initial motion to dismiss, *Brown v. Pierre,* No. 03 Civ. 8712, 2006 WL 1982784 (S.D .N.Y. July 12, 2006), and will be repeated here only to the extent necessary to understand the pending motion.

On November 4, 2003, Mr. Brown filed his initial complaint against the New York City Health & Hospitals Corporation ("HHC"), the City of New York ("the City"), Dr. Mihye Choi, and a Dr. Lemen. Then-Chief Judge Michael B. Mukasey issued an order on November 4, 2003, finding that the plaintiff failed to state a cause of action against HHC and the City because he did not allege the existence of an official policy or custom that was causally related to the injury. *Id.* at *2 (citing *Monell v. Department of Social Services,* 436 U.S. 658 (1978)). Judge Mukasey also held that, to state a Section 1983 claim against the individual doctors, the plaintiff needed to allege facts sufficient to demonstrate deliberate indifference to his medical needs under *Estelle v. Gamble,* 429 U .S. 97 (1976), and he had failed to do so with respect to Dr. Choi. *Brown,* 2006 WL 1982784, at *2, *4. Judge Mukasey directed Mr. Brown to amend the Complaint to address these issues, and Mr. Brown filed his First Amended Complaint ("FAC") on January 21, 2004. The case was then reassigned to the Honorable Laura Taylor Swain, U .S.D.J.

The First Amended Complaint identified as defendants the City of New York, Prison Health Services ("PHS"), Dr. Jean Pierre, and Dr. Gavin. (Am. Compl. at 1-3). On January 19, 2005, the defendants moved to dismiss this Complaint in its entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Memorandum in Support of Defendant's Motion to Dismiss ("Def.Memo.") at 1). On July 12, 2006, Judge Swain granted the motion, finding that the plaintiff failed to state a cause of action against the City and HHC because he failed to show a connection between any official policy and any deprivation of his constitutional rights.

*Brown,* 2006 WL 1982784, at *2-3. Judge Swain further held that the plaintiff did not state a claim against Dr. Choi because he failed to allege facts sufficient to satisfy *Estelle*'s deliberate indifference standard. *Id.* at *3-4.

**\*3** Judge Swain granted Mr. Brown permission to file and serve an amended pleading that included allegations demonstrating that his injuries arose from a policy or custom of the City and HHC. *Brown,* 2006 WL 1982784, at *4. On October 13, 2006, Mr. Brown filed a Second Amended Complaint, adding Defendants Capoziello, Okonta, Schall, and Gonzalez. (SAC at 1).

After several unsuccessful attempts to serve defendant Pierre, Mr. Brown now claims that the medical service provider who took over his care after Dr. Gavin left for military duty was in fact Mr. Jeanty. (Letter of Michael Brown, dated June 17, 2008 ("Brown Reply") at 1). On May 1, 2008, Mr. Brown filed a motion for leave to file a Third Amended Complaint to add Mr. Jeanty, as a defendant and to supplement the factual record. (TAC at 1-3; TAC Addendum). Since Mr. Brown is still not sure whether Dr. Pierre and Mr. Jeanty are the same person, he has named both in the proposed Third Amended Complaint. (Brown Reply at 1).

## Discussion

### A. *Standard for Amendment*

Rule 21 of the Federal Rules of Civil Procedure governs motions to amend to add additional parties. *Momentum Luggage & Leisure Bags v. Jansport, Inc.,* No. 00 Civ. 7909, 2001 WL 58000, at *1 (S.D.N.Y. Jan. 23, 2001). That rule states that a party may be added to an action "at any time, on just terms."Fed.R.Civ.P. 21. In deciding whether to permit joinder, courts apply the "same standard of liberality afforded to motions to amend pleadings under Rule 15." *Soler v. G & U, Inc.,* 86 F.R.D. 524, 528 (S.D.N.Y.1980) (guoting *Fair Housing Development Fund Corp. v. Burke,* 55 F.R.D. 414,

419 (E.D.N.Y.1972)); *accord Smith v. P.O. Canine Dog Chas,* No. 02 Civ. 6240, 2004 WL 2202564, at *12 n. 11 (S.D.N.Y. Sept. 28, 2004); *Momentum Luggage,* 2001 WL 58000, at *2; *Clarke v. Fonix Corp.,* No. 98 Civ. 6116, 1999 WL 105031, at *6 (S.D.N.Y. March 1, 1999).

Generally, a motion to amend is governed by Rule 15(a) of the Federal Rules of Civil Procedure, which states that leave to amend shall be freely given "when justice so reguires." Fed.R.Civ.P. 15(a). However, notwithstanding the liberality of the general rule, "it is within the sound discretion of the court whether to grant leave to amend." *John Hancock Mutual Life Insurance Co. v. Amerford International Corp.,* 22 F.3d 458, 462 (2d Cir.1994); *accord Krumme v. WestPoint Stevens Inc.,* 143 F.3d 71, 88 (2d Cir.1998). In discussing the use of this discretion, the Supreme Court has stated:

> In the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.-the leave should ... be freely given.

*Foman v. Davis,* 371 U.S. 178, 182 (1962) (internal quotation marks omitted).

### B. *Defendant Pierre*

**\*4** The plaintiff named "Dr. Jean Pierre" as a defendant in his First Amended Complaint in 2004, and again in his Second Amended Complaint in 2006. (FAC at 1; SAC at 1). Mr. Brown was unsuccessful in his attempts to serve Dr. Pierre in October 2004 and December 2006. PHS then indicated to the plaintiff through counsel that it employed a physician's assistant named Jean Pierre at Rikers, and provided an address where he could served. (Letter of Gillian C. Thomas, dated Feb. 19, 2008 ("Thomas Letter") at 2). In September 2007, a PHS

employee named Ms. Tina accepted service on behalf of "Jean Pierre, P.A." (Docket Entry 55). However, on February, 19, 2008, defendants' counsel represented that there had been a mistake and that PHS had never employed a doctor or physician's assistant named Jean Pierre during the time period that Mr. Brown was treated. (Thomas Letter at 2). On May 21, 2008, PHS affirmed that it had no record of an employee by that name between January 2002 and January 31, 2005. (Affidavit of Jerome P. Donahue, Director of Human Resources for PHS ("Donahue Aff."), at 2). Accordingly, defendant "Jean Pierre" should be stricken from the Complaint.

## C. Defendant Jeanty

### 1. Statute of Limitations

Because 42 U.S.C. § 1983 contains no statute of limitations of its own, courts must utilize the limitations period for tort actions in the forum state, which in New York is three years. *See Jackson v. Suffolk County Homicide Bureau,* 135 F.3d 254, 256 (2d Cir.1998); *Jaghory v. New York State Department of Education,* 131 F.3d 326, 331 (2d Cir.1997); *Bristow v. Smith,* No. 03 Civ. 2663, 2003 WL 21437005, at *1 (S.D.N.Y. June 18, 2003). Although New York law provides the limitations period, accrual of the federal cause of action is a matter of federal law. *Connolly v. McCall,* 254 F.3d 36, 41 (2d Cir.2001). Under federal law, a Section 1983 cause of action accrues "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Pearl v. City of Long Beach,* 296 F.3d 76, 80 (2d Cir.2002) (quoting *Singleton v. City of New York,* 632 F.2d 185, 191 (2d Cir.1980)). The plaintiff filed the initial Complaint in this case in November 2003 and knew or had reason to know of his injury in April 2003, when Mr. Jeanty allegedly ignored his complaints of pain. (TAC Addendum). The defendants argue that Mr. Brown's cause of action against Mr. Jeanty expired on April 24, 2006, approximately two years before Mr. Brown submitted his Third

Amended Complaint. (Affirmation of Gillian C. Thomas in Opposition to Motion for Leave to Amend Complaint dated June 2, 2008 ("Thomas Aff.") at ¶ 9).

### 2. Relation back

The plaintiff would appear to be barred from adding Mr. Jeanty as a new defendant by the three-year statute of limitations. However, Mr. Brown's Third Amended Complaint seeks to change the name of his medical service provider from Dr. Jean Pierre to George Jeanty. (TAC at 1). The defendants do not dispute that Dr. Pierre was named as a defendant within the statute of limitations in the plaintiff's First Amended Complaint, filed on January 21, 2004. (FAC at 3). Rather, they contend that the addition of defendant Jeanty does not relate back to the original pleading. (Thomas Aff., ¶ 10)

**\*5** An amendment that changes the name of a defendant "relates back to the date of the original pleading" if (1) the claim arises "out of same conduct, transaction, or occurrence" previously set forth, (2) within the time the court allows for service-usually within 120 days of the original filing date-the defendant to be brought into the action "received such notice of the action that [he] will not be prejudiced in defending on the merits," and (3) the defendant "knew or should have known that the action would have been brought against [him] but for a mistake concerning the proper party's identity."Fed.R.Civ.P. 15(c)(1)(B), (C); *see also VKK Corp. v. National Football League,* 244 F.3d 114, 128 (2d Cir.2001); *Byrd v. Abate,* 964 F.Supp. 140, 144-45 (S.D.N.Y.1997); *Harris v. Butler,* No. 91 Civ. 6352, 1996 WL 403053, at *1 (S.D.N.Y. July 18, 1996). With respect to the first requirement, there is no question that Mr. Brown's claims against Mr. Jeanty arise out of the same conduct set forth in the First Amended Complaint. (Brown Reply at 1; FAC at 5; TAC Addendum).

### a. Notice and Prejudice

As to the second requirement, Rule 15(c) is satisfied if, within the period provided by the court for service of the original complaint, the defendant to be brought into the action "received such notice of the action that it will not be prejudiced in defending on the merits."Fed.R.Civ.P. 15(c)(1)(C). While the plaintiff cannot demonstrate that Mr. Jeanty had actual notice of the lawsuit, "[n]otice of allegations against proposed defendants may be imputed to them through a shared attorney if the attorney knew or should have known that but for a mistake concerning the identity of the proper party, the proposed defendants would be added." *Susan Faris Designs, Inc. v. Sheraton New York Corp.,* No. 98 Civ. 8166, 2000 WL 191689, at *5 (S.D.N.Y. Feb. 10, 2000); *see also Gleason v. McBride,* 869 F.2d 688, 693 (2d Cir.1989).

Defendants' counsel have indicated that they would have represented Dr. Jean Pierre had he been the medical service provider who treated Mr. Brown, as counsel normally represents employees of PHS. (Thomas Letter at 2). Thus, it is also likely that defendants' counsel would have represented Mr. Jeanty had he been named in the First Amended Complaint. Accordingly, constructive notice may be imputed to Mr. Jeanty through counsel, so long as counsel should have known that, but for a mistake in identity, Mr. Jeanty would have been named in the existing action.

There is no dispute that defendants' counsel was aware of Mr. Brown's lawsuit, since they responded to the First Amended Complaint on behalf of the City defendants. Indeed, counsel had knowledge of Mr. Brown's claim at least as early as November 8, 2004, when they requested additional time for one defendant to respond to the First Amended Complaint. (Letter of Ross H. Schmierer dated November 8, 2004, at 1). In that Complaint, it was clear that Mr. Brown was attempting to sue the physician's assistant who was in charge of his care, and thus counsel should have known that this individual, whether it was Dr. Pierre or Mr. Jeanty, would have been eventually added to the existing

Thus, notice of the action was received by counsel and may be imputed to Mr. Jeanty who is therefore not prejudiced in defending on the merits.

> FN2. Mr. Brown's time to serve the summons and First Amended Complaint was extended until October 29, 2004. (Docket Entry 14). Although the U.S. Marshals Service may not have completed service until November 17, 2004 (Docket Entry 22), the defendants have never contended that it was untimely.

b. *Mistake*

*6 The defendants, relying on *Perez v. New York City Police,* 234 F.3d 1262 (2d Cir.2000), and *Sepulveda v. City of New York,* No. 01 Civ. 3117, 2003 WL 22052870, at *2 (S.D.N.Y.2003), argue that an amendment to add new defendants "does not relate back if the reason the new defendants were not named in the original complaint is because plaintiff did not know their identities."(Thomas Aff., ¶ 10). In *Perez,* an unpublished Second Circuit case, the court, citing *Tapia-Ortiz v. Doe,* 171 F.3d 150 (2d Cir.1999), affirmed the district court's denial of a motion to amend the complaint to add Jane Doe and John Doe defendants. *Perez,* 2000 WL 1715248, at *1. In *Tapia-Ortiz,* the court held that while the plaintiff timely filed his complaint naming the defendant officers as "John Does," this type of pleading "cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a change in the party sued." *Tapia-Ortiz,* 171 F.3d at 151-52 (citing *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1075 (2d Cir.1993)). The court in *Sepulveda,* citing *Barrow v. Wethersfield Police Department,* 66 F.3d 466 (2d Cir.1995), held that Rule 15(c)(1) (C) allows a proposed amendment to relate back if the change is "the result of an error, such as a misnomer or misidentification," but states that "substitut[ing] a named party for a John Doe defendant ... is not the result of error, but rather the result of ignorance of the identity of the defendant

at the time the complaint was filed." *Sepulveda.* 2003 WL 22052870, at *2.

Here, Mr. Brown did not fail to identify individual defendants, nor does he seek to substitute a named party for a John Doe defendant. The plaintiff simply erred in identifying the physician's assistant who provided his care, as a result of "a misnomer or misidentification." In addition, PHS abetted the plaintiff's error by accepting service for "Dr. Pierre," and once Mr. Brown learned that the person who treated him was instead Mr. Jeanty, he promptly filed a Third Amended Complaint to correct the misidentification. (Brown Reply at 1).

I invited the defendants to address the issue of relation back under Rule 15(c)(1)(C). (Memorandum and Order dated July 29, 2008). However, while they took the opportunity to make an additional submission, the reply did not address this issue. (Letter of Gillian C. Thomas dated August 12, 2008). The plaintiff is therefore permitted to add George Jeanty as a defendant.

D. *Defendant Gonzalez*

Defendants claim that the plaintiff has been unable to serve Warden Gonzalez, has failed to make specific allegations against him in the proposed Third Amended Complaint, and has failed to demonstrate that Warden Gonzalez was personally involved in the alleged constitutional violation. (Thomas Aff., ¶ 11). For these reasons, the defendants argue that Warden Gonzalez should be deleted from the caption of the action. (*Id.* at ¶ 11). However, Warden Gonzalez appears to have been successfully served on December 12, 2006. (Docket Entry 52). Since he is not a new defendant, and Mr. Brown does not add new claims against Warden Gonzalez in his proposed Third Amended Complaint, the defendants' other contentions should be raised in a dispositive motion and will not be addressed here. (SAC Addendum at 3; TAC at 1; Thomas Aff., ¶ 11-13).

E. *Factual Supplementation*

*7 Finally, Mr. Brown seeks to amend the Complaint to add factual material that does not alter his substantive legal claims. Courts have denied leave to amend where "the additional allegations merely reiterate and embroider the claims ... already presented in the original complaint, adding little, if anything, of substance to the case." *Scottish Air International, Inc. v. British Caledonian Group, PLC,* 152 F.R.D. 18, 30 (S.D.N.Y.1993) (quoting *Coleman v. Ramada Hotel Operating Co.,* 933 F.2d 470, 473 (7th Cir.1991)); *see also O'Brien v. Price Waterhouse,* 740 F.Supp. 276, 284 (S.D . N.Y.1990) (deeming "mere elaboration and increased verbiage concerning the same core allegations initially put forward" insufficient to warrant amendment). Here, however, Mr. Brown is amending his Complaint to add new substantive claims. Since the Complaint will be amended in any event and the defendants have not demonstrated any prejudice that would result from the addition of the new factual allegations, they shall be permitted. *In re Enron Corp.,* 367 B.R. 373, 384 (Bankr.S.D.N.Y.2007) (permitting amendment to add factual allegations even though changes were arguably "superfluous"); *Torn v. Rosen,* No. 82 Civ. 3130, 1984 WL 734, at *3 (S.D.N.Y. Aug. 6, 1984) (permitting amendment even where "[p]laintiffs have used this opportunity to sharpen, and thereby arguably alter, the facts asserted in the complaint").

*Conclusion*

For the reasons set forth above, the plaintiff's motion to amend is granted to the extent that he may add George Jeanty as a defendant along with the supplementary factual material. The claim against "Jean Pierre," however shall be deemed stricken. Defendants shall answer the Third Amended Complaint by September 30, 2008. By that same date, the parties shall advise me in writing what further discovery, if any, is necessitated by the amendments.

SO ORDERED.

S.D.N.Y.,2008.
Brown v. Capoziello
Slip Copy, 2008 WL 4201636 (S.D.N.Y.)

END OF DOCUMENT

**TAB 2**

Not Reported in F.Supp.2d                                                                                      Page 1
Not Reported in F.Supp.2d, 2000 WL 739551 (S.D.N.Y.), 18 NDLR P 152
(Cite as: 2000 WL 739551 (S.D.N.Y.))

C

United States District Court, S.D. New York.
Leonard HUNT, Plaintiff,
v.
MEHARRY MEDICAL COLLEGE and the Na-
tional Board of Medical Examiners, Defendants.
No. 98 Civ. 7193(MBM).

June 8, 2000.

Steve Stavridis, Riverdale, NY, for Plaintiff.
Marc J. Gottridge, Joseph J. MacChiarola, Corbin
Silverman & Sanseverino LLP, New York, NY, for
Defendant Meharry Medical College.
Paul J. Fishman, Lance J. Gotko, Friedman Kaplan
& Seiler LLP, New York, NY, for Defendant the
National Board of Medical Examiners.

OPINION and ORDER

MUKASEY, J.
*1 Leonard Hunt, formerly a medical student at
Meharry Medical College ("the College"), alleges
that he was discriminated against on the basis of a
disability in connection with a standardized test ad-
ministered by The National Board of Medical Ex-
aminers ("the Board"). Hunt claims that the Board
violated Section 504 of the Rehabilitation Act of
1973, 29 U.S.C. § 794 (1994) ("the RA" or " §
504"), and Title III of the Americans with Disabil-
ities Act, 42 U.S.C. §§ 12182-12189 (1994) ("the
ADA" or "Title III"). In addition, Hunt claims that
the College violated these statutory provisions and
also breached a settlement agreement that it had
entered into with him.

Pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6),
each defendant moves to dismiss Hunt's amended
complaint. Hunt cross-moves to file a second
amended complaint. For the reasons stated below,
defendants' motions are granted in part and denied
in part, and Hunt's motion is granted.

I.

For the purpose of deciding defendants' Rule 12(b)
motions, the material facts alleged in the amended
complaint are taken as true. *See Cooper v. Pate,*
378 U.S. 546, 546 (1964) (per curiam). Hunt has
epilepsy and glaucoma. (Am.Compl.¶ 2) He be-
came a medical student at the College in 1980, and
was a student there in 1987, when he filed a com-
plaint with the United States Department of Health
and Human Services ("HHS") alleging that the Col-
lege was discriminating against him because of his
physical ailments.(*Id.* ¶¶ 5, 7) The complaint was
resolved by a 1988 settlement agreement, and Hunt
continued his studies. (*Id.* ¶ 8)

Hunt completed his required coursework in 1992.
(*Id.* ¶ 6) He was informed by a letter dated February
3, 1995 that he would be ineligible to receive an
M.D. degree from the College unless he passed the
two-day United States Medical Licensing Examina-
tion ("the Examination" or "the test") when it was
next offered-on August 30-31, 1995. (*Id.* ¶ 8) The
Examination is administered by the Board. (*Id.* ¶ 9)

Before the test, Hunt asked the Board for a quad-
ruple time accommodation-*i.e.,* that he be allowed
to take the test over eight days. (Compl.Ex. B) The
Board told Hunt that he would be given only
"double time," and that therefore he would have to
complete the test in four days. (*Id.* Ex. C at 1)

On August 30, 1995, Hunt sat for the Examination,
and that evening he had a seizure. (Am.Compl.¶ 12)
The next morning, Hunt reported to his physician,
who concluded that he " 'should not continue the
examination ... (without proper rest)." ' (*Id.* ¶ 14)
(quoting Hunt's doctor, ellipses in the amended
complaint) Hunt then called the Board and asked
for a two-day rest period so that he could recuper-
ate before continuing with the Examination. (*Id.* ¶
18) The Board said no, and Hunt failed the test.
(*Id.* ¶¶ 19-20) By letter dated October 24, 1995, the
College told Hunt that because he had not passed

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the Examination he was being dismissed and would not receive an M.D. degree.(*Id.*)

*2 Hunt's complaint was received by the *prose* office on August 29, 1998 or August 31, 1998,[FN1] and was filed with the clerk of the court on October 13, 1998. (Compl. at 1) On July 28, 1999, Hunt-now represented by an attorney-filed an amended complaint. (Am. Compl. at 1)

> FN1. On the complaint, "August 31, 1998" has been partially effaced, and "August 29, 1998" has been stamped over it. For the purpose of this opinion I will assume *arguendo* that the complaint was filed on August 29, 1998.

## II. Hunt's Claims Against the Board

### A. The RA Claim

Hunt contends that the Board violated the RA (1) because it did not provide him with a quadruple time accommodation, and (2) because the Board denied his request for a two-day rest period. (*Id.* ¶¶ 17, 48-49)

Pursuant to Fed.R.Civ.P. 12(b)(6), the Board moves to dismiss Hunt's RA claim. The basis of this motion is a declaration that the Board is not a "program ... receiving Federal financial assistance" within the meaning of the Act. (8/15/99 Mem. of Law at 6-7) (citing Golden Decl. ¶¶ 12-19) In his Memorandum of Law, Hunt argues that the Board accepts federally funded vouchers as payment for its testing fees. (10/5/99 Mem. of Law at 6-8)

Both the declaration and Hunt's references to a voucher program are matters outside the pleadings. *See Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). Accordingly, this court has two options: first, these matters may be excluded from consideration and the motion to dismiss may be decided on the basis of the amended complaint alone; or

second, the Rule 12(b)(6) motion may be converted into a Rule 56 summary judgment motion, with both parties entitled to submit supporting materials before judgment is rendered. *See,e.g., Friedly v. New York,* No. 99-7158, 2000 WL 353210, at *3 (2nd Cir. April 4, 2000) (describing these options). Converting the 12(b)(6) motion into a Rule 56 motion is the preferable course when the issue as to which matters outside the pleadings have been submitted is "discrete and dispositive." 2 James Wm. Moore et al., *Moore's Federal Practice* § 12.34[3][b] (3d ed.1999).

Here, both criteria are met. The narrow issue of whether the Board receives federal funding is discrete-there will be little overlap between the evidence submitted as to the Board's funding and the evidence that will likely be submitted in connection with other aspects of this litigation. Moreover, the funding issue is dispositive of whether the RA governs the Board's conduct. Accordingly, the Board's Rule 12(b)(6) motion is converted into a Rule 56 motion. Judgment will be reserved until the parties have had an opportunity to submit further materials.

The Board argues also that the § 504 claim is in part time-barred. Before considering this argument, three preliminary matters require discussion. First, for statute of limitations purposes, Hunt's action was initiated on the date his complaint was received by the *prose* office (August 29, 1998), not on the date the complaint was filed by the *prose* office with the clerk of the court (October 13, 1998).*See Toliver v. Sullivan,* 841 F .2d 41, 42 (2d Cir.1988).

*3 Second, as to whether Hunt's amended complaint relates back to his original complaint, both complaints concern the same conduct. Moreover, the original complaint plainly put defendants on notice as to the additional claims that are now pressed in the amended complaint. *Compare,e.g.,* Compl. ¶ 1 ("[t]his suit is brought ... pursuant to Title III of the Americans with Disabilities Act, which incorporates by reference [§ 504 of the RA]") *with* Am. Compl. ¶ 1 ("[t]his action is brought pursuant to [§

504 of the RA and] Title III of the Americans with Disabilities Act"). Accordingly, under federal law the amended complaint relates back to the original complaint such that it must be regarded as having been filed on August 29, 1998.[FN2]*See* 3 Moore et al., *supra,* § 15.19[1]-[2] (discussing Fed.R.Civ.P. 15(c)).

> FN2. Because subject matter jurisdiction in this case is not founded on 28 U.S.C. § 1332 (1994), I need not decide whether Hunt's amended complaint relates back to his original complaint under state law, even though it is state law, *seeinfra* at 7, that determines the length of the § 504 limitations period. *See Gleason v. McBride,* 869 F.2d 688, 693 (2d Cir.1989) (in a § 1331 case, applying the federal Rule 15(c) relation back standard as to a federal cause of action the period of limitations for which is supplied by state law); *seegenerally Burgos Martinez v. Rivera Ortiz,* 715 F.Supp. 419, 422-23 (D.P.R.1989).

Third, the RA does not indicate the period during which a § 504 claim may be brought. "When Congress has not established a time limitation for a federal cause of action, the settled practice has been to adopt a ... time limitation" from an analogous state cause of action. *See Wilson v. Garcia,* 471 U.S. 261, 266 (1985). In *Morse v. University of Vt.,* 973 F.2d 122 (2d Cir.1992), the Circuit Court held that § 504 claims are governed by the state statute of limitations applicable to personal injury actions. *See id.* at 127.In New York, the personal injury limitations period is three years. *See*N.Y. C.P.L.R. § 214(5) (McKinney 1999).

Although the length of the § 504 limitations period is fixed by state law, federal law governs the question of when the § 504 claim accrues and the limitations period begins to run. *See Morse,* 973 F.2d at 127. Under federal law, a claim accrues when the plaintiff "knows or has reason to know" of the allegedly injury-causing act. *See id.* at 125 (internal quotation marks and citations omitted). Thus, in a

discrimination case "the proper focus is on the time of the *discriminatory act,* not the point at which the *consequences* of the act become painful." *Chardon v. Fernandez,* 454 U.S. 6, 8 (1981) (emphasis in original) (citing *Delaware State College v. Ricks,* 449 U.S. 250, 258 (1980) (internal quotation marks and other citations omitted); *seealso Morse,* 973 F.2d at 125 ("the timeliness of a discrimination claim is measured from the date the claimant receives notice of the allegedly discriminatory decision") (internal quotation marks and citations omitted).

The Board argues that Hunt's RA claim is time-barred to the extent that it depends on its refusal to grant a quadruple time accommodation. Attached to Hunt's complaint is a letter dated July 18, 1995, which states that the "reasonable accommodation [that] will be provided for the [Examination] ... is double time[,]" not the "quadruple time" that Hunt had requested. (Compl. Ex. C at 2) Hunt had read and understood the letter by August 16, 1995 at the latest. (*Id.* Ex. D at 2) (8/15/95 Letter from the Board to Hunt) (noting that Hunt and a representative of the Board had discussed a "previously approved accommodation of double time" during an August 16, 1995 telephone call) By that date, Hunt "ha[d] reason to know" that he would not be receiving a quadruple time accommodation. Accordingly, to the extent that it is based on the Board's refusal to provide such an accommodation, Hunt's § 504 claim accrued on August 16, 1995 and became time-barred on August 17, 1998-more than one week before he filed his complaint.

*4 Resisting this conclusion, Hunt contends that an August 21, 1995 letter shows that the Board was "amenable" to granting his request up to the date of the Examination. Hunt argues that his claim did not accrue until August 30, 1995, when the test began and it became clear that he would not be receiving quadruple time. However, there was nothing tentative or equivocal about the July 18 letter. It was a flat statement of the Board's position. Moreover, a claim accrues when the plaintiff knew or should

Case 1:07-cv-09653-DM-GSD    Document 38-20    Filed 12/05/08    Page 14 of 36

have known about the allegedly injury-causing act, not when the last possibility of the act being undone has passed. *See Ricks,* 449 U.S. at 260-61. Hunt's argument fails.

Finally, the Board maintains that punitive damages are not available under § 504, and that Hunt's request for such damages should therefore be stricken from the amended complaint. The RA does not state whether punitive damages are available under § 504, and neither the Supreme Court nor our Circuit Court has reached this issue. Before 1992, many federal courts held that punitive damages could not be awarded under § 504. *See Moreno v. Consolidated Rail Corp.,* 99 F.3d 782, 790 (6th Cir.1996) (collecting cases). However, in 1992 the Supreme Court held that "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Franklin v. Gwinnett County Pub. Schs.,* 503 U.S. 60, 70-71 (1992). Since 1992, most federal courts have held that punitive damages are available under § 504 because the RA contains no "clear direction to the contrary." *See,e.g., Rodgers v. Magnet Cove Pub. Schs.,* 34 F.3d 642, 644 (8th Cir.1994); *Waldrop v. Southern Co. Servs., Inc.,* 24 F.3d 152, 157 (11th Cir.1994); *Pandazides v. Virginia Bd. of Educ.,* 13 F.3d 823, 832 (4th Cir.1994); *Saylor v. Ridge,* 989 F.Supp. 680, 690 (E.D.Pa.1998); *Burns-Vidlak v. Chandler,* 980 F.Supp. 1144, 1152 (D.Haw.1997); *Hernandez v. Hartford,* 959 F.Supp. 125, 134 (D.Conn.1997); *Kilroy v. Husson College,* 959 F.Supp. 22, 24 (D.Me.1997); *Garrett v. Chicago Sch. Reform Bd. of Trustees,* No. 95 C 7341, 1996 WL 411319, at *4 (N.D.Ill. July 19, 1996); *Zaffino v. Surles,* No. 91 Civ. 1637(MGC), 1995 WL 146207, at *2-3 (S.D.N.Y. Mar. 31, 1995); *Simenson v. Hoffman,* No. 95 C 1401, 1995 WL 631804, at *7 (N.D.Ill. Oct. 24, 1995); *DeLeo v. Stamford,* 919 F.Supp. 70, 73 (D.Conn.1995); *Mild v. Mehlville Public Sch. Dist.,* No. 4:93CV2392 (JCH), 1995 WL 819138, at *7 (E.D.Mo. Sept. 18, 1995); *Kedra v. Nazareth Hosp.,* 868 F.Supp. 733, 740 (E.D.Pa.1994). This

line of cases conforms to *Franklin,* and I will follow it. Punitive damages are available under § 504.

**B. The ADA Claim**

Hunt contends that the Board violated Title III of the ADA precisely as it did § 504 of the RA-by providing only a double time accommodation, and by denying his request for a rest period. (Am.Compl.¶¶ 52-58) In response, the Board makes three arguments.

*5 First, the Board argues that "prior notice" to state or local officials is a jurisdictional prerequisite to filing a Title III claim in federal court, and that because Hunt did not provide such notice, subject matter jurisdiction may not be exercised over his claim. There is authority that supports the Board's argument. *See,e.g., Snyder v. San Diego Flowers,* 21 F.Supp.2d 1207 (S.D.Cal.1998). However, under 42 U.S.C. § 12188(a)(1), Title III's "remedies and procedures" are "the remedies and procedures set forth in [42 U.S.C.] section 2000a-3(a)," and although § 2000a-3(c) requires prior notice, § 2000a-3(a) does not. *Compare* 42 U.S.C. § 2000a-3(c) (describing notice requirement) *with* 42 U .S.C. § 2000a-3(a) (not mentioning a notice requirement). These statutory provisions are wholly unambiguous. Hunt was not required to notify state or local authorities before filing his Title III claim in federal court. *Accord,e.g., Botosan v. Fitzhugh,* 13 F.Supp.2d 1047, 1050 (S.D.Cal.1998) ("Congress ... expressly adopted subsection (a). It seems unlikely that Congress would absent-mindedly forget to adopt a provision [*i.e.,* subsection (c) ] that appears a mere two paragraphs below the subsection it adopted."); *Doukas v. Metropolitan Life Ins. Co.,* No. Civ. 4-478-SD, 1997 WL 833134, at *3 (D.N.H. Oct. 21, 1997) ("[r]eading Congress's designation of 2000a-3(a) to include the other paragraphs of section 2000a-3 would render the designation of paragraph (a) superfluous"); *seegenerally Sharp v. Waterfront Restaurants,* No. 99-CV-200 TW (AJB), 1999 WL 1095486, at *3 (S.D.Cal. Aug. 2, 1999) (noting that "[t]he vast ma-

Case 1:07-cv-06395-KMK-GJD Document 38-20 Filed 12/05/08 Page 15 of 36

jority of district courts that have passed on the question have held that ... Congress did not intend to incorporate the notification requirements contained in subsection (c)") (collecting cases).

Second, the Board argues that Hunt's RA claim is time-barred to the extent that it depends on the Board's refusal to provide a quadruple time accommodation. The ADA does not specify the period within which Title III claims must be brought. Accordingly, a limitations period must be borrowed from an analogous state cause of action, *see supra* at 7, and neither the Supreme Court nor our Circuit Court has determined what that state cause of action should be.

The appropriate limitations period is provided by New York's personal injury cause of action, *see* N.Y. C.P.L.R. Law § 214(5) (McKinney 1999), and therefore Title III claims must be brought within three years of accrual. First, because the RA and the ADA are substantially similar statutes, the limitations period that applies under *Morse* to § 504, *see supra* at 7, should apply also to Title III. *Cf. Everett v. Cobb County Sch. Dist.,* 138 F.3d 1407, 1409 (11th Cir.1998) ("Because causes of action brought under Title II of the ADA and the Rehabilitation Act are essentially identical, we will ... apply the same statute of limitations to both."); *Duprey v. Connecticut Dep't of Motor Vehicles,* 191 F.R .D. 329, 341 (D.Conn.2000) (same). Second, the rationale of *Morse* was that both § 504 and 42 U.S.C. § 1983 (1994) have "broad, remedial goals," encompass a "wide diversity" of claims, and are part of the "general corpus of discrimination law." *Morse,* 973 F.2d at 126-27. The *Morse* Court thus held that state personal injury limitations periods, which govern § 1983 actions under *Wilson v. Garcia,* 471 U.S. at 266, should apply also to RA claims. *See Morse,* 973 F.2d at 127. Like § 504 and § 1983, Title III has "broad, remedial goals," encompasses a "wide diversity" of claims, and is part of the "general corpus of discrimination law." Therefore, under the logic of *Morse* Title III claims must be brought within the three-year period that

applies to § 1983 actions. *Accord, e.g., Soignier v. American Bd. of Plastic Surgery,* 92 F.3d 547 (7th Cir.1996) (holding that Title III claims are governed by the state limitations period applicable to personal injury actions), *Doukas v. Metropolitan Life Ins. Co.,* 882 F.Supp. 1197 (D.N.H.1995) (same); *Independent Hous, Servs. of San Francisco v. Fillmore Ctr. Assocs.,* 840 F.Supp. 1328 (N.D.Cal.1993) (same).

\*6 Hunt's Title III claim and his § 504 claim share the same factual predicate, and both claims must be brought within three years of accrual. Therefore, the conclusion that Hunt's RA claim is in part timebarred, *see supra* at 8, is controlling, and Hunt's ADA claim is similarly time-barred to the extent that it is based on the Board's refusal to provide a quadruple time accommodation.

Third, the Board contends that Hunt's request for damages should be stricken from the amended complaint because damages can not be awarded under Title III. As noted above, the remedies available under Title III are those that are available under 42 U.S.C. § 2000(a)(3)(a),*See*42 U.S.C. § 12188(a)(1). Under § 2000(a)(3)(a), damages are unavailable to private plaintiffs. *See Newman v. Piggie Park Enterprise, Inc.,* 390 U.S. 400, 401-02 (1968). Therefore, damages are also not available to private plaintiffs under Title III. *See, e.g., Proctor v. Prince George's Hosp. Ctr.,* 32 F.Supp.2d 820, 824 (D.Md.1998); *Jairath v. Dyer,* 972 F.Supp. 1461, 1465 (N.D.Ga.1997) (collecting cases), *vacated on other grounds,* 154 F.3d 1280 (11th Cir.1998); *see also* 135 Cong. Rec. 19,855 (1989) (remarks of Senator Harkin, chief Senate sponsor of the ADA) ("Title III... expressly limits relief to equitable remedies").

Hunt argues that damages are recoverable "under Title IV of the ADA in cases where a party 'discriminate[s] against any individual because such individual has opposed any act or practice prohibited by the [ADA]' or 'interfere[s] with any individual in the exercise or enjoyment ... of any right granted or protected by the ADA." ' (10/5/99 Mem.

of Law at 14-15) (quoting 42 U.S.C. § 12203(a) and § 12203(b)) (brackets in plaintiff's memorandum) However, there is no reference to Title IV in the amended complaint, and with good reason: Hunt has not stated a claim for its violation. Nor is there any suggestion in either of the complaints that the Board retaliated against Hunt, *i.e.,* that Hunt "opposed" an act prohibited by the ADA and that the Board discriminated against him because of this opposition.

Hunt's contention that damages are available to him under § 12203(b) necessarily rests on the assumption that an entity "interfere[s]" with a person in the exercise of his ADA rights whenever it violates those rights. Otherwise, there could be no plausible basis for arguing from § 12203(b) that damages are available in a case such as this one, in which little more is alleged than that plaintiff asked for an accommodation and defendant refused to provide it.

However, this expansive interpretation of "interfere[s]" is untenable. First, Hunt's reading would create a contradiction between Title III and § 12203(b). Under Title III, damages are not available to a private plaintiff simply because he is improperly denied a requested accommodation. *See supra* at 15. However, under Hunt's interpretation of § 12203(b) damages are available in precisely that situation.

*7 Second, Hunt's interpretation focuses on the word "interfere[s]" without reference to its context. Section 12203(b) states that "[i]t shall be unlawful to *coerce, intimidate, threaten, or interfere* with any individual in the exercise or enjoyment of ... any right granted or protected by [the ADA]."42 U.S.C. § 12203(b) (emphasis added)."Where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." 2A Sutherland, *Statutes and Statutory Construction* § 47.17 (5th ed.1991). Here, this canon requires construing "interfere" with reference to "coerce," "intimidate," and "threaten" such that

"interfer[ing]" with a person means doing something more than merely violating his ADA rights-something like "coerc[ing]," "intimidat[ing]," or "threaten[ing]" him in the exercise of those rights. In this case, there is no allegation that the Board did anything of the kind.

### III. Hunt's Claims Against the College

Hunt claims that the College violated both § 504 and Title III by (1) requiring him to pass the Examination by a certain date; (2) permitting students who failed the Examination to graduate with an M .D., but not allowing Hunt to do so "because ... [he] filed a complaint" with HHS in 1987; (3) dismissing Hunt based on the results of the Examination, which the College "knew [was] taken without the benefit of reasonable accommodations"; and (4) denying his "request to have the aforesaid violations reversed."(Am.Compl.¶ ¶ 24-35) Moreover, Hunt claims that the College breached the 1988 settlement agreement because that agreement "mandated that [the College] ... count[ ] only accommodated attempts."(*Id.* ¶ 38) In response, the College makes four arguments.

First, the College contends that the ADA claim must be dismissed because Hunt did not notify state or local authorities before filing his complaint. I have already rejected this argument. *See supra* at 12.

Second, the College asserts that Hunt has not stated either an RA claim or an ADA claim because the Board, and not the College, administers the Examination. However, the College was not absolved of its responsibilities under the relevant statutes simply because it did not itself administer the Examination. *See* 45 C.F.R. § 84.4(b)(4) ("A recipient [of federal financial assistance] may not, directly *or through contractual or other arrangements,* utilize criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, [or] (ii) that have the purpose or effect of defeating or

substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons[.]") (emphasis added); *see also id.* § 84.44(c).[FN3]

> FN3. The above-referenced regulations concern the RA. Hunt contends that these regulations apply also to the ADA. (10/5/99 Mem. of Law at 15) (citing 42 U.S.C. § 12201(a)) The College does not dispute this contention, and thus has conceded the point.

Third, the College argues that the RA and ADA claims are time-barred because they accrued on February 13, 1995, when the College told Hunt that he would not receive a degree unless he passed the Examination the next time it was offered. In support of this argument, the College contends that the letter was an act within the meaning of *Ricks,* and that what followed between Hunt and the College was merely a consequence of that act.

*8 To the extent that Hunt's RA and ADA claims are based on the College's forcing him to take and pass the Examination by a certain time (Am. Compl ¶ 15, 28(b)), this argument is valid and Hunt's claims are time-barred. However, Hunt's other allegations-that he was not given a rest period and that he was retaliated against-can not be characterized as consequences of his having been required to pass the Examination by a particular date. These allegations do not depend on the February 13, 1995 letter, and to the extent that Hunt's ADA and RA claims are derived from these allegations they are not time-barred.[FN4]

> FN4. Hunt argues that the College violated § 504 and Title III on a "continuing" basis such that none of his claims are time-barred. However, the "continuing violations" doctrine applies only to "claims of discriminatory acts committed *under an ongoing policy of discrimination...* [such that] multiple incidents of discrimination, even similar ones, that are not the result of

a discriminatory policy or mechanism do not amount to a continuing violation." *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 765 (2d Cir.1998) (internal quotation marks and citation omitted, emphasis in original). Here, Hunt has not alleged that the College's actions were the product of a discriminatory mechanism, or that they were part of an ongoing policy of discrimination.

Fourth, the College argues that it is not liable for breach of the 1988 settlement agreement because Hunt breached another portion of the agreement, which required him to complete his coursework years before he allegedly did so. *Compare* Settlement Agreement ¶ 11 (stating that Hunt's academic requirements must be completed by December 31, 1990) *with* Am. Compl. ¶ (stating that Hunt's academic requirements were completed "[i]n or around January 1992"). In response, Hunt contends that the College "expressly waived [this] condition" and thus cannot rely upon it. (10/5/99 Mem. of Law at 17) However, "[t]he general rule ... is that a plaintiff may not show waiver of performance without pleading the same and alleging the facts and circumstances constituting the waiver." *R.J. Marshall, Inc. v. Turner Constr. Co.,* 139 N.Y.S.2d 55, 58 (Sup.Ct.1955) (citation omitted); *seealso* 22A N.Y. Jur. Contracts § 370. In this case, Hunt has neither pleaded waiver of performance, nor alleged any of the facts that purportedly establish that there has been such a waiver. Anticipating this difficulty, Hunt notes that he has composed the proposed second amended complaint to avoid this problem. (11/5/99 Mem. of Law at 18) However, such revisions are irrelevant to the question of whether the amended complaint contains allegations as to waiver of performance. It does not. Accordingly, the breach of contract claim must be dismissed.

### IV. Hunt's Cross-Motion

Hunt filed his original complaint *prose,* and in

March 1999, an attorney took Hunt's case on a *probono* basis and filed the amended complaint. Defendants filed their Rule 12(b) motions, and "[i]n preparing the opposition thereto, [Hunt] related to [his attorney] additional information that supported the assertion of ... additional claims."(10/5/99 Mem. of Law at 19) Hunt now moves to file a second amended complaint that contains the "additional information ... [and] additional claims."

I see no reason to deny the motion. There are no allegations that Hunt or his attorney dragged their feet or have proceeded in bad faith; defendants do not contend that they will be prejudiced by the filing of another complaint; and although Hunt has already filed two complaints, as he was permitted to do as of right under Fed.R.Civ.P. 15(a), only one of those complaints was filed with the benefit of an attorney. Accordingly, Hunt's motion to file a second amended complaint is granted.[FN5]*Seegenerally Foman v. Davis,* 371 U.S. 178, 182 (1962) (holding that leave to amend should be " 'freely given' " unless there is an "apparent reason" for not doing so, "such as undue delay, bad faith or dilatory motive on the part of the movant [or] ... undue prejudice to the opposing party") (quoting Fed.R.Civ.P. 15(a)).

> FN5. Defendants argue that Hunt's "additional claims" are not meritorious. *See,e.g.,* (10/10/99 Mem. of Law) (making this argument). If a defendant believes that such is the case, it is free to file a motion to dismiss the second amended complaint.

\*9 For the reasons stated above, the Board's Rule 12(b) motions are granted in part and denied in part as follows: (1) its Rule 12(b)(6) motion to dismiss the RA claim is converted into a summary judgment motion and judgment is reserved (*supra* at 5); (2) the RA and ADA claims are time-barred to the extent that they depend on the Board's failure to provide "quadruple time" (*supra* at 8, 14) (3) the motion to strike Hunt's request for punitive damages as to his RA claim is denied (*supra* at 9); (4) the Rule 12(b)(1) motion to dismiss the ADA claim

is denied; and (5) Hunt's request for damages as to his ADA claim is stricken (*supra* at 15).

The College's Rule 12(b) motions are granted in part and denied in part as follows: (1) the Rule 12(b)(1) motion to dismiss the ADA claims is denied (*supra* at 18); (2) the Rule 12(b)(6) motion to dismiss the RA and ADA claims for failure to state a claim is denied (*supra* at 18); (3) the RA and ADA claims are time-barred to the extent that they depend on Hunt's having been compelled to take and pass the Examination by a certain date (*supra* at 19); (4) the breach of contract claim is dismissed without prejudice (*supra* at 21).

Finally, Hunt's cross-motion to file a second amended complaint is granted (*supra* at 22).

S.D.N.Y.,2000.
Hunt v. Meharry Medical College
Not Reported in F.Supp.2d, 2000 WL 739551 (S.D.N.Y.), 18 NDLR P 152

END OF DOCUMENT

**TAB 3**

Slip Copy                                                                    Page 1
Slip Copy, 2008 WL 4489796 (E.D.N.Y.)
(Cite as: 2008 WL 4489796 (E.D.N.Y.))

Only the Westlaw citation is currently available.
United States District Court, E.D. New York.
Shirley A. Zuri McKIE, Plaintiff,
v.
LAGUARDIA COMMUNITY COLLEGE, Defendant.

**No. 04-CV-5555 (RRM)(MDG).**

Sept. 30, 2008.

Lee Nuwesra, Law Office of Lee Nuwesra, New York, NY, for Plaintiff.
Christopher Aaron Seacord, New York City Law Department, New York, NY, for Defendant.

### *MEMORANDUM & ORDER*

MAUSKOPF, District Judge.

*1 In July 2003, Plaintiff Shirley A. Zuri McKie, an African-American college administrator, was terminated from her employment with Defendant La-Guardia Community College ("LaGuardia"). McKie now brings a single federal civil rights claim for racial discrimination pursuant to 42 U.S.C. § 1981 ("Section 1981"), together with supplemental state law claims for race and age-based discrimination under the New York State Human Rights Law, Executive Law §§ 290 *et seq.,* and the New York City Human Rights Law, Administrative Code §§ 8-101*et seq.* LaGuardia moves for summary judgment on all claims. For the reasons that follow: (a) summary judgment is GRANTED as to the Section 1981 claims; and (b) the Court declines to exercise supplemental jurisdiction over the remaining state law claims.

### FACTUAL BACKGROUND

In September 1995, McKie, assumed a fulltime, tenure-track position as director of LaGuardia's Theatre Department.[FN1]Pursuant to the terms of LaGuardia's Collective Bargaining Agreement (the "CBA"), that position was subject to reappointment. In accordance with the CBA, McKie was reappointed to successive one-year terms beginning July 1996, 1997, and 1998, and then a two-year term for 1999 through 2001.

> FN1. Prior to assuming her tenure-track position, LaGuardia first hired McKie in or about late-1992, as an outside fundraising consultant.

In August 2001, LaGuardia underwent a change of administration, as Dr. Gail Mellow was named president of LaGuardia. Due to this change, McKie's reappointment for the 2001 through 2003 term, her final renewable term prior to an award of tenured status, was delayed. Mellow ultimately did recommend McKie for reappointment on August 14, 2001. In January 2002, McKie expressed her desire to leave the Theatre Department to focus on fundraising generally for LaGuardia, an area in which she had substantial prior work experience. Mellow granted that request, effective July 1, 2002. On McKie's recommendation, her former duties in the Theatre Department were assumed by her younger, non-black subordinate, Barbara Carson, although the parties disagree as to whether Carson was to undertake those duties permanently or on an interim basis. McKie's reassignment to her fundraising role ultimately led to her separation from LaGuardia, and is the source of much of the present dispute.

LaGuardia argues that McKie's performance in the fundraising role was unsatisfactory. Specifically, LaGuardia alleges that McKie failed to work effectively with its then-fundraising consultant, Jose Orengo, a younger, Hispanic man, to improve LaGuardia's fundraising efforts. Based in part on that assessment, Mellow, per LaGuardia policy, recommended that the City University of New York Board of Trustees-the governing body responsible for rendering employment decisions with respect to LaGuardia faculty-not renew McKie's fundraising employment, thereby denying her tenured status

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

and effectively ending her LaGuardia career. Mellow's negative recommendation is predicated ostensibly upon two adverse performance evaluations for McKie, each drafted by McKie's alleged superior, Dr. Audrey Harrigan.

*2 McKie denies that her termination was performance-based and claims that the grounds for her termination were pretextual. In support, McKie cites numerous examples of alleged irregularities in the evaluation process, including: (1) failing to evaluate her on an annual basis as contractually required; (2) back-dating "belated" evaluations to appear in compliance with CBA provisions; and (3) placing those evaluations in her file only after Mellow's decision to recommend against McKie's reappointment.

Apart from procedural irregularities in LaGuardia's evaluation process, McKie contends that the events surrounding her actual termination evince discrimination. McKie complains that LaGuardia placed her between the proverbial "rock and hard place," deliberately passing her over for a fulltime fundraising position, while choreographing circumstances to deny her an opportunity to return to her previous position with the Theatre Department.

With respect to the fundraising role, it is uncontested that Mellow appointed Orengo-rather than McKie-to a fulltime, tenure-track fundraising position in February 2003. McKie claims that despite her stated desire for such a position and her superior qualifications, it was granted to Orengo without an open search process and despite a University-wide hiring freeze. On that basis, McKie alleges that Mellow effected a preconceived plan to discriminatorily deny her a fulltime fundraising position in favor of a younger, non-black candidate.

Similarly, McKie claims that when she was denied further fundraising employment, she was inexplicably barred from resuming her Theatre Department duties on the theory that she had surrendered her Theatre Department position in assuming the fundraising role, a claim McKie denies. That she was

not permitted to return to the Theatre Department is, in McKie's view, further evidence that LaGuardia deliberately manipulated the circumstances to force her removal. McKie further alleges that her Theatre Department duties were permanently assumed by an allegedly under-qualified candidate, Barbara Carson, McKie's younger, non-black subordinate.

## DISCUSSION

### *Summary Judgment Standard*

Summary judgment is appropriate only where there exists no genuine issue of material fact, and the onus to establish the absence of such factual issues falls squarely upon LaGuardia as the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Upon such showing, the onus shifts to McKie to present evidence sufficient to satisfy every element of the claim. In so doing, McKie is required to go beyond the pleadings and "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324.In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in McKie's favor. *Anderson v. Liberty Lobby, Inc.,* 47 U.S. 242, 249-50 (1986).[FN2]

> FN2. To the extent that a LaGuardia's motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure is based entirely on McKie's Complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Rule 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted], *accord Katz v. Molic.* 128

F.R.D. 35, 37-38 (S.D.N.Y.1989) ( "This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."); *see also Jackson v. Onondaga County,* 549 F.Supp.2d 204, 211 (N.D.N.Y.2008).

## Section 1981 Liability

*3 Neither McKie's Complaint, nor her submissions on summary judgment are sufficient to support a claim for Section 1981 liability against LaGuardia.Section 1981 provides, in pertinent part, that "all persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens ...." 42 U.S.C. § 1981(a). "This section this outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment...." *Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir.2004); *see, e.g., Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 68-69 (2d Cir.2000). To establish a Section 1981 claim, plaintiff must show: "(1) that she is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendants; and (3) that the discrimination concerned one or more of the activities enumerated in Section 1981." *Lautere v. Int'l Bus. Mach. Corp.,* 216 F.3d 258, 261 (2d Cir.2000).

However, because Section 1981 does not and cannot, within constitutional bounds, impose vicarious liability on municipalities; as such, Section 1981 liability against such entities can be asserted only pursuant to 42 U.S.C. § 1983 ("Section 1983"), and even then only in accordance with the well-established requirements promulgated in *Monell v. New York City Dep't of Soc. Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).See *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *McCoy v. City of New York,* 131 F.Supp.2d 363, 377-78 (2001)

(citing *Philippeaux v. N. Cent. Bronx Hosp.,* 871 F.Supp. 640, 653-56 (1994) (dismissing Section 1981 claim for failure to assert Section 1983 claim, holding: "... [T]o assert a Section 1981 claim against municipal entities ... plaintiff must allege a violation of Section 1983 and meet the requirements of *Monell.*" )). Thus, where, as here, the defendant sued is a municipality or municipal agency,[FN3] plaintiff must also show that the claimed violations of his or her constitutional rights occurred as a result of a municipal policy or custom. *Patterson,* 375 F.3d at 226.

> FN3. As a community college that is part of the City University of New York system, LaGuardia is a municipal entity subject to liability under 42 U.S.C. § 1983. *See Clissuras v. City Univ. of New York,* 359 F.3d 79, 81-82 (2d Cir.2004) (citing *Pikulin v. City Univ. of New York,* 176 F.3d 598, 600 (2d Cir.1991); *Hester-Bey v. New York City Tech. Coll.,* No. 98-CV-5129, 2000 WL 488484, at *2 (E.D.N.Y. March 22, 2000).

Under *Monell,* an actionable municipal policy exists where "(1) the [c]ity has promulgated a formal rule advocating or supporting the contested conduct, or (2) a single act is taken by a municipal employee who, as a matter of state law, has final policymaking authority in the area in which the action was taken." *Edwards v. City of New York,* 03 Civ. 9407(PAC), 2005 WL 3466009, at *10 (S.D.N.Y. Dec. 19, 2005) (internal quotations omitted). An actionable custom exists where the applicable practice is "so widespread as to have the force of law." *Board of County Comm'rs v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (citing *Monell,* 436 U.S. at 690-91). Such a custom need not have formal approval, but plaintiff must demonstrate that it is a continuing practice. *See Davis v. City of New York,* 228 F.Supp.2d 327, 337 (S.D.N.Y.2007) (citing *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)).

**\*4** Here, although McKie's Complaint asserts the elements of a Section 1981 claim, it indisputably fails to assert an express cause of action under Section 1983. That failure alone warrants dismissal of her Section 1981 claim. *McCoy,* 131 F.Supp.2d at 378. However, even if municipal liability for Section 1981 were not dependent upon the express assertion of a Section 1983 cause of action, McKie must necessarily show that the conduct complained of was pursuant to an official municipal policy or practice as set forth in *Monell* or undertaken by a municipal employee with final policymaking authority. *See, e.g., Birmingham v. Ogden,* 70 F.Supp.2d 353, 373 (S.D.N.Y.1999). As discussed below, Plaintiff has not established, and cannot establish, municipal liability against LaGuardia under either theory.

As an initial matter, nowhere in McKie's Complaint does she allege that LaGuardia maintained a custom, policy or practice of discriminating against individuals on the basis of race, and nowhere does she describe LaGuardia's actions in terms sufficient to maintain a *Monell* claim-a fact which by itself permits summary dismissal. *See Birmingham,* 70 F.Supp. at 373. Even considering Plaintiff's *Monell* arguments, raised for the first time in her opposition to summary judgment, this Court finds that, viewing all of the facts in the light most favorable to McKie, she fails to allege any evidence to permit a reasonable jury to conclude that she was terminated pursuant to a municipal policy, practice or custom as required under *Monell.See Miller v. New York City Health & Hosp. Corp.,* 00 Civ. 140(PKC), 2005 WL 2022016, at \*4 (S.D.N.Y. Aug. 22, 2005) (granting summary judgment on Section 1981 claim because plaintiff provided no evidence of municipal policy or custom); *Hawkins v. City of New York,* 99 Civ. 11704(RWS), 2005 WL 1861855, at \*17 (S.D.N.Y. Aug. 4, 2005) (same); *Richards v. Calvet,* 99 Civ. 12172(RJH), 2005 WL 743251, at \*13 (S.D.N.Y. Mar. 31, 2005) (same).

Indeed, McKie's only basis to assert *Monell* liability

is her conclusory argument that Dr. Mellow is a policy maker, and, as such, her employment decisions necessarily rise to the level of municipal policy. While the act of a policy maker may, indeed, confer municipal liability under the appropriate circumstances (see, *Pembaur v. City of Cincinnati,* 475 U.S. 469, 479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)), the undisputed facts of this case establish that Dr. Mellow does not have final decisionmaking authority with respect to hiring or termination practices, procedures or decisions at LaGuardia or in the City University of New York system. While those procedures are set forth in the CBA, final employment decisions with respect to LaGuardia faculty members rests exclusively with the City University of New York Board of Trustees. *See, e.g.,* Defendant's Exhibit M (August 2001 letter recommending McKie's appointment); Defendant's Exhibit Z (February 2003 letter recommending that McKie not be reappointed). Thus, Plaintiff has not, and cannot, establish any facts to support municipal liability under *Monell.See Birmingham,* 70 F.Supp.2d at 373. As such, Plaintiff cannot sustain her claim for discrimination under Section 1981.

### State Claims

**\*5** Having concluded that McKie's Section 1981 claim must be dismissed, we decline to exercise supplemental jurisdiction over her remaining claims under the New York State Human Rights Law and the New York City Human Rights Law. *See* 28 U.S.C. § 1367(c)(3); *Motorola Credit Corp. v. Uzan,* 388 F.3d 39, 55-57 (2d Cir.2004); *Murray v. Visiting Nurse Svcs. of N.Y.,* 528 F.Supp.2d 257, 280-81 (S.D.N.Y.2007) (collecting cases).

### CONCLUSION

For the reasons set forth above, LaGuardia's motion for summary judgment is GRANTED. The Court declines to exercise supplemental jurisdiction over the remaining state law claims. As such, this matter is DISMISSED, and the Clerk of Court is directed

to close the file.

SO ORDERED.

E.D.N.Y.,2008.
McKie v. Laguardia Community College
Slip Copy, 2008 WL 4489796 (E.D.N.Y.)

END OF DOCUMENT

**TAB 4**

C
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Jessica MCKINNON, Plaintiff,
v.
HERMES OF PARIS, INC. Defendant.
No. 06 Civ. 1001 NRB.

April 10, 2007.

MEMORANDUM AND ORDER

BUCHWALD, J.
*1 Plaintiff Jessica McKinnon ("plaintiff" or
"McKinnon"), a former employee of defendant
Hermes of Paris, Inc. ("defendant" or "Hermes"),
has filed this action pursuant to 42 U.S.C. § 1981
and New York state law, alleging that defendant:
(1) breached a previous settlement agreement with
plaintiff, and (2) ran afoul of Section 1981 by tak-
ing retaliatory action against plaintiff because
plaintiff had previously filed a race discrimination
lawsuit against defendant.

Defendant has moved pursuant to Fed.R.Civ.P.
12(c) and 12(b)(1) to dismiss plaintiff's entire com-
plaint. For the reasons stated below, defendant's
motion is granted.

BACKGROUND [FN1]

FN1. The facts set forth below are taken
from plaintiff's complaint and the parties'
briefs and are not in dispute.

The instant dispute has its origins in a lawsuit filed
by plaintiff in 2004 in which she alleged that she
was subjected to discrimination during the course
of her employment with defendant. That dispute
resulted in a settlement agreement ("Agreement"),
executed on June 6, 2005 which states, in relevant
part:

The Company [Hermes] agrees that Maureen
Baltazar and Elfie Campbell will not disparage,
or make any public statements, to the press or
otherwise, that disparage or might tend to dispar-
age you [McKinnon]. You agree that you will
direct any requests for a reference to the Manager
of Human Resources, and not to any other em-
ployee of Hermes, at the Madison Avenue store,
corporate office or elsewhere. The Manager of
Human Resources will solely confirm your dates
of employment and last position with Hermes.

Plaintiff subsequently interviewed with Burberry,
Bergdorf Goodman, and Bloomingdale's, all high-
end retail establishments, but was not offered any
positions. She then "became suspicious when these
positive interviews were followed by rejections,
and only after [she] told the HR managers who to
contact for a reference at Hermes."Affidavit of Jes-
sica McKinnon ("McKinnon Aff.") ¶ 13. To be
clear, plaintiff states "[o]n information and belief"
that Hermes has provided "false and misleading in-
formation to many of plaintiff's prospective em-
ployers," Complaint ¶ 17; she does not proffer any
concrete factual allegations that this in fact was the
case.

Thereafter, plaintiff hired Documented Reference
Check ("DRC"), a California-based background
checking company, to call Hermes posing as a po-
tential employer of plaintiff seeking a reference. On
October 20, 2005, Wendy Casey of DRC spoke
with Michael Garmon, defendant's then-Director of
Human Resources (the "DRC call"). The brief con-
versation in its entirety, consisted of the following
exchange:

WENDY CASEY: ... Mr. Chavez transferred me
over to you regarding an employment verification
of Jessica McKinnon.

MICHAEL GARMON: Yes.

WENDY CASEY: Okay. What was her title?

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

MICHAEL GARMON: Well, let me see if I can pull her file really quick.

WENDY CASEY: Okay.

MICHAEL GARMON: Okay. She has a very large file.

WENDY CASEY: Really? Why would her file be so enormous?

MICHAEL GARMON: Well, I wasn't actually here when she was here.

*2 WENDY CASEY: Got it. Why is her file so enormous?

MICHAEL GARMON: It looks like she was hired September 11, 1991 and she left in August of 2004.

WENDY CASEY: What day in August?

MICHAEL GARMON: I don't have an exact-let me see if I can pull it from the payroll register. Hold on.

WENDY CASEY: Okay.

MICHAEL GARMON: Did she give you a separation date?

WENDY CASEY: I show January of '05.

MICHAEL GARMON: All right. Let me pull 2005.

WENDY CASEY: Okay.

MICHAEL GARMON: On payroll it's August 4, 2004.

WENDY CASEY: Well, maybe she lied then. What was her title?

MICHAEL GARMON: She was in sales.

WENDY CASEY: Is she eligible for rehire?

MICHAEL GARMON: We don't verify that. Just dates of employment and position held.

WENDY CASEY: Got it. You mentioned that she had a large file. Why is her file so large?

MICHAEL GARMON: We only provide dates and title. All right?

WENDY CASEY: And the size of an employees [sic] personnel file, apparently. I will make a note of our discussion and I thank you for your time.

MICHAEL GARMON: You're welcome. Bye.

Plaintiff alleges that "very large file" is "human resources code for 'problem employee,' " Compl. ¶ 12. Plaintiff's counsel, by letter to the Court dated December 15, 2006, confirmed that this conversation was contemporaneously transcribed by a court stenographer; it was not recorded.

DISCUSSION

I. Standard of Review

Defendant moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the purposes of this motion, we accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party, here the plaintiff. *Patel v. Searles,* 305 F.3d 130, 134-35 (2d Cir.2002) (internal quotation marks and citations omitted); *Burnette v. Carothers,* 192 F.3d 52, 56 (2d Cir.1999). We may also consider documents attached as exhibits or incorporated by reference in the pleadings; matters for which judicial notice can be taken, *Samuels v. Air Trasport Local 504,* 992 F.2d 12, 15 (2d Cir.1993); and any document that is neither attached nor incorporated by reference if plaintiff "solely relies" on it and it is "integral to the complaint." *International Audiotext Network, Inc. v. American Tel. and Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995). Because the transcript of the October

20, 2005 DRC call ("transcript") fits within this last category, we may properly consider it at this stage of the proceedings without converting this motion to one for summary judgment. *Id.*

The same standard is used under Rule 12(c) and Rule 12(b)(6). *Burnette v. Carothers,* 192 F.3d 52, 56 (2d Cir.1999). Thus, "the well-pleaded material allegations of the complaint are taken as admitted; but conclusions of law or unwarranted deductions of fact are not admitted." *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 (2d Cir.1994) (citing 2A Moore & Lucas, Moore's Federal Practice ¶ 12.08, at 2266-69 (2d ed.1984)) (internal quotations omitted). While a plaintiff need not include evidentiary detail, she must allege a factual predicate that is concrete enough to warrant further proceedings. *Taylor v. Maxxim Medical, Inc.,* No. Civ. 399 CV 338(AHN), 2001 WL 290639, at *1 (D.Conn. Feb. 27, 2001) (citing Moore's). Additionally, Section 1981 claims "are plainly insufficient unless they contain at least some allegations of fact indicating a deprivation of civil rights." *Powell v. Jarvis,* 460 F.2d 551, 553 (2d Cir.1972).

## II. Discussion

**\*3** At its essence, plaintiff's complaint contains two separate allegations of wrongdoing by defendant: first, that the DRC call itself constituted an actionable wrong, and second, that "defendant has provided similarly false and misleading information to many of plaintiff's prospective employers."Compl. ¶ 17. Neither allegation states a claim upon which relief can be granted.

### A. The DRC Call

Plaintiff's claim directed to the DRC call raises a threshold issue of admissibility, since California Penal Code § 631 prohibits the secret monitoring of conversations by third parties.[FN2]In *Ribas v. Clark,* 696 P.2d 637, 641, 38 Cal.3d 355, 360 (Cal.1985), in which defendant listened in on an ex-

tension telephone to a conversation between plaintiff and his former wife, the California Supreme Court addressed the issue of whether Section 631's coverage extended beyond electronic recording:

> FN2.Section 631(a) provides in relevant part:
>
> Any person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500), or by imprisonment in the county jail not exceeding one year, or by imprisonment in the state prison, or by both a fine and imprisonment in the county jail or in the state prison.

The Legislature could reasonably have contemplated that [Section 631(a) ] would prohibit the

type of surreptitious monitoring of private conversations alleged here, and there is no indication that it did not. Indeed, it is probable that the Legislature viewed section 631 as a means of proscribing attempts to circumvent other aspects of the Privacy Act, e.g., by requesting a secretary to secretly transcribe a conversation over an extension, rather than tape recording it in violation of section 632.

*Id.* at 361.Because DRC was located in California, Compl. ¶ 11, they are subject to this law. It would therefore appear that there is a serious issue about whether the transcript was illegally obtained, and, as such, whether it could be received in evidence.[FN3]

> FN3. Plaintiff argues that regardless of the transcript's admissibility, the DRC investigator who placed the call will be able to testify as to the conversation under Federal Rule of Evidence 801(d)(2)(D). Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Judgment on the Pleadings ("Opp'n") at 11. Indeed, a California appeals court has upheld the use of inadmissible notes prepared from tape recordings in violation of Penal Code Section 632 to refresh a witness' recollection where that witness was the person to whom the remarks were addressed. *See Frio v. Superior Court,* 250 Cal.Rptr. 819 (Cal.Ct.App.1988). Obviously, such an end-run around the statute may not withstand higher court analysis.

However, because this issue was not thoroughly briefed, and because irrespective of the admissibility of this transcript, this claim is wholly lacking on the merits, we do not reach this issue of California law. To state out a viable claim for breach of contract under New York law, a complaint needs to allege (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages. *Eternity Global Master Fund Ltd. v. Morgan*

*Guar. Trust Co. of New York,* 375 F.3d 168, 177 (2d Cir.2004). Plaintiff can demonstrate neither the elements of breach nor damages.

A review of the transcript demonstrates that defendant did not breach the terms of the Agreement with plaintiff. The only portion of the transcript that plaintiff relies on is Garmon's mention, in an entirely off-handed comment, that plaintiff had a "very large file." The extent of Garmon's "mens rea", as it were, to disparage plaintiff is demonstrated by his responses to the goading by Casey, the DRC employee making the call. When asked twice why plaintiff's file is "so enormous", Garmon answered, sequentially, "Well, I wasn't actually here when she was here," and "It looks like she was hired September 11, 1991 and she left in August of 2004 ."When asked for a third time why plaintiff's file is so large, he answered bluntly, "We only provide dates and title."These are not the words of a person bent on sullying another's reputation. To the contrary, they show marked adherence to the terms of the Agreement. In short, there is simply no wrongdoing on the part of Garmon, and thus by defendant, in this call.

*4 Moreover, plaintiff does not allege any recoverable damages stemming from the DRC call. DRC, of course, was not an actual employer; it naturally follows that plaintiff suffered no possible loss of potential employment as a result of the alleged disparaging comment. Plaintiff's other claims for damages for "impairment and damage to her good name and reputation" and "mental anguish and emotional injury," Compl. ¶¶ 21-22 are not available for breach of contract.

B. The Putative Other Prospective Employers

Plaintiff fares no better in her quest for a claim by asserting that "similarly false and misleading information" was provided to plaintiff's prospective employers. Compl. ¶ 11. At the outset, "similar information" would not be actionable, for the reasons discussed *supra.*More problematic is that plaintiff

asks us to undertake a series of unsupported leaps of faith in logic in order to state a viable claim. Specifically, plaintiff's claim turns on the theory that: (1) Hermes harbored "lingering retaliatory animus" against plaintiff after settlement of the Agreement; (2) Michael Garmon, who was not employed at Hermes during plaintiff's tenure both knew of, and shared in, this animus; (3) plaintiff's prospective employers called Garmon and spoke with him; and (4) Garmon disparaged plaintiff to these potential employers.

In other words, plaintiff seeks to transform a passing reference to a "very large file" [FN4] into repeated violations of the Agreement, each of which was motivated by a pattern of discriminatory animus. There is not one scintilla of evidence to connect this benign starting point with the finish line plaintiff seeks to reach. It is precisely such unwarranted deductions of fact that cannot survive scrutiny on a motion for judgment on the pleadings. *See First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d at 771.

> FN4. This verbalization can easily be understood as a comment made by the speaker to explain a delay in retrieval of information from a file with which he was not familiar.

## CONCLUSION

Because plaintiff has not alleged any wrongdoing by defendant, her claims are dismissed. Her request to amend her complaint is denied.[FN5]

> FN5. Plaintiff was given notice of defendant's intention to move for judgment on the pleadings by defendant's letter to the Court dated September 29, 2006. In that letter, defendant summarized why it believed these causes of action were legally deficient. Thus, as of that date, plaintiff had notice of defendant's intentions. Moreover, a conference call with the parties and the

Court on December 28, 2006 made defendant's position even clearer. Plaintiff had the opportunity to amend her complaint at that time. However, having not availed herself of these opportunities, and by requiring defendant to incur the legal fees-and defendant's counsel to expend the time-required to file this motion, plaintiff has forfeited her right to amend the complaint.

Moreover, plaintiff's request fails as a procedural matter as well. First, "[t]he fact that plaintiffs' request to amend was made informally in response to defendants' motions to dismiss is by itself ground for denying the request." *Bankruptcy Trust of Gerard Sillam v. Refco Group, LLC,* No. 05 Civ. 10072(GEL), 2006 WL 2129786, at *4-5 (S.D.N.Y. July 28, 2006) (citing *In re Tamoxifen Citrate Antitrust Litig.,* 429 F.3d 370, 404 (2d Cir.2005)) (discussing situation in which plaintiff first sought leave to amend in its opposition brief). Denial of leave to amend is within the discretion of the district court.

Second, plaintiff's failure to attach the proposed amendment provides an independent basis for us to reject her request. Rule 7(b) requires that all motions "state with particularity the grounds therefore, and shall set forth the relief or order sought."Fed.R.Civ.P. 7(b)(1)."In the context of a motion to amend, this command generally requires a movant to supply a copy of the proposed amendment." *Bankruptcy Trust of Gerard Sillam,* 2006 WL 2129786, at *5 (citing *Smith v. Planas,* 151 F.R.D. 547, 550 (S.D.N.Y.1993))."Without an opportunity to review plaintiffs' proposed amended complaint, this Court is forced to rule on a hypothetical amended complaint that neither the Court nor defend-

ants [have] seen."*Id.* (internal quotations and citation omitted) (brackets in original).

SO ORDERED.

S.D.N.Y.,2007.
McKinnon v. Hermes of Paris, Inc.
Not Reported in F.Supp.2d, 2007 WL 1098707 (S.D.N.Y.)

END OF DOCUMENT

**TAB 5**

Not Reported in F.Supp.2d                                                                                     Page 1
Not Reported in F.Supp.2d, 2004 WL 2897945 (E.D.Pa.), 10 Wage & Hour Cas.2d (BNA) 577
**(Cite as: 2004 WL 2897945 (E.D.Pa.))**

**C**

United States District Court, E.D. Pennsylvania.
Matthew MICHELS Plaintiff,
v.
SUNOCO HOME COMFORT SERVICE, Scott
Cheek and Robert Young Defendants.
**No. Civ.A.04-1906.**

Dec. 13, 2004.

Thomas More Holland, Law Offices of Thomas
More Holland, Philadelphia, PA, for Plaintiff.
Christin E. Connolly, Ballard Spahr Andrews & In-
gersoll LLP, Philadelphia, PA, for Defendants.

*ORDER*

DUBOIS, J.
**\*1** AND NOW, this 10th day of December, 2004,
upon consideration of the Motion of Sonoco, Inc.,
D/B/A Sunoco Home Comfort Service, Scott
Cheek, and Robert Young to Dismiss Counts I and
IV of the Second Amended Complaint Pursuant to
Rule 12(b)(6) (Document No. 21, filed October 6,
2004), and Plaintiff's Response to Defendants' Mo-
tion to Dismiss Counts I and IV of Plaintiff's
Second Amended Complaint (Document No. 22,
filed October 18, 2004), and the related submis-
sions, IT IS ORDERED that the Motion of Sonoco,
Inc., D/B/A Sunoco Home Comfort Service, Scott
Cheek and Robert Young to Dismiss Counts I and
IV of the Second Amended Complaint Pursuant to
Rule 12(b)(6) is GRANTED and Counts I and IV of
plaintiff's Second Amended Complaint [FN1] are
DISMISSED. The case shall proceed on Counts III,
V, VI, VII, and VIII of the Second Amended Com-
plaint in accordance with the Scheduling Order of
August 26, 2004.

> FN1. The Court notes that plaintiff mis-
> takenly titled his Second Amended Com-
> plaint as "Amended Complaint."

*MEMORANDUM*

I. BACKGROUND

Plaintiff Matthew Michels filed an eight-count
Second Amended Complaint claiming that as a res-
ult of an alleged suspension from his employment,
and other action by defendant, his rights under vari-
ous state and federal laws were violated. In their
Motion, defendants seek dismissal of Counts I and
IV of plaintiff's Second Amended Complaint for
failure to state a claim upon which relief can be
granted pursuant to Federal Rule of Civil Procedure
12(b)(6). For the reasons set forth below, the Court
grants defendants Motion to Dismiss.

II. PROCEDURAL HISTORY

Plaintiff, an employee of defendant Sunoco Home
Comfort ("Sunoco"), filed a Complaint against his
employer and two of its employees, Scott Cheek
and Robert Young. Defendants filed a Motion to
Dismiss Counts I, II, V, and VIII of the Complaint.
Prior to deciding the Motion to Dismiss, this Court
granted a request by plaintiff to file an Amended
Complaint and denied defendants' Motion to Dis-
miss as moot. On June 16, 2004, plaintiff filed an
Amended Complaint. Defendants moved to dismiss
Counts I, II, V, and VIII of the Amended Com-
plaint. This Court granted defendant's Motion to
Dismiss to Count VIII of the Amended Complaint
which stated a claim for intentional infliction of
emotion distress. With respect to Counts I, II, and
IV of the Amended Complaint, the Court granted
defendants' Motion to Dismiss with leave to amend
those counts of the Amended Complaint.

On September 13, 2004, plaintiff filed a Second
Amended Complaint .[FN2]In this Complaint, Count
I alleges that defendants discriminated against
plaintiff on the basis of a disability in violation of
42 U.S.C § 12111 of the American with Disabilities
Act ("ADA") and 43 P.S. § 951 of the Pennsylvania

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Human Relations Act ("PHRA"). Count IV alleges that defendants unlawfully suspended plaintiff in violation of the Family and Medical Leave Act ("FMLA"). Plaintiff seeks compensatory and injunctive relief and attorneys' fees and costs.

> FN2. The Court notes that plaintiff mistakenly titled his Second Amended Complaint as "Amended Complaint."

On October 6, 2004, defendants moved to dismiss Counts I and IV of plaintiff's Second Amended Complaint under Federal Rule of Civil Procedure 12(b)(6).

## II. STANDARD OF REVIEW

*2 Rule 12(b)(6) of the federal rules of civil procedure provides that, in response to a pleading, a defense of "failure to state a claim upon which relief can be granted" may be raised by motion. Fed.R.Civ.P. 12(b)(6). In considering a motion to dismiss under Rule 12(b)(6), a court must take all well pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). Only those facts alleged in the complaint may be considered in deciding such a motion. *ALA, Inc. v. CCAIR, Inc.,* 29 F.3d 855, 859 (3d Cir.1994). A complaint should be dismissed if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). Therefore, the facts alleged in plaintiff's Second Amended Complaint are accepted as true in deciding this motion.

## III. DISCUSSION

### A. *ADA and PHRA claims-Count I*

This Court issued an Order on August 26, 2004, in which it dismissed plaintiff's claims for disability discrimination under the Americans with Disabilit-

ies Act ("ADA") and the Pennsylvania Human Relations Act ("PHRA"), but gave plaintiff leave to file and serve a second amended complaint. In granting defendant's Motion to Dismiss plaintiff's ADA and PHRA claims, the Court stated that plaintiff's claims under the ADA and the PHRA failed to state a claim of disability discrimination because the Amended Complaint contained insufficient facts to support a claim for disability discrimination as plaintiff did not even state the nature of his claimed disability or impairment.

Plaintiff filed a Second Amended Complaint on September 13, 2004. Defendants argue that Count I of the Second Amended Complaint should be dismissed because plaintiff has again failed to state a claim under the ADA and PHRA.[FN3]

> FN3. These claims were asserted in Counts I and II of plaintiff's Amended Complaint. The Second Amended Complaint does not contain a Count II.

Plaintiff's Second Amended Complaint fails to satisfy the pleading requirements for a claim of disability discrimination under the ADA and the PHRA [FN4]-he has not stated the nature of his claimed disability as directed by the Order of August 26, 2004. Plaintiff made only one change with respect to this claim-he substituted "mental impairment" in the Second Amended Complaint for "physical impairment" in the Amended Complaint. (Second Amended Compl. ¶ 22). That change is insufficient to state a cause of action under the ADA and the PHRA. Accordingly, Count I of plaintiff's Second Amended Complaint is dismissed.

> FN4. The Third Circuit treats claims under the PHRA, the state counterpart to the ADA, in the same manner. *See Kelly v. Drexel University,* 94 F.3d 102, 105 (3d Cir.1996).

### B. *FMLA Claim-Count IV*

In the same Order dated August 26, 2004, the Court

dismissed Count V of plaintiff's Amended Complaint for failure to state a claim under the FMLA. The Order stated that "plaintiff has not alleged ... that he is entitled to the protection of the FMLA because he has not alleged that he took any leave, or that any absences from his employment were subject to the FMLA."

Count IV of plaintiff's Second Amended Complaint asserts the same claim under the FMLA as did Count V of the first Amended Complaint. Plaintiff's Second Amended Complaint fails to correct the deficiencies identified by the Court in its Order of August 26, 2004.

*3 The FMLA entitles eligible employees to twelve weeks of unpaid leave during any twelve-month period if the employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee."29 U.S.C. § 2612(a)(1)(D). Courts recognize two causes of action under the FMLA: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his FMLA rights pursuant to 29 U .S.C. § 2615(a)(1), and retaliation claims under 29 U.S.C. § 2615(a)(2), in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act. *See, e.g., Sherrod v. Phila. Gas Works,* 57 Fed. Appx. 68, 72 (3d Cir.2003); *Bearley v. Friendly Ice Cream Corp.,* 322 F.Supp.2d 563, 571 (M.D.Pa.2004).

The only notable changes in the Second Amended Complaint is that plaintiff adds allegations that he was at times required to attend the Employment Assistance Program (EAP) for counseling during work hours, that he was suspended for "exercising these protected rights to take time to care for a serious health condition on a continuous or intermittent basis," and that he was not returned to a comparable position when he returned to work after his alleged suspension. (Second Amended Compl. at ¶¶ 49, 52, 53)

These allegations are insufficient to state a claim

under the FMLA. Plaintiff still has not alleged that any absences from his employment were subject to the FMLA. In addition, he fails to allege that he requested leave to attend the EAP counseling sessions. An employee who seeks FMLA-protected leave must give the employer adequate notice of the need for leave-30 days in advance for foreseeable leave, 29 U.S.C. § 2612(e)(1), or "as soon as practicable" for unforeseeable leave, 29 U.S.C. § 2612(e)(1).

Furthermore, to state a claim under the FMLA, plaintiff must identify a serious health condition, and he fails to do so. A serious health condition is defined in the FMLA as an illness, injury, impairment, or physical or mental condition that involves inpatient care in a hospital, hospice, or residential medical care facility, or continuing treatment by a health care provider. 29 U.S.C. § 2611(11). There are no facts alleged in the Second Amended Complaint sufficient to satisfy this requirement. In that Complaint, plaintiff asserts only that he "[took] time to care for a serious health condition" (Second Amended Compl. at ¶ 52). Determining whether an illness qualifies as a serious health condition for purposes of the FMLA is a legal question, which a plaintiff may not avoid "merely by alleging his condition to be so." *Haefling v. United Parcel Service, Inc.,* 169 F.3d 494, 499 (7th Cir.1999).

Finally, plaintiff does not set forth allegations sufficient to state a retaliation claim under the FMLA. To make out a prima facie case of retaliation under the FMLA, a plaintiff must allege that (1) he engaged in protected activity; (2) his employer took adverse action after or contemporaneous with his protected activity; and (3) a causal link exists between his protected activity and the employer's adverse action. *Abramson v. Wm. Patterson College of N.J.,* 260 F.3d 265, 286 (3d Cir.2001). Plaintiff has not satisfied the first part of this test-he has not alleged facts sufficient to demonstrate that he was entitled to protection under the FMLA. Moreover, he has not set forth any facts sufficient to establish a casual link existed between any FMLA-protected

leave and his suspension.

**\*4** For the reasons set forth above, defendants' Motion to Dismiss Count IV of plaintiff's Second Amended Complaint is granted.

E.D.Pa.,2004.

Michels v. Sunoco Home Comfort Service

Not Reported in F.Supp.2d, 2004 WL 2897945 (E.D.Pa.), 10 Wage & Hour Cas.2d (BNA) 577

END OF DOCUMENT