**TAB 6**

Slip Copy                                                                 Page 1
Slip Copy, 2008 WL 4443274 (N.D.N.Y.)
**(Cite as: 2008 WL 4443274 (N.D.N.Y.))**

Only the Westlaw citation is currently available.
United States District Court, N.D. New York.
Jose ORRACA, Plaintiff,
v.
C.O.R. PILATICH; C.O. Rios; C.O. LaForge;
C.O.R. Kleister; and C.O. Velez, Defendants.
**No. 9:05-CV-1305.**

Sept. 26, 2008.

Jose Orraca, Pine City, NY, pro se.
Hon. Andrew M. Cuomo, Attorney General of the
State of New York, Douglas J. Goglia, Esq., Asst.
Attorney General, of Counsel, Albany, NY, for De-
fendants.
Hon. Andrew M. Cuomo, Attorney General of the
State of New York, Michael G. McCartin, Esq., As-
sistant Attorney General, of Counsel, Albany, NY,
for Defendants.

### ORDER

DAVID N. HURD, District Judge.
**\*1** Plaintiff, Jose Orraca, brought this civil rights
action pursuant to 42 U.S.C. § 1983. In a Report
Recommendation dated August 28, 2008, the Hon-
orable George H. Lowe, United States Magistrate
Judge, recommended that defendants' motion for
partial summary judgment be granted and that
plaintiff's claims against defendants Rios, LaForge,
and Valez be dismissed with prejudice. Objections
to the Report Recommendation have been filed by
the plaintiff.

Based upon a de novo review of the portions of the
Report-Recommendation to which the plaintiff has
objected, the Report-Recommendation is accepted
and adopted. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion for partial summary judg-
ment is GRANTED;

2. Plaintiff's claims against defendants C.O. Rios,
C.O. LaForge, and C.O. Valez are DISMISSED
with prejudice; and

3. Remaining for trial are plaintiff's claims against
C.O. R. Pilatich and C.O.R. Kleister.

IT IS SO ORDERED.

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate
Judge.
This *pro se* prisoner civil rights action, commenced
pursuant to 42 U.S.C. § 1983, has been referred to
me for Report and Recommendation by the Honor-
able David N. Hurd, United States District Judge,
pursuant to 28 U.S.C. § 636(b) and Local Rule
72.3(c). Currently pending before the Court is De-
fendants' motion for partial summary judgment pur-
suant to Fed.R.Civ.P. 56. (Dkt. No. 32.)For the
reasons that follow, I recommend that Defendants'
motion be granted.

### I. BACKGROUND

#### A. Summary of Plaintiff's Complaint

Liberally construed, the Complaint of Jose Orraca
("Plaintiff") alleges that five employees of the New
York State Department of Correctional Services
("Defenndants") [FN1] violated his rights under the
First, Eighth and Fourteenth Amendments when
they physically assaulted him, or caused him to be
physically assaulted, on four occasions without pro-
vocation and/or in retaliation against Plaintiff for
having filed grievances against them. (*See gener-
ally* Dkt. No. 1, ¶¶ 10-22 [Plf.'s Compl.].)

> FN1. These five Defendants are as follows:
> (1) Coxsackie Correctional Facility

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

("C.F.") Correctional Officer ("C.O.") Robert Pilatich; (2) Wallkill C.F. C.O. Ramon Rios; (3) Wallkill C.F. C.O. Thomas A. LaForge; (4) Ulster C.F. C.O. Richard J. Kleister; and (5) Ulster C.F. C.O. S. Velez. (Dkt. No. 1, ¶¶ 5-9 [Plf.'s Compl.]; *see also* Dkt. Nos. 5-7, 9, 11 [Acknowledgments of Service, indicating Defendants' first names].)

More specifically, Plaintiff alleges that Defendants violated his rights in the following four ways: (1) on **August 6, 2004**, at Coxsackie C.F., Defendant **Kleister** verbally and physically assaulted Plaintiff without provocation, and Defendant **Velez** physically assaulted Plaintiff without provocation; (2) on or about **September 27, 2004**, at Wallkill C.F., Defendant **Pilatich** witnessed an unidentified female correctional officer from Green C.F. sexually assault Plaintiff without stopping her, and Defendants **Rios, LaForge** knew that assault would happen but failed to prevent or stop it, in retaliation against Plaintiff for having filed a grievance against Defendant Kleister arising from the above-described incident on August 6, 2004; (3) on **July 18, 2005**, at Coxsackie C.F., Defendants **Kleister** and **Pilatich** physically assaulted Plaintiff in retaliation against Plaintiff for having filed a grievance against Defendant Kleister arising from the above-described incident on August 6, 2004, and a letter of complaint against Defendant Pilatich arising from the above-described incident on September 27, 2004; and (4) on **August 24, 2005**, at Coxsackie C.F., Defendants **Kleister** and **Pilatich** physically assaulted Plaintiff, and/or caused him to be physically assaulted, in retaliation against Plaintiff for having received a sentence of only forty-five days keeplock confinement on Defendant Pilatich's previous misbehavior report against Plaintiff. (*See generally* Dkt. No. 1, ¶¶ 10-22 [Plf.'s Compl.].)

*2 I note that, in construing Plaintiff's Complaint, I have afforded it the liberal construction that all pleadings must be afforded, under Fed.R.Civ.P. 8. *See* Fed.R.Civ.P. 8(f) ("All pleadings shall be so construed as to do substantial justice."). I have also afforded it the extra-liberal construction normally afforded to the pleadings of *pro se* civil rights litigants, out of special solicitude to them due to their general lack of familiarity with legal terminology and the litigation process.[FN2] I have done this not because I believe that Plaintiff is in need of this special solicitude. (I do not: his litigation experience, which is considerable,[FN3] is analogous to the litigation experience of plaintiffs whose special solicitude the Second Circuit has diminished or revoked due to their obvious familiarity with the legal system and pleading requirements.) [FN4] Rather, I have continued to afford an extra-liberal construction to Plaintiff's Complaint because I find that doing so does not matter to the outcome of Defendants' motion for summary judgment, given the nature of the record evidence in this case.

FN2. *Estelle v. Gamble,* 429 U.S. 97, 106 (1976) ("[A] *pro se* complaint ... must be held to less stringent standards than formal pleadings drafted by lawyers ....") [internal quotation marks and citation omitted]; *McEachin v. McGinnis,* 357 F.3d 197, 200 (2d Cir.2004) ("[W]hen the plaintiff proceeds *pro se,*... a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations.") [citation omitted]; *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) ("[C]ourts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest.") [internal quotation marks and citation omitted]; *Boddie v. Schnieder,* 105 F.3d 857, 860 (2d Cir.1997) ("In evaluating whether a plaintiff has met the [ ] requirements [under Rule 12(b)(6) ], we hold complaints prepared *pro se* to less stringent standards than formal pleadings drafted by lawyers.'") [quoting *Haines v. Kerner,* 404 U.S. 519, 520 (1972) ] ).

FN3. For example, Plaintiff has filed at

least 19 other federal court cases or appeals: *Orraca v. N.Y.C. Police Dep't,* 92-CV-8273 (S.D.N.Y.) (prisoner civil rights case); *Orraca v. Kelly,* 95-CV-0729 (W.D.N.Y.) (prisoner civil rights case); *Orraca v. Maloy,* 96-CV-2000 (N.D.N.Y.) (prisoner civil rights case); *Orraca v. Cetti,* 96-CV-6385 (W.D.N.Y.) (prisoner civil rights case); *Orraca v. Walker,* 98-CV-0448 (N.D.N.Y.) (prisoner civil rights case), *appeal dismissed,*No. 00-0109, Order (2d Cir. filed Dec. 7, 2000); *Orraca v. Walker,* 98-CV-4459 (S.D.N.Y.) (habeas corpus proceeding); *Orraca v. Estabrook,* 99-CV-1216 (N.D .N.Y.) (prisoner civil rights case); *Orraca v. Clark,* 00-CV-0766 (N.D.N.Y.) (prisoner civil rights case); *Orraca v. Walker,* 00-CV-1922 (S.D.N.Y.) (habeas corpus proceeding) *Orraca v. Walker,* 00-CV-5503 (S.D.N.Y.) (habeas corpus proceeding); *Orraca v. McCreery,* 04-CV-1183 (N.D.N.Y.) (prisoner civil rights case); *Orraca v. Lee,* 04-CV-1249 (N.D.N.Y.) (prisoner civil rights case), *appeal dismissed,*No. 07-1602, Order (2d Cir. filed Dec. 7, 2000); *Orraca v. Reyes,* 05-CV-1393 (S.D.N.Y.) (prisoner civil rights case); *Orraca v. Palmer,* 05-CV-1857 (S.D.N.Y.) (prisoner civil rights case); *Orraca v. DeLuke,* 07-CV-0411 (N.D.N.Y.) (prisoner civil rights case); *Orraca v. Mastrantonio,* 07-CV-0497 (N.D.N.Y.) (prisoner civil rights case); *Orraca v. Mastrantonio,* 07-CV-0364 (W.D.N.Y.) (prisoner civil rights case).

FN4.*See, e.g., Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v.*

*C. Gummerson,* 201 F.3d 431, at *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *see also Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977)[citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring); *Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *2-3 & nn. 8-15 (N.D.N.Y. Oct. 18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), *appeal dismissed,*No. 07-1014, Order (2d Cir. filed Nov. 9, 2007) (finding Plaintiff's appeal to be frivolous where he objected to, *inter alia,* the district court's revocation of his special solicitude based on his extraordinary litigation experience).

## B. Summary of Grounds in Support of Defendants' Motion

Defendants' motion for partial summary judgment is premised on the following two grounds: (1) Plaintiff's claims against Defendants Rios and La-Forge should be dismissed because Plaintiff has failed to establish that they were personally involved in the constitutional violations alleged; and (2) Plaintiff's claims against Defendant Velez should be dismissed because Plaintiff has failed to establish that he was personally involved in the constitutional violations alleged and, indeed, Plaintiff admitted in his deposition that he did not recall any assault on him committed by Defendant Velez. (Dkt. No. 32, Part 7, at 3-8 [Defs.' Memo. of Law].)

## II. APPLICABLE LEGAL STANDARD

Under Fed.R.Civ.P. 56, summary judgment is war-

ranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [FN5] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[FN6]

> FN5. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

> FN6. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."[FN7]The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."[FN8]Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[FN9]

> FN7.Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Ra-*

*dio Corp.,* 475 U.S. 574, 585-87 (1986).

> FN8.Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading...."); *Matsushita,* 475 U.S. at 585-86;*see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

> FN9. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N .Y. Mar. 29, 2004) [internal quotations omitted] [emphasis added].

*3 What this burden-shifting standard means when a plaintiff has failed to respond to a defendant's motion for summary judgment is that "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically."[FN10]Rather, practically speaking, the Court must (1) determine what material facts, if any, are *disputed* in the record presented on the defendants' motion, and (2) assure itself that, based on those *undisputed* material facts, the law indeed warrants judgment for the defendants.[FN11]However, the plaintiff's failure to respond to the defendant's motion for summary judgment lightens the defendant's burden on the motion.

> FN10. *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996).

> FN11.*See Champion,* 76 F.3d at 486 ("Such a motion may properly be granted only if the facts as to which there is no genuine dispute show that ... the moving party is entitled to a judgment as a matter of law.") [internal quotation marks and citation omitted]; *Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 232 (N.D.N.Y.2001) (Scullin, C.J.) (stating that, where a plaintiff has failed to respond to a defendant's motion for summary judgment, "[t]he Court must review the merits

of Plaintiff's claims"). This requirement (that the Court determine, as a threshold matter, that the movant's motion has merit) is also recognized by Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court, which provides that "the nonmoving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown,"*only where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein."*N.D.N.Y. L.R. 7.1(b)(3) [emphasis added].

More specifically, where a plaintiff has failed to properly respond [FN12]to a defendant's statement of material facts, contained in its Statement of Material Facts (a/k/a its "Rule 7.1 Statement"), the facts as set forth in that Rule 7.1 Statement will be accepted as true [FN13]to the extent that (1) those facts are supported by the evidence in the record,[FN14]and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment.[FN15]

> FN12.*See* N.D.N.Y. L.R. 7.1(a)(3) ("The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statements of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.").

> FN13.*See* N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*) [emphasis in original].

FN14.*See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[W]here the non-movant party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted]; *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added]; *Adirondack Cycle & Marine, Inc. v. Am. Honda Motor Co., Inc.,* 00-CV-1619, 2002 U.S. Dist. LEXIS 4386, at *2-3 (N.D.N.Y. Mar. 18, 2002) (McAvoy, J.) ("Local Rule 7.1 requires a party opposing summary judgment to respond to the statement of undisputed material facts submitted by the movant. To the extent such facts are not controverted, *the properly supported facts* will be taken as true.") [emphasis added; citation omitted]; *cf.*Fed.R.Civ.P. 83(a)(1) ( "A local rule shall be consistent with ... Acts of Congress and rules adopted

under 28 U.S.C. §§ 2072 and 2075 [which include the Federal Rules of Civil Procedure]...."); Fed.R.Civ.P. 56(e) (requiring that, "if the non-movant does not ... respond [to a summary judgment motion], summary judgment, *if appropriate,* shall be entered against the non-movant," and requiring that, as a threshold matter, the motion for summary judgment must be "made *and supported* as provided in this rule") [emphasis added].

FN15.*See Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

Similarly, where a plaintiff has failed to respond to a defendant's properly filed and facially meritorious memorandum of law (submitted in support of its motion for summary judgment), the plaintiff is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court.[FN16]Stated another way, where a defendant has properly filed a memorandum of law (in support of a properly filed motion for summary judgment), and the plaintiff has failed to respond to that memorandum of law, the only remaining issue is whether the legal arguments advanced in the defendant's memorandum of law are *facially meritorious.*[FN17]A defendant's burden in making legal arguments that are facially meritorious has appropriately been characterized as "modest." [FN18]

FN16. N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown ."); N.D.N.Y. L.R. 7.1(a) (requiring opposition to motion for

summary judgment to contain, *inter alia,* a memorandum of law); *cf.*Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's *response*... must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so *respond,* summary judgment, if appropriate, shall be entered against the adverse party.") [emphasis added]; *see, e.g., Beers v. GMC,* 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.,* 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

FN17.*Hernandez v. Nash,* 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, at *7-8 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b][3], "the court must review the motion to determine whether it is *facially meritorious* " ) [emphasis added; citations omitted]; *accord, Topliff v. Wal-Mart Stores East LP,* 04-CV-0297, 2007 U.S. Dist. LEXIS 20533, at *28 & n. 43 (N.D.N.Y. March 22, 2007) (Lowe, M.J.); *Hynes v. Kirkpatrick,* 05-CV-0380, 2007 U.S. Dist.

LEXIS 24356, at *5-6 & n. 2 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi*, 04-CV-1311, 2007 U.S. Dist. LEXIS 26583, at *28-29 & n. 40 (N .D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey*, 03-CV-0170, 2006 U.S. Dist. LEXIS 95065, at *5 & n. 2 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

FN18. *See Ciaprazi v. Goord*, 02-CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986) ]; *accord, Saunders v. Ricks*, 03-CV-0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct. 18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), *Smith v. Woods*, 03-CV-0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr. 24, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.); *cf. Race Safe Sys. v. Indy Racing League*, 251 F.Supp.2d 1106, 1109-1110 (N.D.N.Y.2003) (Munson, J.) (reviewing whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian*, 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v.*

*Superintendent Montello*, 95-CV-989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

Implied in the above-stated standard is the fact that, where a non-movant fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se.*[FN19] However, in the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit.[FN20] (Here, I note that Plaintiffs' Complaint is neither notarized nor verified pursuant to 28 U.S.C. § 1746.[FN21]) That having been said, to be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit must, among other things, not be conclusory.[FN22] An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.[FN23] Finally, even where an affidavit (or verified complaint) is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[FN24]

FN19. *See Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso*, No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g*, 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment);

*Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.). Stated another way, even *pro se* plaintiffs must obey the Court's procedural rules. *See McNeil v. U.S.,* 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Edwards v. I.N.S.,* 69 F.3d 5, 8 (2d Cir.1995) ("[W]hile a *pro se* litigant's pleadings must be construed liberally, ...*pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them.") [citations omitted].

FN20.*See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

FN21. (Dkt. No. 1.)

FN22.*SeeFed.R.Civ.P.* 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN23.*See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a tri-

al.").

FN24.See, e.g., Jeffreys v. City of New York, 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; Argus, Inc. v. Eastman Kodak Co., 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); Allah v. Greiner, 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); Olle v. Columbia Univ., 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that

testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), aff'd, 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

## III. ANALYSIS

### A. Whether Plaintiff Has Failed to Establish that Defendants Rios and LaForge Were Personally Involved in the Constitutional Violations Alleged

*4 As indicated above in Part I.A. of this Report-Recommendation, the only claim against Defendants Rios and LaForge in Plaintiff's Complaint is that, on or about September 27, 2004, at Wallkill C.F., they knew that an unidentified female correctional officer from Green C.F. was going to sexually assault Plaintiff but failed to prevent or stop that assault, in retaliation against Plaintiff for having filed a grievance against Defendant Kleister arising from the above-described incident on August 6, 2004. (Dkt. No. 1, ¶¶ 6-7, 13-15, 20 [Plf.'s Compl.].)

More specifically, Plaintiff alleges as follows: (1) on or about September 27, 2004, Defendants Rios and LaForge were tasked with the duty of escorting Plaintiff from Wallkill C.F. to Coxsackie C.F.; (2) at that time, they were "aware" and "kn[e]w" that Plaintiff would be assaulted upon "arriving at Coxsackie [C.F.] ... and did nothing to prevent or stop the assault from happening"; (3) upon their arrival at Coxsackie C.F., they "hand[ed] the Plaintiff over to" Defendant Pilatech and an unidentified female correctional officer when "ordered" to do so by Defendant Pilatech; (4) with the help of Defendant Pilatech and two unidentified male correctional officers, the female correctional officer took Plaintiff into a room and "removed the handcuffs" that Plaintiff was wearing; (5) the two male correctional officers and the female correctional officer laughed

while Defendant Pilatech verbally abused Plaintiff;
(6) the two male correctional officers and Defend-
ant Pilatech laughed while the female correctional
officer handled Plaintiff's genitalia; and (7) then,
"[l]ong after" the assault was complete, Defendants
Rios and LaForge "returned to the torture room"
and "returned to their duty" of escorting Plaintiff.
(*Id.* at ¶¶ 13, 15.)

In their motion for partial summary judgment, De-
fendants argue that Plaintiff's claim against Defend-
ants Rios and LaForge should be dismissed because
Plaintiff has failed to establish that they were per-
sonally involved in the constitutional violations al-
leged. (Dkt. No. 32, Part 7, at 3-6 [Defs.' Memo. of
Law].) In support of this argument, they have asser-
ted the following facts in their Rule 7.1 Statement,
and have supported those facts with accurate cita-
tions to record evidence: (1) Defendant Rios did not
know in advance that Plaintiff was going to be as-
saulted by anyone on September 27, 2004, or on
any other date; [FN25] (2) Defendant Rios was not
present when Plaintiff was allegedly assaulted by
other correctional officers on September 27, 2004;
[FN26] (3) Defendant LaForge did not know in ad-
vance that Plaintiff was going to be assaulted by
anyone on September 27, 2004, or on any other
date; [FN27] and (4) Defendant LaForge was not
present when Plaintiff was allegedly assaulted by
other correctional officers on September 27, 2004.
[FN28]

> FN25. (Dkt. No. 32, Part 6, ¶ 4 [Defs.'
> Rule 7.1 Statement, accurately citing Para-
> graph 5 of Declaration of Rios, attached at
> Dkt. No. 32, Part 4].)

> FN26. (Dkt. No. 32, Part 6, ¶ 2 [Defs.'
> Rule 7.1 Statement, accurately citing page
> 76 of Plaintiff's deposition transcript, at-
> tached at Dkt. No. 32, Part 3, at 76, testify-
> ing that Defendant Rios was "not involved
> in [the] incident at all" and that he merely
> "handed [Plaintiff] over to [the offending]
> officers"]; *see also* Dkt. No. 32, Part 3, at
> 68, 70 [Ex. A to McCartin Decl., attaching

page 68 of Plaintiff's deposition transcript,
indicating that the "transport officers"
were not in the room when the alleged as-
sault occurred on September 27, 2004, and
that the only persons in the room were Def.
Pilatech and "the [one] other officer," i.e.,
the unidentified female officer].)

> FN27. (Dkt. No. 32, Part 6, ¶ 8 [Defs.'
> Rule 7.1 Statement, accurately citing Para-
> graph 3 of Declaration of LaForge, at-
> tached at Dkt. No. 32, Part 5].)

> FN28. (Dkt. No. 32, Part 6, ¶ 6 [Defs.'
> Rule 7.1 Statement, accurately citing page
> 76 of Plaintiff's deposition transcript, at-
> tached at Dkt. No. 32, Part 3, at 76, testify-
> ing that Defendant LaForge was "not in-
> volved in [the] incident at all" and that he
> merely "handed [Plaintiff] over to [the of-
> fending] officers"]; *see also* Dkt. No. 32,
> Part 3, at 68, 70 [Ex. A to McCartin Decl.,
> attaching page 68 of Plaintiff's deposition
> transcript, indicating that the "transport of-
> ficers" were not in the room when the al-
> leged assault occurred on September 27,
> 2004, and that the only persons in the room
> were Def. Pilatech and "the [one] other of-
> ficer," i.e., the unidentified female of- ficer].)

In opposing Defendants' motion for partial sum-
mary judgment, Plaintiff failed to submit a Rule 7.1
Response. (*See generally* Dkt. No. 33 [Plf.'s Opp.
Papers].) As explained above in Part II of this Re-
port-Recommendation, where a plaintiff has failed
to properly respond to a defendant's Statement of
Material Facts (a/k/a its "Rule 7.1 Statement"), the
facts as set forth in that Rule 7.1 Statement will be
accepted as true to the extent that (1) those facts are
supported by the evidence in the record, and (2) the
non-moving party, if he is proceeding *pro se,* has
been specifically advised of the potential con-
sequences of failing to respond to the movant's mo-
tion for summary judgment. Here, the facts asserted
by Defendants are supported by the evidence in the

record, as explained in the preceding paragraph. In addition, Plaintiff was specifically advised of the potential consequences of failing to respond to Defendants' motion for partial summary judgment, on or about October 16, 2007. (Dkt. No. 32, Part 1, at 1-2 [Defendants' Notice of Motion].).[FN29] As a result, the following four facts are accepted as true, for purposes of Defendants' motion: (1) Defendant Rios did not know in advance that Plaintiff was going to be assaulted by anyone on September 27, 2004, or on any other date; (2) Defendant Rios was not present when Plaintiff was allegedly assaulted by other correctional officers on September 27, 2004; (3) Defendant LaForge did not know in advance that Plaintiff was going to be assaulted by anyone on September 27, 2004, or on any other date; and (4) Defendant LaForge was not present when Plaintiff was allegedly assaulted by other correctional officers on September 27, 2004.

> FN29. Moreover, I note that, clearly, Plaintiff was aware of these potential consequences since, as of the date of the filing of Defendants' motion for partial summary judgment (i.e., October 16, 2007), Plaintiff had considerable experience litigating prisoner civil rights actions in federal court, including experience in opposing at least *six* motions for summary judgment. *See, e.g., Orraca v. City of New York Police Dep't,* 897 F.Supp. 148 (S .D.N.Y.1992) (granting the defendants' motion for partial summary judgment in Plaintiff's prisoner civil rights action); *Orraca v. Kelly,* 95-CV-0729, Order (W.D.N.Y. filed Sept. 30, 1999) (granting the defendants' motion for summary judgment in Plaintiff's prisoner civil rights action); *Orraca v. Walker,* 98-CV-0448, Order (N.D.N .Y. filed March 28, 2000) (Kahn, J.) (granting the defendants' motion for summary judgment in Plaintiff's prisoner civil rights action); *Orraca v. Maloy,* 96-CV-2000, Order (N.D.N.Y. filed March 22, 2001) (Mordue, J.) (granting the defendants' motion for

summary judgment in Plaintiff's prisoner civil rights action); *Orraca v. Estabrook,* 99-CV-1216, Order (N.D.N.Y. filed March 25, 2002) (Mordue, J.) (granting the defendants' motion for summary judgment in Plaintiff's prisoner civil rights action); *Orraca v. Lee,* 04-CV-1249, Order (N.D.N.Y. filed March 29, 2007) (Hurd, J.) (granting the defendants' motion for summary judgment in Plaintiff's prisoner civil rights action).

*5 Based on these undisputed facts, and the lack of any other material record evidence, I find that there is no evidence in the record from which a rational fact-finder could conclude that either Defendant Rios or LaForge was personally involved in the constitutional violations alleged to have occurred on September 27, 2004.

Even if I were to *sua sponte* perform an independent review of the record to find evidence contradicting any of these facts, I would be unable to find such evidence. Plaintiff's allegations (in his Complaint) that Defendants knew in advance that the assault would happen do not constitute evidence since those allegations are unsworn. (Dkt. No. 1, at 1, 10-11 [Plf.'s Compl., containing no verification or notarization].) Furthermore, while Plaintiff asserts in his Affidavit in Opposition to Defendants' Motion that "Officers Rios and LaForge knew beforehand that ... Plaintiff was going to have a confrontation with assaultive correctional officers on ... Sept. 27, 200[4]," that assertion lacks the detail necessary to demonstrate that Plaintiff possessed personal knowledge of what Defendants Rios and LaForge knew at the time in question. (*See* Dkt. No. 33, ¶¶ 4, 6 [Plf.'s Opp. Papers].) To the extent that Plaintiff is reasoning that they must have known that the assault would happen because it did in fact happen, such reasoning is entirely conclusory and speculative in nature.

I note that Plaintiff's argument in opposition to Defendants' motion indicates that he is basing his claim against Defendants Rios and LaForge on a

theory of undue care or negligence, which is not even actionable under 42 U.S.C. § 1983. (*Id.* at ¶ 8 [arguing that Defendants Rios and LaForge had the "responsibility" of "car[ing]" for Plaintiff's "safety," and of "not ... allow [ing] the assault to happen," and that they incurred "liab[ility]" by breaching that responsibility].) [FN30] I note also that, even assuming for the sake of argument that the two unidentified male correctional officers present in the "torture room" (along with the unidentified female correctional officer and Defendant Pilatich) were in fact Defendants Rios and LaForge and that they witnessed their superior officers (who had issued them orders to "hand over" Plaintiff) using excessive force against Plaintiff, it is questionable to me that any laughter by Rios and LaForge-while it would have been unprofessional and unkind-would plausibly suggest the sort of criminal recklessness necessary for them to incur liability under the Constitution. [FN31]

FN30. *See, e.g., Farmer v. Brennan,* 511 U.S. 825, 835 (1994) ( "[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Daniels v. Williams,* 474 U.S. 327, 331-33 (1986) (stating that "injuries inflicted by governmental negligence are not addressed by the United States Constitution" and rejecting § 1983 claim based on alleged due process violation under Fourteenth Amendment); *Hudson v. Palmer,* 486 U.S. 517, 531 (1984) ("[T]he Due Process Clause of the Fourteenth Amendment is not violated when a state employee negligently deprives an individual of property...."); *Franks v. Delaware,* 438 U.S. 154, 171 (1978) ( "Allegations of negligence or innocent mistake are insufficient [to state a claim under the Fourth Amendment]."); *Pena v. Deprisco,* 432 F.3d 98, 112 (2d Cir.2005) ("In order to establish a violation of a right to substantive due process, a plaintiff must demonstrate not only gov-

ernment action but also that the government action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'...[T]he Fourteenth Amendment is not a 'font of tort law.' ...It does not provide a comprehensive scheme for determining the propriety of official conduct or render all official misconduct actionable....'[N]egligently inflicted harm is categorically beneath the threshold of constitutional due process.'") [citations omitted]; *Riddick v. Modeny,* No. 07-1645, 2007 WL 2980186, at *2 (3d Cir. Oct. 9, 2007) ("The protections afforded prisoners by the Due Process Clause of the Fourteenth Amendment are not triggered by the mere negligence of prison officials."); *Billington v. Smith,* 292 F.3d 1177, 1190 (9th Cir.2002); ("The Fourth Amendment's 'reasonableness' standard is not the same as the standard of 'reasonable care' under tort law, and negligent acts do not incur constitutional liability."); *Myers v. Okla. County Bd. of County Com'rs,* 151 F.3d 1313, 1320 (6th Cir.1998) ("[A]ctions leading to a confrontation, such as the decision to enter the apartment, must be more than merely negligent to be "unreasonable" for purposes of the Fourth Amendment inquiry."); *Madiwale v. Savaiko,* 117 F.3d 1321, 1326 (11th Cir.1997) ("Negligent or innocent mistakes do not violate the Fourth Amendment."); *Sevier v. City of Lawrence, Kan.,* 60 F.3d 695, 699, n. 7 (10th Cir.1995) ("Mere negligent actions precipitating a confrontation [that was the subject of plaintiff's Fourth Amendment claim] would not, of course, be actionable under § 1983.").

FN31. *See Luttrell v. Nickel,* 129 F.3d 933, 936 (7th Cir.1997) ( "[Correctional Sergeant's] failure personally to investigate [the plaintiff's] cellmate's mental state and her response to [the plaintiff's] request

with laughter did not amount to deliberate indifference."); *Sampay v. Griffin,* 06-CV-0360, 2007 U.S. Dist. LEXIS 44111, at *3 (M.D.La. May 8, 2007) (prison doctor's laughter at prisoner who stated he was in pain "from his head to his toes" after his unsuccessful suicide attempt was not, in and of itself, deliberate indifference), *adopted by* 2007 U.S. Dist. LEX-IS 40401 (M.D. La. June 4, 2007); *Owens v. Cuyter,* 81-CV-1722, 1989 U.S. Dist. LEXIS 8071, at *12 (E.D.Pa. July 14, 1989) ("While Dr. Dincer's alleged laughter when the plaintiff showed him his medical ailment would seem inappropreate 'bedside manner' on his part, this shortcoming does not rise to the level of deliberate indifference which could constitute a constitutional deprivation."); *cf. Barad v. Comstock,* 03-CV-0736, 2005 U.S. Dist. LEXIS 38418, at *30 (W.D.N.Y. June 30, 2005) ("[Plaintiff] alleges that defendant laughed at him and told the guards that it was a 'false alarm' [when plaintiff complained he was going to die from a kidney-stone attack] but plaintiff has not established that defendant wantonly intended to cause plaintiff to suffer [in order] to establish the subjective element of the deliberate indifference claim.").

For all of these reasons, I recommend that Plaintiff's claim against Defendants Rios and La-Forge be dismissed due to their lack of personal involvement in the constitutional violations alleged.

**B. Whether Plaintiff Has Failed to Establish that Defendant Velez Was Personally Involved in the Constitutional Violations Alleged**

As indicated above in Part I.A. of this Report-Recommendation, the only claim against Defendant Velez in Plaintiff's Complaint is that, on August 6, 2004, at Coxsackie C.F., Defendant Velez physically assaulted Plaintiff without provocation. (Dkt.

No. 1, ¶¶ 9, 19 [Plf.'s Compl.].)

*6 In their motion for partial summary judgment, Defendants argue that Plaintiff's claim against Defendant Velez should be dismissed because Plaintiff has failed to establish that Defendant Velez was personally involved in the constitutional violations alleged. (Dkt. No. 32, Part 7, at 6-8 [Defs.' Memo. of Law].) In support of this argument, Defendants have asserted the following facts in their Rule 7.1 Statement, and have supported those facts with accurate citations to record evidence: (1) Plaintiff has admitted that Defendant Velez was a "good [correctional] officer[ ]"; [FN32] and (2) Plaintiff has admitted that he does not recall Defendant Velez assaulting him on August 6, 2004 (or at any other time).[FN33]

> FN32. (Dkt. No. 32, Part 6, ¶ 11 [Defs.' Rule 7.1 Statement, accurately citing page 57 of Plaintiff's deposition transcript, attached at Dkt. No. 32, Part 3, at 57].)

> FN33. (Dkt. No. 32, Part 6, ¶ 10 [Defs.' Rule 7.1 Statement, accurately citing pages 13 and 14 of Plaintiff's deposition transcript, attached at Dkt. No. 32, Part 3, at 13-14]; *see also* Dkt. No. 32, Part 3, at 18 [Ex. A to McCartin Decl., attaching page 18 of Plaintiff's deposition transcript, stating, before Defendant Kleister assaulted him on Aug. 6, 2004, Defendant Kleister was accompanied by one other officer-"a little heavyset officer" whose name Plaintiff did not know (indicating that the officer was someone *other* than Defendant Velez, whose name Plaintiff *did* know) ]; Dkt. No. 32, Part 3, at 27 [Ex. A to McCartin Decl., attaching page 27 of Plaintiff's deposition transcript, stating that, before Def. Kleister assaulted him on Aug. 6, 2004, Defendant Kleister was accompanied by "a heavy Italian guy," whose name "could be" Manolific]; Dkt. No. 32, Part 3, at 32, 35 [Ex. A to McCartin Decl., attaching pages 32 and 35 of

Plaintiff's deposition transcript, stating that, at the time Defendant Kleister assaulted him on Aug. 6, 2004, the "heavy" officer was present, as well as a "whole bunch of guys from Coxsackie" (indicating that the "bunch of guys" did not include Defendant Velez, whom Plaintiff alleged in his Complaint was from Ulster C.F.) ]; Dkt. No. 32, Part 3, at 36-37, 52-53 [Ex. A to McCartin Decl., attaching pages 36, 37, 52, and 53 of Plaintiff's deposition transcript, stating that he remembered Defendant Velez, but he did not remember if he was present at the time of the assault on Aug. 6, 2004].)

In opposing Defendants' motion for partial summary judgment, Plaintiff failed to submit a Rule 7.1 Response. (*See generally* Dkt. No. 33 [Plf.'s Opp. Papers].) As explained above in Part II of this Report-Recommendation, where a plaintiff has failed to properly respond to a defendant's Rule 7.1 Statement, the facts as set forth in that Rule 7.1 Statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se*, has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. Here, the facts asserted by Defendants are supported by the evidence in the record, as explained in the preceding paragraph. In addition, Plaintiff was specifically advised of the potential consequences of failing to respond to Defendants' motion for partial summary judgment, on or about October 16, 2007.[FN34] As a result, the following two facts are accepted as true, for purposes of Defendants' motion: (1) Plaintiff has admitted that Defendant Velez was a "good [correctional] officer[ ]"; and (2) Plaintiff has admitted that he does not recall Defendant Velez assaulting him on August 6, 2004 (or at any other time).

> FN34. Moreover, clearly, Plaintiff was aware of these potential consequences

since, as of the date of the filing of Defendants' motion for partial summary judgment, Plaintiff had considerable experience litigating prisoner civil rights actions in federal court, including experience in opposing at least six motions for summary judgment.

Furthermore, in opposing Defendants' motion for partial summary judgment, Plaintiff failed to respond to Defendants' legal argument that Plaintiff's claims against Defendant Velez should be dismissed. (*See generally* Dkt. No. 33 [Plf.'s Opp. Papers].) As explained above in Part II of this Report-Recommendation, where a defendant has properly filed a memorandum of law (in support of a properly filed motion for summary judgment), and the plaintiff has failed to respond to that memorandum of law, the plaintiff has "consented" to the relief requested by the defendant, the only remaining issue is whether the legal arguments advanced in the defendant's memorandum of law are *facially meritorious.* A defendant's burden in making legal arguments that are facially meritorious has appropriately been characterized as "modest."

Based on these undisputed facts, and this unopposed legal argument, I find that Defendants have met their modest burden in persuading the Court to grant their request that Plaintiff's claim against Defendant Velez be dismissed due to his lack of personal involvement in any of the constitutional violations alleged. (Dkt. No. 32, Part 7, at 6-8 [Defs.' Memo. of Law, citing relevant portions of record and case law].)

*7 I would add only that, even if I were to *sua sponte* perform an independent review of the record to find evidence establishing the personal involvement of Defendant Velez in any of the constitutional violations alleged, I would be unable to find such evidence. I note that Plaintiff's deposition testimony indicates that Defendant Velez's *sole* role in any of the events giving rise to the claims asserted in Plaintiff's Complaint may have been in helping another correctional officer on or about September 27,

2004, to transport Plaintiff in a van from Shawan-gunk C.F. to a scheduled doctor's appointment outside the facility, and then transferring custody of Plaintiff at Wallkill C.F. to a female correctional officer who is alleged to have subsequently assaulted Plaintiff.[FN35] Setting aside the fact that Plaintiff's Complaint does not even conclusorily allege that Defendant Velez was involved in the assault that Plaintiff alleges he experienced on September 27, 2004, I can find no record evidence from which any rational fact-finder could conclude that Defendant Velez knew in advance that the assault would happen, participated in that assault, witnessed that assault, or in any way failed to stop that assault.

> FN35. (Dkt. No. 32, Part 3, at 36-37, 52-61, 75-76 [Ex. A to McCartin Decl., attaching pages 36-37, 52-61, 75-76 of Plaintiff's deposition transcript].)

For all of these reasons, I recommend that Plaintiff's claim against Defendant Velez be dismissed due to his lack of personal involvement in the constitutional violations alleged.

## C. Denial of Any Request by Plaintiff, During any Appeal from this Report-Recommendation, to Supplement the Record on Defendants' Motion

In the event that, during any objections to this Report-Recommendation, Plaintiff attempts to supplement the record on Defendants' motion for partial summary Judgment, I respectfully recommend that the Court, in exercising its discretion on the matter, decline to permit him to do so.

The Second Circuit recognizes that the decision of whether or not to accept such evidence rests in the sound discretion of the district court. *See, e.g., Hynes v. Squillance,* 143 F.3d 653, 656 (2d Cir.1998) ("[W]e have upheld the exercise of the district court's discretion in refusing to allow supplementation of the record upon the district court's

*de novo* review.") (affirming decision by Scullin, J.) [citations omitted]. In deciding whether or not a district court has abused that discretion in denying the supplementation of the record on appeal, the Second Circuit considers factors such as efficiency and fairness. *See Hynes v. Squillance,* 143 F.3d at 565 ("Considerations of efficiency and fairness militate in favor of a full evidentiary submission for the Magistrate Judge's consideration....").

With regard to the efficiency consideration, I find that permitting Plaintiff (on appeal) to adduce evidence that was not presented before me would be an inefficient use of judicial resources, and indeed "would frustrate the purpose of the Magistrates Act." *Greenhow v. Sec 'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992).

*8 With regard to the fairness consideration, I note that the Fifth Circuit has suggested four factors that a court might consider in deciding whether to accept additional evidence after a magistrate judge's recommendation has been issued:

> (1) the moving party's reasons for not originally submitting the evidence; (2) the importance of the omitted evidence to the moving party's case; (3) whether the evidence was previously available to the non-moving party when it responded to the summary judgment motion; and (4) the likelihood of unfair prejudice to the non-moving party if the evidence is accepted.

*Performance Autoplex II Ltd. v. Mid-Continent Cas. Co.,* 322 F,3d 847, 862 (5th Cir.2003) [citation omitted]. Generally, these fairness factors are considered by Courts within the Second Circuit (and outside of the Second Circuit).[FN36] Here, I find that these four fairness factors-particularly the third and fourth factors-weigh against permitting

Plaintiff to supplement the record on Defendants' motion for summary judgment during any appeal to the District Court from this Report-Recommendation. Plaintiff has had a full and fair opportunity to be heard on his claims, including a full and fair opportunity to (1) conduct discovery in this matter,[FN37] and (2) respond with evidence and argument to Defendants' motion for partial summary judgment.[FN38] Defendants are entitled to have their motion decided on a level playing field, based on evidence and arguments to which they could properly reply, under the Federal Rules of Civil Procedure and Local Rules of Practice.

> FN36.*See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at * 18 n. 8 (S.D.N.Y. Sept. 30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; *see also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v.. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the ma-

gistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

> FN37. *(See, e.g.,*Dkt. No. 15 [Pretrial Scheduling Order filed May 18, 2006, establishing six and-a-half months until expiration of discovery period, on November 30, 2006]; Dkt. No. 21 [Order filed Dec. 18, 2006, extending discovery deadline to Feb. 16, 2007]; Dkt. No. 24 [Order filed March 28, 2007, extending discovery deadline to Apr. 6, 2007] )

> FN38. I note this action has been pending now since October 3, 2005, long past the eighteen months envisioned by Congress when the Civil Justice Reform Act of 1990 was passed. *See Adelman v. Hobbie.* 03-CV-0032, 2006 WL 2639359, at *8 (N.D.N.Y. Sept. 13, 2006) (Sharpe, J., adopting Report-Recommendation by Treece, M.J.) (dismissing pro se civil rights action for failure to prosecute under Rule 41[b] in part because "[o]ver three years has passed since this litigation was commenced, well past the eighteen months envisioned by Congress when the Civil Justice Reform Act of 1990 was instituted").

For these reasons, I recommend that the Court, in exercising its discretion on the issue, deny any request by Plaintiff to supplement the record on Defendants' motion for partial summary judgment, during any objections to this Report-Recommendation.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for partial summary judgment (Dkt. No. 32) be *GRAN-TED,* and that Plaintiff's claims against Defendants Rios, LaForge and Valez be *DISMISSED* with prejudice.

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on** *de novo* **review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but were not, presented to the Magistrate Judge in the first instance.**[FN39]

> FN39. *See, supra,* note 36 of this Report-Recommendation.

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

N.D.N.Y.,2008.
Orraca v. Pilatich
Slip Copy, 2008 WL 4443274 (N.D.N.Y.)

END OF DOCUMENT

**TAB 7**

Not Reported in F.Supp.2d                                                      Page 1
Not Reported in F.Supp.2d, 2007 WL 2580509 (N.D.N.Y.)
(Cite as: 2007 WL 2580509 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court, N.D. New York.
Jose J. SHOMO, Plaintiff,
v.
State of NEW YORK DEPARTMENT OF COR-
RECTIONAL SERVICES; Correctional Medical
Services, Inc.; et al., Defendants.
No. 9:04-CV-0910 (LEK/GHL).

Sept. 4, 2007.

Jose J. Shomo, Alden, NY, pro se.
Hon. Andrew M. Cuomo, Attorney General of the
State of New York, David M. Finkelstein, Esq., As-
sistant Attorney General, of Counsel, Albany, NY,
for State Defendants.
Thuillez, Ford, Gold, Butler & Young, LLP, Debra
J. Young, Esq., Kelly M. Monroe, Esq., of Counsel,
Albany, NY, for Corporate Defendants.

### DECISION AND ORDER

LAWRENCE E. KAHN, U.S. District Judge.
*1 This matter comes before the Court following a
Report-Recommendation filed on August 6, 2007,
by the Honorable George H. Lowe, United States
Magistrate Judge, pursuant to 28 U.S.C. § 636(b)
and L.R. 72.3 of the Northern District of New
York. Report-Rec. (Dkt. No. 89). After ten days
from the service thereof, the Clerk has sent the en-
tire file to the undersigned, including the objections
by the Jose J. Shomo, which were filed on August
10, 2007. Objections (Dkt. No. 90).

It is the duty of this Court to "make a de novo de-
termination of those portions of the report or spe-
cified proposed findings or recommendations to
which objection is made."28 U.S.C. § 636(b)."A
[district] judge ... may accept, reject, or modify, in
whole or in part, the findings or recommendations
made by the magistrate judge."Id. This Court has
considered the objections and has undertaken a de
novo review of the record and has determined that

the Report-Recommendation should be approved
for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation
(Dkt. No. 89) is **APPROVED** and **ADOPTED** in
its **ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion for summary
judgment (Dkt.Nos.72, 73) is **GRANTED;** and it is
further

**ORDERED,** that Plaintiff's Complaint (Dkt. No. 1)
is **DISMISSED IN ITS ENTIRETY, WITH PRE-
JUDICE;** and it is further

**ORDERED,** that the Clerk serve a copy of this Or-
der on all parties.

**IT IS SO ORDERED.**

### ORDER and REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate
Judge.
This matter has been referred to me for Report and
Recommendation by the Honorable Lawrence E.
Kahn, United States District Judge, pursuant to 28
U.S.C. § 636(b) and Local Rule 72.3(c) of the Loc-
al Rules of Practice for the Northern District of
New York. In this pro se civil rights action brought
under 42 U.S.C. § 1983, Inmate Jose J. Shomo
("Plaintiff") alleges that, between January 4, 2001,
and July 22, 2004, while he was incarcerated by the
New York State Department of Correctional Ser-
vices ("DOCS")-mostly at Coxsackie Correctional
Facility ("Coxsackie C.F.") and Mohawk Correc-
tional Facility ("Mohawk C.F.")-sixteen employees
of DOCS ("State Defendants") [FN1] and four em-
ployees of Correctional Medical Services, Inc.
("Corporate Defendants") [FN2] were deliberately
indifferent to his serious medical needs and denied
him adequate accommodation for his disabilities,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

thus violating his rights under, *inter alia,* (1) the Eighth Amendment to the United States Constitution, (2) the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), (3) the Rehabilitative Act of 1973, 29 U.S.C. § 794 ("RA"), and (4) various federal civil rights statutes, including 42 U.S.C. § 1981. (Dkt. No. 1.) Currently before the Court are the State Defendants' motion for summary judgment (Dkt. No. 72) and the Corporate Defendants' motion for summary judgment (Dkt. No. 73). For the reasons discussed below, I recommend that both motions be granted.

> FN1. Specifically, the sixteen individual State Defendants are as follows: (1) DOCS Commissioner Glenn S. Goord; (2) DOCS Deputy Commissioner and Chief Medical Officer Lester N. Wright; (3) DOCS Deputy Commissioner Stephen M. Bernardi; (4) DOCS Americans with Disabilities Coordinator Donna M. Masterson; (5) Coxsackie C.F. Superintendent Gary H. Filion; (6) Coxsackie C.F. Deputy Superintendent of Health Services Joan Smith; (7) Mohawk C.F. Superintendent Kenneth S. Perlman, (8) Mohawk C.F. Deputy Superintendent of Health Services Joan Rosado; (9) Mohawk C.F. Chief Medical Physician Y.D. Sharma; (10) Mohawk C.F. Physician Zaki; (11) Mohawk C.F. Director of Nursing Judith Antonsen; (12) Mohawk C.F. Nurse Administrator J. Nallenbach; (13) Mohawk C.F. Registered Nurse J. Harris; (14) Mohawk C.F. Registered Nurse F. Rockhill; (15) Mohawk C.F. Occupational Therapist D. Connarton; and (16) Mohawk C.F. Dietitian C. Onley. (Dkt. No. 1.)

> FN2. Specifically, the four individual Corporate Defendants are as follows: (1) Coxsackie Regional Medical Unit Chief Physician Kirk Hochstetler; (2) Coxsackie Regional Medical Unit Nurse Practitioner Patricia Gardella; (3) Coxsackie Regional Medical Unit Director of Nursing Kathy

Allen; and (4) Coxsackie Regional Medical Unit Nurse Administrator Valerie Memheart. (Dkt. No. 1.)

# I. LEGAL STANDARD

## A. Motion for Summary Judgment

*\*2* Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [FN3] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[FN4]

> FN3. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

> FN4. *Schwapp v. Town of Avon.* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."Fed.R.Civ.P. 56(e).[FN5] The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."[FN6]"A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[FN7]

> FN5.*See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp..* 475 U.S. 574, 585-87 (1986).

FN6. *Matsushita,* 475 U.S. at 585-86;*see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

FN7. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N. Y. March 29, 2004) [internal quotations omitted] [emphasis added].

When deciding a motion for summary judgment, the facts set forth in a movant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [FN8] and are not specifically controverted by the non-movant.[FN9] Once a movant has filed a Rule 7.1 Statement, the opposing party must file a Rule 7.1 Response.[FN10] This Rule 7.1 Response "shall mirror the movant's [Rule 7.1 Statement] by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises."[FN11] A district court has no duty to perform an independent review of the record to find proof of a factual dispute.[FN12] In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit.[FN13]

FN8. *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[W]here the non-movant party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden of showing the

absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted]; *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added]; *Adirondack Cycle & Marine, Inc. v. American Honda Motor Co., Inc.,* 00-CV-1619, 2002 U.S. Dist. LEXIS 4386, at *2-3 (N.D.N.Y. Mar. 18, 2002) (McAvoy, J.) ("Local Rule 7.1 requires a party opposing summary judgment to respond to the statement of undisputed material facts submitted by the movant. To the extent such facts are not controverted, *the properly supported facts* will be taken as true.") [emphasis added; citation omitted]; *cf.*Fed.R.Civ.P. 83(a)(1) ("A local rule shall be consistent with ... Acts of Congress and rules adopted under 28 U.S.C. §§ 2072 and 2075 [which include the Federal Rules of Civil Procedure] ...."); Fed.R.Civ.P. 56(e) (requiring that, "if the non-movant does not ... respond [to a summary judgment motion], summary judgment, *if appropriate,* shall be entered against the non-movant," and requiring that, as a threshold matter, the motion for summary judgment must be "made *and supported* as provided in this rule") [emphasis added].

FN9.*See* N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing*

*party."* ).

FN10.*See* N.D.N.Y. L.R. 7.1(a)(3).

FN11.(*Id.*)

FN12.*See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN13.*See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

Here, I note that Plaintiff's Complaint is notarized and contains a verification pursuant to 28 U.S.C. §

1746. (Dkt. No. 1, Part 1, at 18.) However, to be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit (or verified complaint) must, among other things, not be conclusory.[FN14] An affidavit (or verified complaint) is conclusory if, for example, its assertions lack any supporting evidence or are too general.[FN15] Moreover, "[a]n affidavit must not present legal arguments."[FN16] Finally, even where an affidavit (or verified complaint) is based on personal knowledge and is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[FN17]

FN14.*See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN15.*See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dis-

pute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a tri- al.").

FN16. N.D.N.Y. L.R. 7.1(a)(2).

FN17.*See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific

statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit's application of its Local Rule § 0.23).*See, infra,* note 24 of this Report-Recommendation.

**B. Revocation of Plaintiff's Special Status as *Pro Se* Civil Rights Litigant**

*3 Imposed over the aforementioned burden-shifting framework is the generous perspective with which the Court *generally* views a *pro se* civil rights plaintiff's papers.FN18For example, where a civil rights plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, *generally* the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest.FN19Moreover, if the non-moving party is proceeding *pro se,* he must be specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment, before those consequences may be imposed.FN20 (1

note that, here, Plaintiff was so advised by Defendants.) [FN21] Having said that, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment."[FN22]

> FN18. See *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) (*per curiam* ) (*pro se* civil rights action); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir.1989) (*pro se* civil rights action); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998) (*pro se* civil rights action), *aff'd in part, vacated in part on other grounds,* 205 F.3d 1324 (2d Cir.2000) (unpublished decision).

> FN19. See *Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

> FN20. See *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

> FN21. (Dkt. No. 72, Part 1.) Plaintiff apparently read the notice, since he subsequently requested (and was granted) two extensions of time in which to respond to Defendants' motion. (Dkt.Nos.76, 78.)Morever, I note that Plaintiff also received such notice several months before, from the defendants in another action. *See Shomo v.. State of New York,* 04-CV-0707 (N.D.N.Y.) (LEK/DEP) (prisoner civil rights action; Plaintiff specifically advised of consequences of failing to respond to Defendants' motion for summary judgment on 10/30/06).

> FN22. *Bussa v. Aitalia Line Aeree Italiane*

*S.p.A.,* 02-CV-10296, 2004 WL 1637014, at *4 (S.D.N.Y. July 21, 2004) [citations omitted], *accord, Durran v. Selsky.* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) [citations omitted]. For example, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S .D.N.Y. Dec. 5, 1994).

In addition, "[t]here are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special solicitude" or status that is normally afforded *pro se* litigants.[FN23] Generally, the rationale for this revocation of special status (at least in the Second Circuit) is not that the *pro se* litigant should be punished but that his excessive litigiousness demonstrates his *experience,* the lack of which is the reason for conferring the special status upon *pro se* litigants in the first place.[FN24] Moreover, permitting experienced *pro se* litigants to retain their special status (despite their litigation experience) would tilt the scales of justice unfairly in favor of the *pro se* litigant and against his opponents.[FN25] As observed by Judge Irving R. Kaufman, of the Second Circuit, regarding an active *pro se* litigant nearly 45 years ago:

> FN23. *Smith v. Burge,* 03-CV-0955, 2006 WL 2805242, at *3 & n. 3 (N.D.N.Y. Sept. 28, 2006) (Kahn, J., adopting report-recommendation of Lowe, M.J.) [citations omitted].

> FN24. See, e.g., *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-

Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *Edwards v. Selsky,* 04-CV-1054, 2007 WL 748442, at *2-3 (N.D.N.Y. March 6, 2007) (Mordue, C.J., adopting Report-Recommendation of Lowe, M.J.); *Rolle v. Garcia,* 04-CV-0312, 2007 WL 672679, at *4 (N.D.N.Y. Feb. 28, 2007) (Kahn, J., adopting Report-Recommendation of Lowe, M.J.); *Mora v. Bockelmann,* 03-CV-1217, 2007 WL 603410, at *4 (N.D.N.Y. Feb. 22, 2007) (Mordue, C.J., adopting Report-Recommendation of Homer, M.J.); *Brown v. Goord,* 04-CV-0785, 2007 WL 607396, at *2-3 (N.D.N.Y. Feb. 20, 2007) (McAvoy, J., adopting Report-Recommendation of Lowe, M.J.); *Mitchell v. Harriman,* 04-CV-0937, 2007 WL 499619, at *3 (N.D.N.Y. Feb. 13, 2007) (Sharpe, J., adopting Report-Recommendation of Homer, M.J.); *Sledge v. Kooi,* 04-CV-1311, 2007 WL 951447, at *3-4 (N.D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 WL 969576 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Gill v. Pidylpchak,* 02-CV-1460, 2006 WL 3751340, at *2 (N.D.N.Y. Dec. 19, 2006) (Scullin, J., adopting Report-Recommendation of Treece, M.J.); *Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *2 (N.D.N.Y. Oct. 18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *3 (N.D.N.Y. June 22, 2006) (McAvoy, J., adopting Report-Recommendation of Lowe, M.J.); *Davidson v. Talbot,* 01-CV-0473, 2005 U.S. Dist. LEXIS 39576, at *20 (N.D.N.Y. March 31, 2005) (Treece, M.J.), *adopted by* 2006 U.S. Dist. LEXIS 47554 (N.D.N.Y. July 5, 2006) (Scullin, J.); *Gill v. Riddick,* 03-CV-1456, 2005 U.S. Dist. LEXIS 5394, at *7 (N.D.N.Y. March 31, 2005) (Treece, M.J.); *Yip v. Bd. of Tr. of SUNY,* 03-CV-0959, 2004 WL 2202594, at *3 (W.D.N.Y. Sept. 29, 2004); *Davidson v. Dean,* 204 F.R.D. 251, 257 & n. 5 (S.D.N.Y.2001); *Santiago v. C.O. Campisi,* 91 F.Supp.2d 665, 670 (S.D.N.Y.2000); *McGann v. U.S.,* 98-CV-2192, 1999 WL 173596, at *2 (S.D.N.Y. March 29, 1999); *Hussein v. Pitta,* 88-CV-2549, 1991 WL 221033, at *4 (S.D.N.Y. Oct. 11, 1991).

FN25. *Edwards,* 2007 WL 748442, at *2; *Sledge,* 2007 WL 951447, at *3;*see also Hussein,* 1991 WL 221033, at *4 (concluding that experienced *pro se* litigant should no longer be afforded special leniency because continuing to afford him such leniency would be unfair to "numerous attorneys," whose time and energy had already been consumed by plaintiff); Jessica Case, "Pro se Litigants at the Summary Judgment Stage: Is Ignorance of the Law an Excuse?" 90 *Ky. L.J.* 701, 735-740 (Spring 2001) (discussing how extending special leniency to *pro se* litigants in some circumstances "distorts the adversarial system and the role of trial judges") [citing cases]; Julie M. Bradlow, "Procedural Due Process Rights of *Pro se* Civil Litigants," 55 *U. Chi. L.Rev.* 659, 672 (Spring 1988) (discussing how "extending too much procedural leniency to a *pro se* litigant risks undermining the impartial role of the judge in the adversary system") [citations omitted].

He comes before this Court wearing the cloak of a *pro se* applicant, and seeks to extract from us the solicitude ordinarily afforded one appearing

without counsel. But this should not shield him from rebuke when merited. He is an intelligent, able and sophisticated litigant, who is no stranger to this Court, having appeared frequently in his own behalf both in the District Court and the Court of Appeals. We would expect that one possessed of his background would be conscious of the outer limits of forceful advocacy and fully aware when his acts transgress those limits. Moreover, we are not to be manipulated by resourceful but meritless moves .... [which] serve only to distract us from important judicial business.[FN26]

> FN26. *Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977) [citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring) ].

Courts relying on the "experience" rationale for revoking a *pro se* litigant's special status look at a variety of factors in assessing whether or not the *pro se* litigant is experienced. Most often, these factors include (1) the number of previous federal court actions filed, (2) the number of previous federal court appeals filed, (3) the number of previous state court actions filed, (4) the number of previous state court appeals filed, and (5) the recency or simultaneity of the actions and/or appeals.[FN27]

> FN27.*See, e.g., Eggersdorf,* 8 F. App'x at 143;*Gummerson,* 201 F.3d at *2; *Flynn,* 32 F.3d at 31; *Frawley,* 2006 WL 1742738, at *3 & n. 2;*Talbot,* 2005 U.S. Dist. LEXIS 39576, at *18-20 & n. 10; *Riddick,* 2005 U.S. Dist. LEXIS 5394, at *7 & n. 3; *Dean,* 204 F.R.D. at 257; *Santiago,* 91 F.Supp.2d at 670; *McGann,* 1999 WL 173596, at *2, 8-10;*McClellan,* 1996 U.S. Dist. LEXIS 8164, at *3-4 & n. 3; *Brown,* 1995 U.S. Dist. LEXIS 213, at *2 n. 1.

*4 There is, of course, no formula for determining "How many is too many?" However, *generally,* if a *pro se* litigant has filed a dozen or more actions and/or appeals before the date of the decision in

question, it is quite possible that he will be deemed to be "experienced." [FN28]Granted, there are some cases revoking the special status of a *pro se* litigant who has filed *fewer* than a dozen cases.[FN29]However, there appear to be *more* cases refusing to revoke the special status of a *pro se* litigant who has filed fewer than a dozen cases.[FN30]

> FN28.*See, e.g., Eggersdorf,* 8 F. App'x at 143 (denying leniency to *pro se* civil rights inmate based on fact that at one point plaintiff had *twelve* simultaneously pending lawsuits in Northern District alone); *Gummerson,* 201 F.3d at *2 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had *twelve* simultaneously pending lawsuits in Northern District alone); *Talbot,* 2005 U.S. Dist. LEXIS 39576, at *18-20 & n. 10 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had filed *twenty* lawsuits in Northern District alone); *Riddick,* 2005 U.S. Dist. LEXIS 5394, at *7 & n. 3 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had filed *twenty* lawsuits in Northern District alone). Interestingly, this *de facto* "rule of twelve" is consistent with the California Code of Civil Procedure, which declines to extend a reduction in small-claims-court filing fees to those litigants who have filed more than 12 small-claims lawsuits in the state within the previous 12 months. *See*Cal. Civ. Proc. § 116.230 (2006).

> FN29.*See, e.g., Santiago,* 91 F.Supp.2d at 670 (denying leniency to *pro se* civil rights inmate based on fact that at one point plaintiff had *ten* lawsuits pending in Southern District); *Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *2 & n. 11 (N.D.N.Y. Oct. 18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (denying leniency to *pro se* civil rights inmate who had previously

filed *eight* federal court actions or appeals); *McClellan*, 1996 U.S. Dist. LEXIS 8164, at *3-4 & n. 3 (denying leniency to *pro se* civil rights inmate based on fact that inmate had filed *seven* previous lawsuits against prison officials); *Brown*, 1995 U.S. Dist. LEXIS 213, at *2 n. 1 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had *seven* lawsuits pending in Western District).

FN30. *See, e.g., McEachin v. Faruki*, 03-CV-1442, 2006 WL 721570, at *2 n. 3 (N.D.N.Y. March 20, 2006) (refusing to deny leniency to *pro se* civil rights inmate who had filed *eleven* other federal lawsuits since 2000); *Pritchett v. Portoundo*. 03-CV-0378, 2005 WL 2179398, at *2 n. 3 (N.D.N.Y. Sept. 9, 2005) (refusing to deny leniency to *pro se* civil rights inmate who had filed *eight* other federal lawsuits since 1996); *Burke v. Seitz*, 01-CV-1396, 2006 WL 383513, at *2 n. 5 (N.D.N.Y. Feb. 13, 2006) (refusing to deny leniency to *pro se* civil rights inmate who had filed *six* other federal lawsuits in previous nine years); *Ariola v. Onondaga County Sheriff's Dept.*, 04-CV-1262, 2007 WL 119453, at *3 (N.D.N.Y. Jan. 10, 2007) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (refusing to deny leniency to *pro se* civil rights inmate who had previously filed *five* actions or appeals in federal or state court); *Smith*, 2006 WL 2805242, at *3 & n. 4 (refusing to deny leniency to *pro se* civil rights inmate based on his filing of *five* other lawsuits); *Abbas v. Senkowski*, 03-CV-0476, 2005 WL 2179426, at *2 n. 4 (N.D.N.Y. Sept. 9, 2005) (continuing to afford special status to *pro se* litigant despite his litigation experience due to his having filed *three* other federal actions since 1997); *Loren v. Feerick*, 97-CV-3975, 1997 WL 441939, at *1 & n. 9 (S.D.N .Y. Aug. 6, 1997) (continuing to afford special

status to *pro se* litigant despite his litigation experience due to his having filed *three* previous actions in state court regarding current matter, and two previous actions in district court regarding current matter).

One reason for this array of cases is that, in determining whether or not a *pro se* litigant is "experienced," courts sometimes consider additional factors, such as (1) the quality of the *pro se* litigant's submissions to the Court (e.g., whether they are typed, cogent, supported by applicable affidavits, exhibits, and/or memoranda of law, etc),[FN31] (2) whether or not the *pro se* litigant has been victorious (or partially victorious) in any of his previous actions or appeals,[FN32] and (3) whether or not the *pro se* litigant has received sufficient formal legal training to familiarize him with legal procedure and terminology.[FN33]

> FN31. *See, e.g., Saunders*, 2006 WL 3051792, at *2 (in deciding whether *pro se* plaintiff should be denied special solicitude, considering the fact that, among other things, "with regard to the current action, ... the motion papers that [p]laintiff has submitted over the past several years have often been fairly good-being typed, being accompanied by affidavits, and containing legal memoranda, exhibits, etc.").

> FN32. *See, e.g., Saudners*, 2006 WL 3051792, at *2 (in deciding whether *pro se* plaintiff should be denied special solicitude, considering the fact that plaintiff had settled two of his previous six federal court actions, receiving $25,000 in exchange for his agreement to voluntarily dismiss the actions, and the fact that some of plaintiff's motions in his many actions have been granted); *Ab v. Sekendur*, 03-CV-4723, 2004 WL 2434220, at *5 (N.D.Ill. Oct. 28, 2004) (considering, during decision of whether *pro se* plaintiff should be denied leniency normally af-

forded inexperienced *pro se* litigants, fact that "[plaintiff's] has successfully applied for and received ... [a] patent, and as the record in this case indicates, he engaged in lengthy business negotiations with Anoto and various other corporations").

FN33.*See, e.g., Walker v. Suburban Hosp. Ass'n,* No. 90-1506, 1991 U.S.App. LEXIS 4049, at *3, n. 2 (4th Cir. March 13, 1991) ("Walker us not due the lenient treatment accorded pro se litigants. Walker has ... a law degree.... Certainly, the policies underlying the Court's admonitions to accord pro se litigants an understanding view of their pleadings and conduct do not have force in this context."); *Heimbaugh v. San Francisco,* 591 F.Supp. 1573, 1577 (N.D.Cal.1984) ("While plaintiff appears [pro se], he is schooled in the law, having recently completed law school .... There is every reason to hold him to the certification he made by signing the pleadings he has filed in this action."); *Pham v. U.S .,* 317 F.3d 178, 186-188 (2d Cir.2003) (relying on fact that *pro se* prisoner was "not trained in the law," and that he was "untutored," when explaining reason for extending him special solicitude under the circumstances); *Iwachiw v. N.Y. City Bd. of Educ.,* 2007 U.S. Dist. LEXIS 8040, at *12 (E.D.N.Y. Feb. 5, 2007) ("This policy of liberally construing pro se submissions is driven by the understanding that implicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training.") [internal quotation marks and citations omitted]; *cf.* John C. Rothermich, "Ethical and Procedural Implications of "Ghostwriting" for *Pro Se* Litigants: Toward Increased Access to Civil Justice." 67 *Fordham L.Rev.* 2687, 2697 (Apr.1999)

(arguing that, when the papers of a *pro se* litigant are "ghostwritten" by a legal assistant, the "special leniency" normally afforded to *pro se* litigants is "unwarranted") [citations omitted], *accord, Saunders,* 2006 WL 3051792, at *2, n .15.

Here, Plaintiff has filed at least 10 other federal and state court actions and appeals.[FN34]Eight of those actions or appeals involved claims of torts or civil rights violations arising from the conditions of his imprisonment.[FN35]Moreover, in two of those actions, Plaintiff faced a motion for summary judgment, as he does here.[FN36]Perhaps because of this considerable litigation experience, Plaintiff has acquired a familiarity with court procedures-a fact that was recently noted by one judge.[FN37]For example, in the current case, Plaintiff has demonstrated sufficient sophistication to file a motion to proceed *in forma pauperis,* a motion for a preliminary injunction, a motion for reconsideration, motion to extend various discovery deadlines, a motion to compel discovery, two motions to reopen discovery, and two motions for extensions of time to respond to motions filed by Defendants.[FN38]This familiarity with court procedures is not surprising to me, given that Plaintiff has testified that he is a "paralegal," and that he "teach[es][a] legal resources course to other inmates."[FN39]Perhaps because of this training and experience, Plaintiff's numerous filings in this action have been quite good, often being typed, organized, cogent, and/or supported by declarations.[FN40]As a result of Plaintiff's skills of advocacy, the Court has granted his motion to proceed *in forma pauperis,* his motion to extend various discovery deadlines in the action's Pretrial Scheduling Order, his two motions for extensions of time to respond to Defendants' motion for summary judgment, and part of his motion to compel discovery.[FN41]

> FN34. Specifically, those federal and state court actions and appeals are as follows: (1) *Shomo v. State of New York,* 06-CV-0353 (W.D.N.Y.) (prisoner civil

rights action; Order filed 11/2/06 dismissing Plaintiff's Complaint for, *inter alia,* failure to state a claim, and requiring him to file Amended Complaint; notice of interlocutory appeal filed on 11/21/06 regarding aforementioned Order); (2) *Shomo v. State of New York,* Docket No. 06-5434-PR (2d Cir.) (interlocutory appeal from dismissal of prisoner civil rights action); (3) *Shomo v. Zon,* 05-CV-10337 (S.D.N.Y.) (habeas corpus proceeding; currently pending); (4) *Shomo v. State of New York,* 04-CV-0707 (N.D.N.Y.) (LEK/DEP) (prisoner civil rights action; currently pending); (5) *Shomo v. Maher,* 04-CV-4149 (S.D.N.Y.) (habeas corpus proceeding; action dismissed, and certificate of appealability denied, on 3/31/05); (6) *Shomo v. Myers,* 03-CV-10213, 2007 U.S. Dist. LEXIS 2608 (S.D.N.Y. Jan. 10, 2007) (prisoner civil rights action; original Complaint dismissed for failure to state claim by Order filed 4/6/05 with partial leave to replead; defendants' motion for summary judgment granted on 1/10/07, and Amended Complaint dismissed; notice of appeal later filed on 1/24/07); (7) *Shomo v. City of New York,* Docket No. 07-1208-CV (2d Cir.) (appeal from dismissal of prisoner civil rights action); (8) *Shomo v. Zon,* 827 N.Y.S.2d 391 (N.Y.App.Div., 4th Dept., 2006) (Article 78 proceeding seeking review of denial of inmate grievance; proceeding transferred from N.Y. Sup. Ct ., Erie County; petition denied on 12/22/06); (9) *Shomo v. New York City D.O.C.,* Index No. 6516/1996 (N.Y. Sup.Ct., Bronx County) (action sounding in tort; currently pending); (10) *Shomo v. State of New York,* Index No.2007-013-008, Claim No. 112049 (N.Y. Ct. Cl .) (claims of negligent medical care, and cruel and unusual punishment as a result of misdiagnosed medical condition; currently pending).

FN35.*Id.*

FN36.*See Shomo v. State of New York,* 04-CV-0707 (N.D.N.Y.) (LEK/DEP) (prisoner civil rights action; defendants' motion for summary judgment filed on 10/30/06; Plaintiff responded to motion for summary judgment on 11/20/06); *Shomo v. City of New York,* 03-CV-10213 (S.D.N.Y.) (prisoner civil rights action; defendants' motion for summary judgment filed on 10/5/06; Order filed on 1/10/07, granting motion for summary judgment).

FN37.*See Shomo v. State of New York,* Index No.2007-013-008, Claim No. 112049, Decision at 1 (N.Y. Ct. Cl., filed March 30, 2007) (Patti, J.) ("[Plaintiff] seems well-acquainted ... with the filing requirements of [the court] ....").

FN38. (Dkt.Nos.2, 4, 11, 49, 52, 69, 75, 76, 78.)

FN39. (Dkt. No. 72, Part 4, at 155 [Ex. A to Finkelstein Decl., attaching transcript of Plf.'s deposition].)

FN40. (*See, e.g.,* Dkt. Nos. 1, 2, 3, 4, 7, 10, 11, 49, 52, 69, 75, 76, 78.)

FN41. (Dkt.Nos.6, 49, 66, 76, 78.)

Under the circumstances, I find that Plaintiff's special status as a *pro se* litigant should be revoked for the remainder of this action. Again, continuing to afford him such special status would be unnecessary (and unfairly prejudicial to Defendants).[FN42]

> FN42. I note that it appears that, as of the current date, Plaintiff has earned two strikes for purposes of 28 U.S.C.1915's "three strikes" rule. *See Shomo v. State of New York,* 06-CV-0353 Memorandum and Order at 5-9 (W.D.N.Y., filed Nov. 2, 2006) (dismissing Plaintiff's Complaint for, *inter alia,* failure to state a claim, and

requiring him to file Amended Complaint); *Shomo v. City of New York,* 03-CV-10213, 2005 WL 756834, at *7-12 (S.D.N.Y. Apr. 4, 2005) (dismissing original Complaint for failure to state claim, with partial leave to replead).

## II. ANALYSIS

**\*5** As an initial matter, Plaintiff has requested to file a sur-reply with regard to Defendants' motions. (*See*Dkt. No. 88.)The State Defendants have opposed that request. (*See*Dkt. No. 87). In light of the Local Rule generally prohibiting the filing of sur-replies (*see* L.R. 7.1[b][1] ), the minimal value of Plaintiff's sur-reply (*see*Dkt. No. 88), and the revocation of Plaintiff's special status as a *pro se* civil rights litigant (*see, supra,* Part I.B. of this Report-Recommendation), I deny Plaintiff's request. Accordingly, I direct the Clerk's Office to strike from the docket pages 2 through 5 of Plaintiff's letter request, which attaches his proposed sur-reply. (Dkt. No. 88.)

## A. State Defendants' Motion for Summary Judgment

The State Defendants argue that Plaintiff's claims against them should be dismissed for four reasons: (1) issue preclusion based on two previous court decisions regarding the claims at issue in this litigation; (2) a failure to state, or establish, a claim under the Eighth Amendment; (3) a failure to state a claim under the ADA or the RA; and (4) a failure to state a claim under the Civil Rights Act. (*See generally*Dkt. No. 72, Part 17 [State Defs.' Mem. of Law].)

## 1. Issue Preclusion

The State Defendants argue that Plaintiff is precluded, or "collaterally estopped," from religating the issues on which his Complaint is based because those issues were previously litig-

ated and decided in *Shomo v. Zon,* 827 N.Y.S.2d 391 (N.Y.App.Div., 4th Dept., 2006) and *Shomo v. Myers,* 03-CV-10213, 2007 U.S. Dist. LEXIS 2608 (S.D.N.Y. Jan. 10, 2007).[FN43]

> FN43. (Dkt. No. 72, Part 17, at 5-13 [State Defs.' Mem. of Law].)

"Collateral estoppel, or issue preclusion, bars the relitigation of issues actually litigated and decided in the prior proceeding, as long as that determination was essential to that judgment." *Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.,* 56 F.3d 359, 368 (2d Cir.1995) [citations omitted]."Four elements must be met for collateral estoppel to apply: (1) the issues of both proceedings must be identical, (2) the relevant issues were actually litigated and decided in the prior proceeding, (3) there must have been full and fair opportunity for the litigation of the issues in the prior proceeding, and (4) the issues were necessary to support a valid and final judgment on the merits." *Central Hudson,* 56 F.3d at 368 [citations and internal quotation marks omitted].

Of these four elements, the only one placed at issue by Plaintiff's response papers is the first element: whether the issues of both proceedings are identical. The State Defendants are correct when they state that (1) factual questions (and not simply questions of law) may constitute "issues" for purposes of the aforementioned collateral estoppel analysis, (2) issue preclusion may apply even though "the events involved in the two proceedings took place at different times (or the question was one of [someone's] ... condition [occurring] at different time periods)," (3) among the factors that should be considered when deciding whether two proceedings raise the same "issue" (for purposes of collateral estoppel) are whether there is a "substantial overlap" between the evidence and/or arguments advanced in the two proceedings, and (4) the party seeking to assert collateral estoppel in a proceeding need not have been involved in the prior proceeding.[FN44]

> FN44. (Dkt. No. 72, Part 17, at 7 [State

Defs.' Mem. of Law].)

**\*6** I have carefully read the decisions in *Shomo v. Zon*, 827 N.Y.S.2d 391 (N.Y.App.Div., 4th Dept., 2006) and *Shomo v. Myers*, 03-CV-10213, 2007 U.S. Dist. LEXIS 2608 (S.D.N.Y. Jan. 10, 2007). I find that the Fourth Department's decision in *Shomo v. Zon* is simply too short to enable me to discern whether or not any of the issues presented in that proceeding are the same as any of the issues presented in the current proceeding.[FN45] However, the Southern District's decision in *Shomo v. Myers* is far more lengthy and helpful.

> FN45. Granted, I do know what *allegations* Plaintiff was asserting in that proceeding, since the State Defendants were helpful enough to provide Plaintiff's Complaint in that proceeding. (Dkt. No. 72, Part 6 [Ex. C to Finkelstein Decl.].) However, that information would be relevant only to a Rule 12(b)(6) failure-to-state-a-claim analysis, not to a Rule 56 genuine-issue-of-material-fact analysis. What I would need to know to determine the preclusive effect of *Shomo v. Zon* on the current proceeding would be what *evidence* the Fourth Department considered in reaching its conclusion in *Shomo v. Zon.* The Fourth Department does not describe that evidence in its decision, stating only, "The evidence supports respondent's determination that petitioner's medical needs are being met, and petitioner failed to establish that respondent is deliberately indifferent to serious medical needs of petitioner." *Shomo v. Zon*, 827 N.Y.S.2d 391, 391 (N.Y.App.Div., 4th Dept., 2006).

In *Shomo v. Myers*, one of the issues was whether the chief physician at the City of New York Department of Corrections acted with the required state of mind for a deliberate indifference claim under the Eighth Amendment (i.e., criminal recklessness) when, between September 26, 2000 (before which any conduct was non-actionable due to the applicable statute of limitations) and December 24, 2003 (the date of filing of Plaintiff's Complaint in the action), she (1) knew, or was chargeable with knowledge, of Plaintiff's complaints that he needed assistance performing activities of daily living due to his chronic nervous system disorder, but she (2) declined to transfer Plaintiff to a hospital facility that could provide him with such assistance, because (3) there existed both (a) medical reports and notations recommending that Plaintiff receive assistance with activities of daily living, and (b) medical reports and notations stating that Plaintiff did not require such assistance, (4) "[f]aced with a body of conflicting professional judgments, [she], in her capacity as Chief Physician, was compelled to make a professional judgment of her own," and "[s]he determined that Plaintiff was sufficiently capable of performing activities of daily living, and that transfer to a hospital facility was unnecessary."*Shomo*, 2007 U.S. Dist. LEXIS 2608, at \*12-14.

This issue appears very similar to an issue in the current action: whether Defendants Sharma (Mohawk C.F. Chief Medical Physician), Zaki (Mohawk C.F. Physician), Rosado (Mohawk C.F. Deputy Superintendent of Health Services), Antonsen (Mohawk C.F. Director of Nursing), Nallenbach (Mohawk C.F. Nurse Administrator), Harris (Mohawk C.F. Registered Nurse J. Harris), Rockhill (Mohawk C.F. Registered Nurse F. Rockhill), Connarton (Mohawk C.F. Occupational Therapist D. Connarton), Smith (Coxsackie C.F. Deputy Superintendent of Health Services), and Wright (DOCS Deputy Commissioner and Chief Medical Officer) acted with the required state of mind for a deliberate indifference claim under the Eighth Amendment (i.e., criminal recklessness) when, between January 4, 2001, and July 22, 2004, they (1) knew, or were chargeable with knowledge, of Plaintiff's complaints that he needed assistance performing activities of daily living due to his chronic nervous system disorder, but (2) they declined to provide him with such assistance (either by transferring Plaintiff to another facility or otherwise), because (3) there existed both (a) medical reports

and notations recommending that Plaintiff receive assistance with activities of daily living, and (b) medical reports and notations stating that Plaintiff did not require such assistance, (4) faced with a body of conflicting professional judgments, they, in their various medical capacities, were compelled to make a professional judgment of their own, and they determined that Plaintiff was sufficiently capable of performing some activities of daily living, and that assistance with further such activities (or a prison transfer) was unnecessary. (*See generally*Dkt. No. 1 [Plf.'s Compl.]; Dkt. No. 72, Part 2 [State Defs.' Rule 7.1 Statement]; Dkt. No. 79, Part 2 [Plf.'s Rule 7.1 Response].)

*7 If the aforementioned medical professionals (i.e., Sharma, Zaki, Rosado, Antonsen, Nallenbach, Harris, Rockhill, Connarton, Smith and Wright) did not, as a matter of law, possess the requisite state of mind, it is difficult for me to imagine circumstances under which any of the other State Defendants (i.e., Goord, Bernardi, Masterson, Filion, Perlman, Onley) could have possessed such a state of mind, given the fact that they were relying on the professional judgment of those individuals.

The only question that might give me some pause is whether the medical records considered in *Shomo v. Myers* were substantially similar to the medical records submitted by the parties on Defendants' motions in the current action. After carefully reading *Shomo v. Myers*, and carefully reviewing the medical records submitted by the parties in the current action, I find that the medical records considered in *Shomo v. Myers* were, indeed, substantially similar to the medical records submitted by the parties on Defendants' motions in the current action.

For example, in *Shomo v. Myers*, the medical records supporting Plaintiff's request for assistance with activities of daily living included the following: (1) a September 25, 1999, medical opinion of Dr. Harjinder Bhatti that Plaintiff needed such assistance; (2) an October 9, 1999, concurring opinion of Physician's Assistant Doni Pitchford. *Shomo*, 2007 U.S. Dist. LEXIS 2608, at *14. The medical

records undermining Plaintiff's request for assistance with activities of daily living included the following: (1) an October 13, 1999, determination of a neurologist at Bellevue Hospital that Plaintiff was able to perform activities of daily living, and did not need assistance with such activities; and (2) the notation of prison medical staff on or about October 13, 1999, that Plaintiff was able to eat and use the toilet without assistance. *Id.* at *14-15.

Moreover, in *Shomo v. Myers*, several medical records existed that both supported and undermined Plaintiff's request for assistance with activities of daily living. *Id.* at *17-20.For example, a medical record from January 26, 2000, reflected the findings of two physicians at Bellevue Hospital that Plaintiff's "[e]lectrodiagnostic studies are consistent with the presence of left brachial plexopathy" and the possibility of "a concurrent reflex sympathetic dystrophy." *Id.* at *17-18.However, that medical record did not indicate that Plaintiff suffered from paralysis, and did not prescribe any particular mode of care for Plaintiff, returning him to the general population. *Id.* at *17-20.Similarly, reports existed from March and April of 2000 indicating that Dr. Appel prescribed physical therapy and occupational therapy for Plaintiff, but did not prescribe that he receive any assistance with activities of daily living. *Id.* at *20.

Here, the record on Defendants' motions for summary judgment contains approximately 1,572 pages of Plaintiff's medical records. (*See*Dkt. No. 72, Part 9 [Ex. A to Howard Decl., containing 1,523 pages of medical records] [filed under seal]; Dkt. No. 73, Parts 4-5 [Exs. E and F to Young Decl., attaching 18 pages of medical records]; Dkt. No. 79, Part 3, Exs. 27, 31, 33, 34 [Plaintiff's Response Papers, containing 31 pages of medical records].) Among these records are the following: (1) the January 26, 2000, medical record from Bellevue Hospital (which, as stated earlier, does not indicate that Plaintiff suffered from paralysis, and does not prescribe any particular mode of care for Plaintiff, returning him to the general population); and (2) the

March and April 2000 reports from Dr. Appel (which, note that Plaintiff "again requests help with ADL," but, as stated earlier, do not prescribe that Plaintiff receive any assistance with activities of daily living, only physical therapy and occupational therapy). (Dkt. No. 79, Part 3, Ex. 31 [Plaintiff's Response Papers].)

*8 Simply stated, I find that the issue of whether the State Defendants acted with criminal reckless-ness (when, faced with a body of conflicting medic-al reports, they decided, in their professional judg-ments, or in reliance on medical professionals exer-cising their professional judgments, that Plaintiff did not need further assistance with performing his activities of daily living) was actually litigated and decided in *Shomo v. Myers.*

Plaintiff's arguments to the contrary are not per-suasive. Plaintiff argues that issue preclusion is not appropriate under the circumstances because (1) the issues addressed in *Shomo v. Zon,* 827 N.Y.S.2d 391 (N.Y.App.Div., 4th Dept., 2006) and *Shomo v. Myers,* 03-CV-10213, 2007 U.S. Dist. LEXIS 2608 (S.D.N.Y. Jan. 10, 2007) were different than the is-sues facing the Court in the current action, because the location and nature of the incidents giving rise to Plaintiff's claims in those actions are different than the location and nature of the incidents in the current action, (2) the ruling in *Shomo v. Myers* re-garding whether Plaintiff had a *sufficiently serious medical need* for purposes of the Eighth Amend-ment was actually resolved in Plaintiff's favor (i.e., the Southern District found that a question of fact existed regarding whether Plaintiff was unable to perform activities of daily living to such an extent that his condition constituted a serious medical need), (3) the ruling in *Shomo v. Myers* may not be given preclusive effect herein because that ruling was an order on a motion for summary judgment and Second Circuit Rule 0.23 states that "[r]ulings by summary order do not have preclusive effect," and (4) given the uncertainty surrounding Plaintiff's medical condition, the Court should reserve de-cision on Defendants' motion until Plaintiff has

been evaluated by a qualified neurologist.[FN46]

FN46. (Dkt. No. 79, Part 1, at 4-8 [Plf.'s Mem. of Law].)

I reject Plaintiff's first argument because (1) as I stated earlier, issue preclusion may apply even though the events involved in the two proceedings took place at different times, and (2) in any event, I find that the facts giving rise to Plaintiff's deliberate indifference claim in *Shomo v. Myers* were substan-tially similar to the events giving rise to Plaintiff's deliberate indifference claim in the current proceed-ing.

I reject Plaintiff's second argument because, in the Court's resolution of the State Defendants' motion for summary judgment, it does not matter whether or not the Southern District found a question of fact with regard to whether Plaintiff had a sufficiently serious medical condition for purposes of the Eighth Amendment. This is because, for the sake of argument, I am assuming, in this Report-Recommendation, that Plaintiff's medical condition was sufficiently serious for purposes of the Eighth Amendment. *See, infra,* Part II.A.2. of this Report-Recommendation. Rather, the issue before the Court, at least with respect to the State Defendants' collateral estoppel argument, is whether or not the Southern District's ruling in *Shomo v. Myers* with regard to the defendants' state of mind (regarding that condition) should be given preclusive effect in the current proceeding (and I have found that the ruling should be given such effect).

*9 I reject Plaintiff's third argument because that argument is premised on a misreading of Section 0.23 of the Local Rules of the Second Circuit. Plaintiff reads that Local Rule as referring to "summary judgment orders." In fact, that rule refers to "summary orders"-quite a different thing. *See* Local Rules of the Second Circuit § 0.23(a) ("[I]n those cases in which decision is unanimous and each judge of the panel believes that no jurispru-dential purpose would be served by an opinion (i.e., a ruling having precedential effect), the ruling may

be by summary order instead of by opinion."). Furthermore, the fact that the Southern District's decision was published on Lexis and Westlaw only (rather than being published also in a federal reporter) [FN47] is of no consequence to the issue of whether the decision may be given preclusive effect. This is because, among other reasons, the Southern District's decision was not a "summary order," nor was it issued by the Second Circuit.

> FN47.See Shomo v. Myers, 03-CV-10213, 2007 U.S. Dist. LEXIS 2608, 2007 WL 102108 (S.D.N.Y. Jan. 10, 2007).

Finally, I reject Plaintiff's fourth argument for a number of reasons. It is not the function of an impartial judiciary to sua sponte conduct discovery for a party (such as an evaluation of Plaintiff by a neurologist) in order to eliminate differences of medical opinion. If Plaintiff is requesting an Order staying the pending motions for summary judgment, and permitting limited discovery in the form of an examination of a neurologist, there is a procedure available for making such a request. See, e.g.,Fed.R.Civ.P. 56(f), 26(b)(1), 16(b). I will set aside the fact that Plaintiff has not even bothered to try to follow that procedure, despite his considerable litigation experience and familiarity with court procedures. The more serious defect with Plaintiff's argument is that he has not shown cause in support of such an Order. It is clear from the 1,523 pages of medical records before the Court that, since the onset of his injury in 1994, Plaintiff has been examined by several neurologists, who have formed differing opinions regarding Plaintiff's condition. I have no reason to believe that another such examination would yield a diagnosis that would somehow reconcile or eliminate the differences between these medical opinions. Nor can I imagine how such an examination would even be material to the state-of-mind issue presented by the State Defendants' motion, since the neurologist's findings would occur years after the period of time in question, i.e., January 2001 to and July 2004 (and thus could not possibly have been considered by the State Defend-

ants' when they made their respective professional judgments). Moreover, as a practical matter, I wonder who Plaintiff proposes would pay for an "independent examination" by a "qualified neurologist," as Plaintiff requests. Succinctly stated, Plaintiff has been given sufficient opportunity to conduct discovery in this matter, as the Court implicitly ruled when it denied his request to re-open discovery on February 26, 2007. (Dkt. No. 69.)[FN48]

> FN48. I note that, on February 9, 2007, the Court partially granted Plaintiff's request for an order compelling further discovery from Defendants. (Dkt. No. 66.)

*10 As a result, I recommend that the Court dismiss Plaintiff's claim against the State Defendants under the Eighth Amendment on the ground that the issue of whether the State Defendants acted with criminal recklessness (when, faced with a body of conflicting medical reports, they decided, in their professional judgments, or in reliance on medical professionals exercising their professional judgments, that Plaintiff did not need further assistance with performing his activities of daily living) was actually litigated and decided in Shomo v. Myers, 03-CV-10213, 2007 U.S. Dist. LEXIS 2608 (S.D.N.Y. Jan. 10, 2007).

2. Eighth Amendment Claim

The State Defendants next argue that Plaintiff's Eighth Amendment deliberate indifference claim fails as a matter of law because (1) Plaintiff fails to allege facts indicating, or adduce evidence establishing, that his medical condition was sufficiently serious for purposes of the Eighth Amendment, or that Defendants acted with the requisite state of mind with regard to that medical condition, (2) Plaintiff fails to allege facts indicating, or adduce evidence establishing, that Defendants Goord, Wright, Bernardi, Masterson, Filion, Perlman, Smith, Rosado, and Rockhill-all but the last of whom were all supervisory officials-were person-

ally involved in constitutional violations alleged, (3) Plaintiff's suffering was caused not by Defendants' actions but by Plaintiff's own systematic noncompliance with the health care plan established for him by the medical staff at Walsh Regional Medical Unit, and (4) Defendants are protected by the doctrine of qualified immunity.[FN49]

> FN49. (Dkt. No. 72, Part 17, at 13-22 [State Defs.' Mem. of Law].)

With respect to the State Defendants' first argument (regarding the seriousness of Plaintiff's medical condition and the state of mind of the State Defendants), Plaintiff responds with a series of arguments: (1) a question of fact exists regarding whether Plaintiff suffers from a sufficiently serious medical condition (i.e., paralysis), as is evident from the medical records that the State Defendants did not provide to the Court and that Plaintiff is providing to the Court at Dkt. No. 79, Part 3, at Ex. 31; (2) the State Defendants' failure to hand feed Plaintiff was not merely a "disagreement" between a patient and his doctors but was a conscious infliction of indignation, humiliation, and, indeed, pain (due to choking, stomach pains, vomiting, and neck and back pains); (3) the conduct of Defendants Hochstetler and Gardella constituted criminal recklessness since they temporarily ordered Plaintiff's hand feeding to be discontinued after Plaintiff had an altercation with a nurse, and then they permanently discontinued that hand feeding after Plaintiff (as he puts it) "went balistic [sic] and verbally cursed Hochstetler out," demonstrating that the discontinuance of hand feeding was "payback for [Plaintiff's] abusive tongue"; (4) the conduct of Defendants Hochstetler and Gardella constituted criminal recklessness since, on October 28, 2002, they issued a "discharge summary" that was in total contradiction to a "Specialist's Report" issued by neurologist Dr. Mark P. Dentinger on October 18, 2002. [FN50]

> FN50. (Dkt. No. 79, Part 1, at 8-15 [Plf.'s Mem. of Law]; Dkt. No. 72, Part 4, at 204 [Ex. A to Finkelstein Decl., attaching transcript of Plf.'s deposition].)

*11 With respect to the State Defendants' second argument (regarding the personal involvement of various of the State Defendants), Plaintiff argues that those Defendants who were supervisory officials did not merely receive complaints from Plaintiff but responded to those complaints, explained the medical treatment provided to Plaintiff and defended DOCS, Coxsackie C.F., and/or Mohawk C.F.[FN51] For example, Defendants Bernardi and Smith personally investigated Plaintiff's complaints (and Defendant Bernardi promulgated DOCS Directive 2614).[FN52] Defendants Goord, Bernardi, Wright and Smith entered into contractual agreements with Correctional Medical Services, Inc., knowing that those contracts would violate the Eighth Amendment, the ADA, and the RA.[FN53]Defendant Wright personally signed letters responding to Plaintiff's complaints.[FN54]Defendant Filion personally investigated Plaintiff's complaints, rendering personal "findings" with regard to those complaints.[FN55]Defendant Perlman personally investigated Plaintiff's complaints, taking the position that it was beyond the authority of an Inmate Grievance Review committee to recommend that Plaintiff's requested accommodations be granted.[FN56]Defendant Masterson personally reviewed all denials of inmates' requests for reasonable accommodations-reversing, modifying or affirming those denials.[FN57]Finally, Defendants Rosado and Rockhill were involved in developing and implementing Plaintiff's health care plan at Walsh Regional Medical Unit.[FN58]

> FN51. (Dkt. No. 79, Part 1, at 15-20 [Plf.'s Mem. of Law].)
>
> FN52.(Id. at 15-16.)
>
> FN53.(Id. at 16.)
>
> FN54.(Id. at 17.)
>
> FN55.(Id. at 18.)
>
> FN56.(Id.)
>
> FN57.(Id. at 18-19.)

FN58.(*Id.* at 19-20.)

With respect to the State Defendants' third argument (regarding the cause of Plaintiff's suffering), Plaintiff argues that (1) while he did refuse a few routine exams (e.g., regarding his vital signs, blood pressure, etc.), he did not refuse either of the two diagnostic neurological exams ordered for him, and (2) while he did refuse medications on a few occasions, he did so because of adverse reactions he had experienced from those medications in the past, and, in any event, those medications were not for the treatment of any pains or ailments in his arms.[FN59]

FN59.(*Id.* at 20-22.)

With respect to the State Defendants' fourth argument (regarding qualified immunity), Plaintiff argues that the record evidence demonstrates that those State Defendants who were Plaintiff's physicians were "plainly incompetent" in that they "did not know the meaning of [his] diagnos[es]" and they "did not understand the medical definition of 'paralysis' or its verios [sic] stages."[FN60] Plaintiff also argues that it is clear that Defendant Hochstetler was intending to cause Plaintiff pain from the fact that Defendant Hochstetler issued a "negative impact discharge summary" on October 28, 2002, despite the fact that Plaintiff had received a "favorable neurology report just weeks earlier" from Dr. Dentinger .[FN61]

FN60.(*Id.* at 23-26.)

FN61.(*Id.* at 26.)

I need not reach the merits of the State Defendants' second, third, and fourth arguments, because I find that their first argument has merit. Specifically, I agree with them that, even if the Court were to assume that Plaintiff's medical needs were sufficiently serious for purposes of the Eighth Amendment, Plaintiff has failed to adduce any evidence establishing that the State Defendants acted with the requisite state of mind with regard to those

medical needs. I reach this conclusion for the several reasons stated by the State Defendants in their memorandum of law. (*See* Dkt. No. 72, Part 17, at 17-19 [State Defs.' Mem. of Law].)

**\*12** A more detailed analysis of the State Defendants' argument properly begins with the recognition that the term "deliberate indifference" refers to a state of mind that is equivalent to *criminal recklessness.*[FN62] Mere *negligence* by a DOCS employee is not sufficient for a prisoner to state a claim under the Eighth Amendment.[FN63] For this reason, a prisoner's *disagreement* with a DOCS employee regarding the treatment that he should properly receive is insufficient to state a claim under the Eighth Amendment.[FN64] As the Second Circuit has explained,

> FN62. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998).
>
> FN63. *Estelle v. Gamble,* 429 U.S. 97, 106 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").
>
> FN64. *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ( "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.").

It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself

of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff[ ] understandably seeks .... We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution.... The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves .... The essential test is one of medical necessity and not one simply of desirability.

*Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) [internal quotations and citations omitted].

Here, Plaintiff received rather constant medical attention while at Mohawk C.F.'s Walsh Regional Medical Unit. In their Rule 7.1 Statement, the State Defendants describe this medical attention, which included the development of a health care plan for Plaintiff, and the provision of assistance with various activities of daily living.[FN65] These factual assertions are supported by the record citations offered by the State Defendants (as well as by other portions of the record, not cited by the State Defendants).[FN66] In his Rule 7.1 Response, Plaintiff fails to offer any response whatsoever with regard to these factual assertions-much less offer a response in matching numbered paragraphs, with the denials supported by a specific citation to the record where the factual issue arises, as required by Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court.[FN67] Various other factual assertions by the State Defendants (regarding medical care treatment denied by Plaintiff) are either admitted by Plaintiff or not specifically denied by him in accord with Local Rule 7.1(a) (3).[FN68] Moreover, several record citations that Plaintiff does offer in support of his denials do not in fact support those denials

FN69

FN65. (Dkt. No. 72, Part 2, ¶¶ 16-21 [State Defs.' Rule 7.1 Statement].)

FN66.(*Id.*)

FN67. (*See generally*Dkt. No. 79, Part 2 [Plf.'s Rule 7.1 Response].)

FN68. (*Compare*Dkt. No. 72, Part 2, ¶¶ 23, 24, 28 [State Defs.' Rule 7.1 Statement] *with*Dkt. No. 79, Part 2, ¶¶ 10, 11, 14 [Plf.'s Rule 7.1 Response, admitting that (1) he routinely refused medications, physical therapy, assistance with ADLs, physical examinations, weekly assessments, and to be weighed, and (2) during the time in question, generally his weight was stable, and indeed 30 pounds above the ideal weight for a person of his height].)

FN69. (*See, e.g.,*Dkt. No. 79, Part 2, ¶ 16 [Plf.'s Rule 7.1 Response, citing to Dkt. No. 72, Part 9, at 100, which does not support Plf.'s denial of Paragraph 30 of Defendants' Rule 7.1 Statement].)

As explained above, Plaintiff was specifically advised of the potential consequences of failing to respond to the State Defendants' motion for summary judgment.[FN70] Moreover, his special status as a *pro se* civil rights litigant has been revoked for the remainder of this action.[FN71] Even if his special status had not been revoked, I would decline to exercise my discretion to *sua sponte* scour the record (beyond the review I have already performed) for evidence disputing the State Defendants' factual assertions.[FN72] As a result, I treat as undisputed the State Defendants' aforementioned factual assertions, namely those factual assertions contained in Paragraphs 16, 17, 18, 19, 20, 21, 23, 30 (and part of the factual assertions contained in Paragraphs 24 and 28) of their Rule 7.1 Statement. Based on these undisputed facts, I cannot imagine circumstances under which the treatment that Plaintiff received

would give rise even to a claim of ordinary negligence against the State Defendants, much less a claim of deliberate indifference.

> FN70. *See, supra,* note 21 of this Report-Recommendation.

> FN71. *See, supra,* Part I.B. of this Report-Recommendation.

> FN72. *See, supra,* note 12 of this Report-Recommendation.

*13 Although my above-stated conclusion (that the treatment Plaintiff received does not give rise to a claim of deliberate indifference against the State Defendants) needs no further support, it is further supported by the fact that, in his deposition, Plaintiff admitted that he could eat independently with the use of adaptive equipment (which was provided to him by Defendants in this action).[FN73] This admission is certainly consistent with the other record evidence, which indicates that Plaintiff can eat by himself (with the use of adaptive equipment) and that his weight, during the relevant time period, was generally above the "ideal" weight for a person of his height.[FN74] What Plaintiff complains about in this action is the indignity and discomfort of being made to eat out of a bowl "like a dog," as he puts it.[FN75] However, "mere inconvenience or discomfort" while eating in prison does not state an Eighth Amendment claim of deliberate indifference. *Powell v. Kingston,* 05-CV-0112, 2005 U.S. Dist. LEXIS 5586, at *6-7 (W.D.Wis. March 29, 2005) (prisoner made to eat meals served in bags without assistance of utensils). As is often observed by federal courts, "[t]he Constitution does not mandate comfortable prisons and conditions that are restrictive and even harsh are part of the penalty that criminal offenders pay for their offenses against society."*Powell,* 2005 U.S. Dist. LEXIS 5586, at *7 [internal quotation marks and citations omitted].

> FN73. (Dkt. No. 72, Part 4, at 216-217 [Ex. A to Finkelstein Decl., attaching transcript of Plf.'s deposition].)

> FN74. (*See, e.g.,*Dkt. No. 72, Part 10, ¶ 15 [Antonsen Decl.]; Dkt. No. 72, Part 8, ¶ 18 [Howard Decl.]; Dkt. No. 72, Part 9, at 103, 109 [Ex. A to Howard Decl., attaching Plf.'s medical records] [filed under seal].)

> FN75. (Dkt. No. 72, Part 4, at 42, 43, 46, 48, 56, 71, 197, 199, 215, 217, 218, 220 [Ex. A to Finkelstein Decl., attaching transcript of Plf.'s deposition].)

Finally, I note that none of Plaintiff's arguments in opposition to the State Defendants' argument on this subject are persuasive or even on topic. Plaintiff's first argument (i.e., that the medical records that Plaintiff is providing to the Court at Dkt. No. 79, Part 3, at Ex. 31 create a question of fact regarding whether Plaintiff suffers from a sufficiently serious medical condition) has nothing to do with whether the State Defendants *acted with the requisite state of mind* with regard to Plaintiff's medical condition. (Nor do those 18 pages of records, in fact, establish that the State Defendants acted with such a state of mind.) Plaintiff's second argument (i.e., the State Defendants' failure to hand feed Plaintiff was not merely a "disagreement" between a patient and his doctors but was a conscious infliction of pain) is completely conclusory, unsupported by any record citations regarding any State Defendants. Finally, Plaintiff's third and fourth arguments (i.e., regarding the conduct of Defendants Hochstetler and Gardella) have to do with two *Corporate* Defendants, not any *State* Defendants.

As a result, I recommend that the Court dismiss Plaintiff's claim against the State Defendants under the Eighth Amendment on the alternative ground that Plaintiff has failed to adduce facts establishing that the State Defendants acted with deliberate indifference to Plaintiff's medical needs.

**3. Claim Under ADA and RA**

The State Defendants next argue that Plaintiff fails to state a claim under the ADA and the RA, because (1) he fails to allege facts indicating, or adduce evidence establishing, that Defendants were motivated by discriminatory animus or ill will due to disability, and (2) he fails to identify programs from which he was excluded.[FN76]

FN76. (Dkt. No. 72, Part 17, at 22-24 [State Defs.' Mem. of Law].)

*14 Plaintiff responds with three arguments: (1) it is beyond question that, pursuant to the definition of "disability" in the ADA and the RA, Plaintiff had a disability under the circumstances; (2) by including a copy of Section D of DOCS Directive 2614, Plaintiff has adduced evidence of Defendants' "state of mind" in denying the assistance that Plaintiff requested, namely, their feeling that "it was too burdensome" to provide Plaintiff such assistance, and that they would rather force Plaintiff to "humiliat[e]," "belitt[le]," and "dehumaniz[e]" himself; and (3) Plaintiff has, in fact, identified which programs or services from which he was excluded, namely, the programs or services described in Paragraph 73 of his Complaint.[FN77]

FN77. (Dkt. No. 79, Part 1, at 27-29 [Plf.'s Mem. of Law].)

Plaintiff's first argument is either a non-sequitur or a straw man, since the State Defendants do not argue that Plaintiff did not possess a "disability" under the ADA and the RA.[FN78] Furthermore, I need not reach the merits of Plaintiff's third argument, because I find his second argument to be unconvincing: DOCS Directive 2614 in no way constitutes evidence of any discriminatory animus or ill will due to disability by the State Defendants.[FN79] First, it is not a violation of the ADA to deny an inmate's request for reasonable accommodations because of a reason *other than his disability*.[FN80] (For example, where an inmate alleges that he has been treated differently than other disabled inmate simply because of incompetent medical treatment, he has not stated a claim of discrimination under

the ADA.) [FN81] Here, I can find no record evidence, or even a nonconclusory factual allegation, that Plaintiff was discriminated against because of his disability.[FN82] Furthermore, it is not a violation of the ADA to deny an inmate's request for reasonable accommodations solely because of cost; indeed, in certain circumstances, the ADA expressly exempts defendants from having to make reasonable accommodations for disabled persons if it would be unduly burdensome to the defendants to make such accommodations.[FN83] Second, even if it were a violation of the ADA to deny an inmate's request for reasonable accommodations solely because of cost, I can find no evidence in the record that the State Defendants were denying Plaintiff's request for reasonable accommodations solely because of cost. The only record citation that Plaintiff offers for this assertion does not constitute such evidence; and, it is worth noting, that record citation actually suggests that Plaintiff, on several occasions between April 26, 2001, and May 1, 2001, refused to be treated or examined.[FN84] Nor does Plaintiff's conclusory argument to that effect (i.e., that Defendants were motivated by their feeling that "it was too burdensome" to provide such assistance to Plaintiff) in his opposition memorandum of law constitute such evidence.

FN78. (Dkt. No. 72, Part 17, at 22-24 [State Defs.' Mem. of Law].)

FN79. (Dkt. No. 79, Part 3, at Ex. 28 [Plf.'s Opp. to Defs.' Motion, attaching DOCS Directive 2614, which states, in pertinent part, "The Department is required to make 'reasonable accommodations' or modifications to existing policies and procedures ... unless to do so would be an undue burden on the Department, cause a fundamental alteration to a program, or compromise the safety or security of the facility.... DEFINITIONS ... D. *Undue Burden:* reasonable accommodations or modifications which would result in a fundamental alteration in the nature of a program or activity or in

undue financial and administrative hard-
ship. This is a limited exception under the
ADA and generally cannot be used for
denying an accommodations or a modifica-
tion requested for program accessibil- ity."].)

FN80.*See*42 U.S.C. § 12132 ("[N]o quali-
fied individual with a disability shall, *by
reason of such disability,* be excluded from
participation in or be denied the benefits of
the services, programs, or activities of a
public entity, or be subjected to discrimin-
ation by any such entity.") [emphasis ad-
ded]; *Gracia v. S. U.N.Y. Health Sciences
Ct. of Brooklyn,* 280 F.3d 98, 112 (2d
Cir.2001) ("[A] private suit for money
damages under Title II of the ADA may
only be maintained against a state if the
plaintiff can establish that the Title II viol-
ation was motivated by either discriminat-
ory animus or ill will due to disability."). 
For the sake of argument, I will assume
that the ADA and RA apply to state pris-
ons, although that fact is of some dispute
in federal courts. *Compare Saunders v.
Horn,* 960 F.Supp. 893, 897 (E.D.Pa.1997)
("[I]t would seem ... that both the ADA
and the Rehabilitation Act apply to state
and local correctional facilities.") *with
Callaway v. Smith County,* 991 F.Supp.
801, 805 (E.D.Tex.1998) ("[T]he language
of the Americans with Disabilities Act and
the Rehabilitation Act did not make unmis-
takably clear that the statutes applied to
state prisons."); *see also Randolph v.
Rodgers,* 980 F.Supp. 1051, 1059-1060
(E.D.Mo.1997) (collecting cases).

FN81. *Bryant v. Madigan,* 84 F.3d 246,
249 (7th Cir.1996).

FN82.*See Dukes v. Georgia,* 428
F.Supp.2d 1298, 1322-1324
(N.D.Ga.2006) (granting defendant's mo-
tion for summary judgment with respect to

prisoner's ADA / RA claim based on de-
fendant's alleged failure to, *inter alia,*
provide plaintiff assistance with eating, be-
cause "Plaintiff has proffered no evidence
to show that Defendant's actions were
taken on the basis of Plaintiff's disability
....").

FN83.*See, e.g.,*42 U.S.C. §
12182(2)(A)(iii) (making exception for en-
tities that "can demonstrate that taking
such steps [of accommodation] would ...
result in an undue burden"); 42 U.S.C.
12111(10)(B) (articulating factors to be
considered in determining whether accom-
modation would impose undue hardship
under ADA); *EEOC v. Amego, Inc.,* 110
F.3d 125, 148 (1st Cir.1997) (entity ex-
empted from requirements of ADA due to
"undue hardship" that would occur to en-
tity due to cost of proposed accommoda-
tion) [citing *Vande Zande v. Wisconsin
Dep't of Admin.,* 44 F.3d 538, 542 [7th
Cir.1995] ).

FN84. (*See, e.g.,*Dkt. No. 72, Part 9, at
733-734 [Ex. A to Howard Decl., attaching
Plf.'s medical records] [filed under seal].)

Granted, I note that, in his deposition, Plaintiff test-
ified that, at one point, following a complaint by a
nurse's aid that it was taking too long to hand feed
Plaintiff shredded raw cabbage, Defendant Hoch-
stetler directed his nurses to stop hand feeding
Plaintiff for a couple days because doing so was too
"cumbersome." [FN85]However, this evidence does
not create a reasonable dispute of material fact with
regard to the State Defendants' motion for two reas-
ons. First, Defendant Hochstetler is not a *State* De-
fendant. Regardless of why Defendant Hochstetler
acted, there is no evidence that any State Defendant
took any adverse action against Plaintiff based on a
claim of "undue burden." Second, even if Defend-
ant Hochstetler were a *State* Defendant, this motive
by Defendant Hochstetler (to take action based on
burdensomeness to his medical staff) would be

rendered fleeting and insignificant when compared to Plaintiff's other deposition testimony that Defendant Hochstetler was acting the way he did because (1) Plaintiff had been accused of pushing a tray onto one of the nurses, and (2) Plaintiff had become verbally abusive toward Defendant Hochstetler on two occasions, first after he placed Plaintiff on a cabbage diet, and then after he ordered his nurses to temporarily stop hand feeding Plaintiff.[FN86]

> FN85. (Dkt. No. 72, Part 4, at 70-71, 83 [Ex. A to Finkelstein Decl., attaching transcript of Plf.'s deposition, wherein Plaintiff testified, *inter alia*,"Nurse's aid ... complained about how long it was taking to feed me the shredded raw cabbage.... [Dr. Hochstetler] said, 'Well, it is too incumbersome [sic], I am not going to have nurses feed you .... Only going to be on this a couple days, we will feed you when you get off. But no, I am not going to have my nurse feed you' ".)

> FN86. (Dkt. No. 72, Part 4, at 59, 70-71, 83, 220 [Ex. A to Finkelstein Decl., attaching transcript of Plf.'s deposition, wherein Plaintiff testified, *inter alia*,"I was accused of pushing a tray on [sic] one of the nurses .... [Dr. Hochstetler] put me on the cabbage.... I ended up calling [Dr. Hochstetler] words I won't repeat.... I went ballistic, to my dismay. I called the man every name in the book, none of which I am going to repeat here. And so he took exception to that, and he said, 'Since you want to talk to me like that, I swear, I swear by God ... as long as you are in my facility ... my nurses will never feed you, and in fact you are going to get the bare minimum.'...I went ballistic.... You know, I mean, maybe I shouldn't have went [sic] ballistic, maybe I shouldn't have done what I did."].)

*15 Furthermore, setting aside this summary judgment analysis (i.e., involving the consideration of

record evidence), and turning to a motion-to-dismiss analysis (i.e., involving the consideration of only Plaintiff's Complaint), I find that Plaintiff has not even alleged, in his Complaint, facts indicating such discriminatory animus or ill will due to disability by the State Defendants.[FN87]Rather, Plaintiff alleges that Defendants' denial of Plaintiff's requests for reasonable accommodations was caused by unspecified misleading statements about Plaintiff made by unidentified "lower level [ ]" medical staff to "higher up" officials, motivated by the belief of "lower level[ ]" medical staff that Plaintiff was "a difficult patient who had to be put in his place."[FN88]Thus, according to Plaintiff's own factual allegations, the only staff members who were motivated by any animus or ill will whatsoever were "lower level[ ]" staff members. This is significant because 11 of the 16 State Defendants are *supervisory* officials,[FN89] and thus cannot reasonably be understood to fall into the category of so-called "lower level[ ]" staff members. In any event, the animus or ill will that Plaintiff alleges was not based on Plaintiff's disability but on the "lower level[ ]" staff members' perception that Plaintiff had a "difficult" personality. It is worth noting that elsewhere in Plaintiff's Complaint he alleges that staff members perform "minor tasks" for other patients with physical disabilities, suggesting, again, that they do not harbor an animus or ill will against disabled inmates.[FN90]

> FN87. (*See*Dkt. No. 1 [Plf.'s Compl.].)

> FN88.(*Id.* at ¶ 73[G] [alleging, *inter alia*, "truth be told, the defendants['] denial of reasonable accommodations [is] not truly based or premised upon there being a non-verifiable medical condition ... [;] rather, defendants[']s denial is based upon the lower levels of medical staff misleading those higher up, simply because they considered plaintiff a difficult patient who had to be put in his place"].)

> FN89.*See, supra,* note 1 of this Report-Recommendation.

FN90.(Id. at 73[C] [alleging, *inter alia*,"staff will not assist [Plaintiff] in such minor tasks as making tea, [but] sometimes they do daily for other patients with far less physical disabilities [than] the plaintiff has ....“].)

Finally, yet another reason for concluding that Plaintiff's ADA and RA claim against the 16 individual State Defendants fail to state a claim upon which relief may be granted: "Because ... the ADA [and the RA] provide[ ] redress to disabled individuals for discrimination by a public entity, individuals may not be sued [under those statutes]." *Atkins v. County of Orange.* 251 F.Supp.2d 1225, 1233 (S.D.N.Y.2003) [citations omitted].

As a result, I recommend that the Court dismiss Plaintiff's claim against the State Defendants under the ADA and the RA on the alternative ground that Plaintiff has failed to allege facts indicating, or adduce facts establishing, that the State Defendants violated either the ADA or RA. I note that a similar conclusion (that Plaintiff's ADA and RA factual allegations fail to state a claim) was reached by the Southern District of New York in *Shomo v.. Myers,* 03-CV-10213, 2005 WL 7564834, at *6 (S.D.N.Y. Apr. 4, 2005) ("I decline to adopt the statute of limitations analysis ... for [Plaintiff's claim under the ADA and RA], ... because Shomo clearly lacks a cause of action under either statute.").

**4. Claim Under 42 U.S.C. § 1981**

Finally, the State Defendants argue that Plaintiff fails to state a claim under 42 U.S.C. § 1981, because he fails to allege facts indicating that the State Defendants discriminated against him because of his race.[FN91]Plaintiff fails to respond to this argument.[FN92]

FN91. (Dkt. No. 72, Part 17, at 24 [State Defs.' Mem. of Law].)

FN92. (*See generally*Dkt. No. 79, Part 1

[Plf.'s Mem. of Law].)

*16 "Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown."N.D.N.Y. L.R. 7.1(b)(3). Among the "papers" required to be filed and served by Plaintiff in response to the State Defendants' motion is a memorandum of law.[FN93]Because Plaintiff has, in his memorandum of law, failed to oppose the State Defendants' argument, he has "consented" to that argument under Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court.[FN94]

FN93. N.D.N.Y. L.R. 7.1(a) (requiring opposition to motion for summary judgment to contain, *inter alia,* a memorandum of law); *cf.*Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's *response*... must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so *respond,* summary judgment, if appropriate, shall be entered against the adverse party.") [emphasis added].

FN94. N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."); *see, e.g., Beers v. GMC,* 97-CV-0482, 1999 U.S. Dist. LEX-

IS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ).

Because Plaintiff has "consented" to the State Defendants' argument, the only remaining issue is whether the State Defendants' have met their burden "to demonstrate entitlement to the relief requested" through that argument. This threshold burden has appropriately been characterized as "modest."[FN95]This is because, as a practical matter, the burden requires only that the State Defendants present an argument that is "facially meritorious."[FN96]I find that the State Defendants' argument is facially meritorious. Moreover, even if I were to examine the State Defendants' argument in depth, and I were to independently scour the record for any proof of a factual dispute, I am confident that I would reach the same conclusion. The State Defendants are indeed correct that 42 U.S.C. § 1981 prohibits only discrimination that is motivated by racial animus,[FN97] and I have found no allegation (or evidence) that adverse actions were taken against Plaintiff because of his race.[FN98]

FN95.See Ciaprazi v. Goord, 02-CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing Celotex Corp. v. Catrett, 477 U.S. 317, 323-324 (1986) ]; accord, Saunders v. Ricks, 03-CV-0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct. 18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.); Smith v. Woods, 03-CV-0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr. 24, 2006) (Hurd, J., adopting Report-Re-

commendation of Lowe, M.J.).

Authority exists for the similar proposition that a review of whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1(b)(3) is a more limited endeavor than a review of a contested dispositive motion. See, e.g., Race Safe Sys. v. Indy Racing League, 251 F.Supp.2d 1106, 1109-1110 (N .D.N.Y.2003) (Munson, J.) (reviewing whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); Wilmer v. Torian, 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss and the reasons set forth in defendants' motion papers), adopted by1997 U.S. Dist. LEXIS 16340, at *2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); accord, Carter v. Superintendent Montello, 95-CV-989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), adopted by 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

FN96.Hernandez v. Nash, 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, at *7-8 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b][3], "the court must review the motion to determine whether it is facially meritorious" ) [emphasis added; citations omitted]; accord, Topliff v. Wal-Mart Stores East LP, 04-CV-0297, 2007 U.S. Dist. LEXIS 20533, at *28 & n. 43 (N.D.N.Y. March 22, 2007) (Lowe, M.J.); Hynes v. Kirk-

*patrick*, 05-CV-0380, 2007 U.S. Dist. LEXIS 24356, at *5-6 & n. 2 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi*, 04-CV-1311, 2007 U.S. Dist. LEXIS 26583, at *28-29 & n. 40 (N .D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey*, 03-CV-0170, 2006 U.S. Dist. LEXIS 95065, at *5 & n. 2 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

FN97. The State Defendants refer to 42 U.S.C. § 1981 as "the Equal Rights Act." (Dkt. No. 72, Part 17, at 24 [State Defs.' Mem. of Law].) If that is indeed the popular name for 42 U.S.C. § 1981, I am unfamiliar with it. Rather, it appears that 42 U.S.C. § 1981-together with the various other federal statutes cited by Plaintiff in his Complaint-are popularly known as "the Civil Rights Statutes." In any event, the State Defendants are indeed correct that 42 U.S.C. § 1981 regards only discrimination *based on race. See* 42 U.S.C. § 1981(a) ("All persons ... shall have the same right to ... equal benefit of all laws ... as is enjoyed by white citizens ....").

FN98. (*See generally* Dkt. No. 1 [Plf.'s Compl.].)

As a result, I recommend that the Court dismiss Plaintiff's claim against the State Defendants under 42 U.S.C. § 1981 on the alternative ground that Plaintiff has failed to allege facts indicating that the State Defendants discriminated against him because of his race.

**5. Claims Under 42 U.S.C. §§ 1984, 1985, 1986, and 2000d**

Under the circumstances, the Court can, and

should, *sua sponte* review the pleading sufficiency of Plaintiff's other civil rights claims (i.e., those claims occurring under 42 U.S.C. §§ 1984, 1985, 1986, and 2000d). (*See* Dkt. No. 1, ¶¶ 28, 78, 79 [Plf.'s Compl., citing referenced statutes].) This authority is derived from three sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."; and (3) Rule 12(h)(3) of the Federal Rules of Civil Procedure, which provides that "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." FN99

FN99. I note that, under the circumstances, the Court would also be able to *sua sponte* address the *evidentiary* sufficiency of Plaintiff's claims under 42 U.S.C. §§ 1984, 1985, 1986, 2000d, since Plaintiff was certainly on notice that he had to come forward with all of his evidence regarding those claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence.") [citations omitted].

*17 As for Plaintiff's attempted claim under 42 U.S.C. § 1984, "[s]ections one and two of 42 U.S.C. § 1984 were declared unconstitutional by the Supreme Court in 1998 ..., and sections three and four were repealed by Congress in 1948. Accordingly, [Plaintiff] has no viable claims under 42

U.S.C. § 1984...." *Dennison v. Pa. Dept. of Corr.*, 268 F.Supp.2d 387, 395, n. 3 (M .D. Pa.2003), *accord, McDuffy v. Koval,* 226 F.Supp.2d 541, 550-551 (D.Del.2002), *Bd. of Tr. Sabis Intern. Sch. v. Montgomery,* 205 F.Supp.2d 835, 853, n. 12 (S.D.Oh.2002).

As for Plaintiff's attempted claim under 42 U.S.C. § 1985, Plaintiff has alleged no facts indicating the existence of a conspiracy to interfere with his civil rights. (*See*Dkt. No. 1, ¶¶ 28, 78, 79 [Plf.'s Compl.].) Specifically, for the reasons stated in this Part of the Report-Recommendation, and for the reasons stated above in Part II.A.2.-4. of this Report-Recommendation, I find no factual allegations indicating the occurrence of any violation of the ADA, the RA, and 42 U.S.C. §§ 1981, 1983, 1984, 1986, and 2000d in which the State Defendants could have conspired (nor do I find any factual allegations indicating a conspiracy).

As for Plaintiff's attempted claim under 42 U.S.C. § 1986, Plaintiff has alleged no facts indicating that any of the State Defendants, "having knowledge that any of the wrongs conspired to be done, and mentioned in [42 U.S.C. § 1985], are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do."42 U.S.C. § 1986. (*See also*Dkt. No. 1, ¶¶ 28, 78, 79 [Plf.'s Compl.].) Specifically, because I find no factual allegations indicating a violation of 42 U.S.C. § 1985, I find no factual allegations indicating that any State Defendants (1) had knowledge of a violation of 42 U.S.C. § 1985 and (2) neglected to prevent such a violation.

Finally, as for Plaintiff's attempted claim under 42 U.S.C. § 2000d, that Section, like 42 U.S.C. § 1981, prohibits only discrimination based on a person's "race, color, or national origin ." 42 U.S.C. § 2000d. Plaintiff has alleged no facts indicating discrimination on such a basis. (*See*Dkt. No. 1, ¶¶ 28, 78, 79 [Plf.'s Compl.].)

As a result, I recommend that the Court *sua sponte* dismiss Plaintiff's claim against the State Defend-

ants under 42 U.S.C. §§ 1984, 1985, 1986 and 2000d on the ground that Plaintiff has failed to allege facts indicating that the State Defendants violated any of those statutes.

**B. Corporate Defendants' Motion for Summary Judgment**

The Corporate Defendants argue that Plaintiff's claims against them should be dismissed for four reasons: (1) a failure to state, or establish, a claim under the Eighth Amendment; (2) a failure by Plaintiff to exhaust his available administrative remedies before filing this action; (3) a failure to state a claim under the ADA or the RA; and (4) a failure to state a claim under the Civil Rights Act. (*See generally*Dkt. No. 73, Part 8 [Corporate Defs.' Mem. of Law].)

**1. Eighth Amendment Claim**

**\*18** The Corporate Defendants argue that Plaintiff's Eighth Amendment deliberate indifference claim fails as a matter of law because (1) Plaintiff fails to allege facts indicating, or adduce evidence establishing, that the Corporate Defendants acted with the requisite state of mind with regard to Plaintiff's medical condition, and (2) Plaintiff fails to allege facts indicating, or adduce evidence establishing, the personal involvement of the Corporate Defendants in the constitutional violations alleged.[FN100]

> FN100. (Dkt. No. 73, Part 8, at 2-6 [Corporate Defs.' Mem. of Law].)

In response to the Corporate Defendants' first argument, Plaintiff argues that the conduct of Defendants Hochstetler and Gardella constituted criminal recklessness since (1) in April of 2001, they temporarily ordered Plaintiff's hand feeding to be discontinued after Plaintiff had an altercation with a nurse, and then they permanently discontinued that hand feeding after Plaintiff (as he puts it) "went balistic [sic] and verbally cursed Hochstetler out," demonstrating that the discontinuance of hand feed-

ing was "payback for [Plaintiff's] abusive tongue," (2) on October 28, 2002, they issued a "discharge summary" that was in total contradiction to a "Specialist's Report" issued by neurologist Dr. Dentinger on October 18, 2002.[FN101]

> FN101. (Dkt. No. 79, Part 1, at 8-15 [Plf.'s Mem. of Law].)

The problem with Plaintiff's argument regarding Defendants Hochstetler and Gardella is that the record evidence demonstrates, at most, a mere *disagreement* between Plaintiff and Defendants Hochstetler and Gardella regarding the medical care that Plaintiff should have properly received at Coxsackie C.F.'s Regional Medical Unit, not (as Plaintiff argues) a conscious infliction of indignation, humiliation, and pain. As found by the Southern District under nearly identical circumstances in *Shomo v. Myers*, during the time in question, there existed in Plaintiff's medical records both reports that Plaintiff needed assistance with various activities of daily living (such as hand feeding), and reports that he did *not* need such assistance; and, as a result of these conflicting medical opinions, medical professionals were "compelled to make a professional judgment of [their] own."*Shomo*, 2007 U .S. Dist. LEXIS 2608, at *12-14.

For example, on or about March 21, 2001, Dr. Murnane, a neurologist, examined Plaintiff and reported that he *"doubt[ed] strongly"* that Plaintiff had "any significant peripheral nerve lesion (either plexus or radiculopathy) as a cause of his 'paralysis .' " [FN102] Moreover, Plaintiff's medical records at the Coxsackie Regional Medical Unit contained several reports indicating that Plaintiff did not need to be hand fed and/or that he might be malingering. One record reported that, on or before March 26, 2001, Defendant Hochstetler had obtained from Sullivan C.F. specific details from Plaintiff's medical records there indicating that Plaintiff was generally able to eat independently, once his meals were "set up" for him.[FN103]Another record reported that, on March 31, 2001, at Coxsackie C.F., Plaintiff spit his foot out in a garbage can immedi-

ately after being hand fed his breakfast, and then claimed that he had vomited.[FN104]Other records reported that, on April 8, 2001, when medical staff prepared to assist Plaintiff with eating, he declined the bulk of the meal and, instead, expressed an interest in filing a medical complaint against medical staff.[FN105]

> FN102. (Dkt. No. 72, Part 9, at 711-12 [Ex. A to Howard Decl., attaching Plaintiff's "Progress Notes" dated 3/21/01, authored by Dr. Murnane]; *see also*Dkt. No. 72, Part 9, at 94 [Ex. A to Howard Decl., attaching Discharge Summary by Defendant Hochstetler regarding Plaintiff, dated 10/28/02, stating that "Dr. Murnane, Neurologist[,] has seen [Plaintiff], in March 2001. From his consult, Dr. Murnane says 'Given the presence of intact DTR's I *doubt strongly* any significant peripheral nerve lesion (either plexus or radiculopathy) as a cause of his 'paralysis.' On review of 2000 EMG done, I disagree with the assessment of a left brachial plexus lesion given the normal motor and sensory amplitudes .... I suspect the problem is one of the CNS either in the cervical cord or functional (psychiatric).' "] [emphasis in original]; Dkt. No. 72, Part 9, at 684 [Ex. A to Howard Decl., attaching Plaintiff's "Progress Notes" dated 3/26/01, stating, "Current exam suggests that peripheral lesion is not cause of paralysis-may be in cervical cord or functional (psychiatric)"].)

> FN103. (Dkt. No. 1, Part 2, at 7 [Ex. 2 to Plf.'s Verified Compl., attaching memorandum from Defendant Hochstetler dated 3/26/01, summarizing information obtained from Sullivan C.F. regarding Plf.'s ability to eat independently].)

> FN104. (Dkt. No. 72, Part 9, at 718 [Ex. A to Howard Decl., attaching Plaintiff's "Progress Notes" dated 3/31/01, stating, at end of report, "Dr. Hochstetler aware"].)

FN105. (Dkt. No. 72, Part 9, at 720 [Ex. A to Howard Decl., attaching Plaintiff's "Progress Notes" dated 4/8/01]; Dkt. No. 72, Part 9, at 122 [Ex. A to Howard Decl., attaching Plaintiff's "Refusal of Medical Examination and/or . Treatment," dated 4/8/01, which states, "Dinner pt. refused assistance with dinner," and indicated that Plaintiff instead wanted to file a medical complaint]; cf. Dkt. No. 72, Part 9, at 117 [Ex. A to Howard Decl., attaching Plaintiff's "Refusal of Medical Examination and/or Treatment," dated 3/7/01, which states that "Pt refused both breakfast and lunch trays"].)

*19 Relying on these reports (among other reports), Defendants Hochstetler and Gardella made the professional judgment that Plaintiff did not need assistance with certain activities of daily living, including hand feeding. Rather, their professional judgment was that Plaintiff could (and should be encouraged to) eat independently, with the use of adaptive equipment (i.e., a nonslip "scoop bowl," a nonslip "Dyson pad," and a straw), once corrections officers had "set up" his meal tray.FN106However, Plaintiff grew frustrated with this plan because he felt he was being forced to "huff and suck" down his food "like a dog," as he put it.FN107As a result, he became abusive toward the medical staff.FN108When this happened, Defendants Hochstetler and Gardella decided to stop the hand feeding that they had occasionally been providing to Plaintiff.FN109

FN106. (Dkt. No. 72, Part 9, at 94 [Ex. A to Howard Decl., attaching Discharge Summary by Defendant Hochstetler regarding Plaintiff, dated 10/28/02]; Dkt. No. 72, Part 9, at 80, 98, 99, 100 [Ex. A to Howard Decl., attaching Plaintiff's medical records dated 11/21/01, 3/21/01, 10/17/02 and 10/23/02, respectively]; Dkt. No. 72, Part 4, at 48, 56, 190 [Ex. A to Finkelstein Decl., attaching transcript of Plf.'s depos-

ition]; Dkt. No. 1, Part 2, at 7 [Ex. 2 to Plf.'s Verified Compl., attaching memorandum from Defendant Hochstetler dated 3/26/01, stating that "[i]t is standard medical practice to assist each patient in maintaining as much independence as possible."].)

FN107. (Dkt. No. 72, Part 4, at 42, 43, 46, 48, 56, 71, 197, 199, 215, 217, 218, 220 [Ex. A to Finkelstein Decl., attaching transcript of Plf.'s deposition].)

FN108. (See, e.g.,Dkt. No. 72, Part 9, at 709-710 [Ex. A to Howard Decl., attaching Plaintiff's "Progress Notes" dated 3/18/01, stating, "Noon meal tray set up for patient. Patient adamantly refuses to eat unless he is fed by staff. Order from NP is for pt to feed himself. Pt is argumentative and hostile towards staff. Again, he demeans and accuses other staff members of not caring for his medical needs, calls staff members racists, bitches, etc.... Mr. Shomo will not make any attempts to help himself."] .)

FN109.(Id.; see also, infra, note 106 of this Report-Recommendation.)

For example, in late April of 2001, following an accusation that Plaintiff had pushed a tray onto one of the staff members, Defendant Hochstetler placed Plaintiff on a cabbage diet; then, following a complaint by a nurse that hand feeding Plaintiff had become too "cumbersome," Defendant Hochstetler directed his nurses to stop hand feeding Plaintiff for a couple of days; and, finally, after Plaintiff became verbally abusive toward Defendant Hochstetler, going "ballistic" on him (as Plaintiff puts it), Defendant Hochstetler decided to lengthen the term of that hand-feeding prohibition.FN110

FN110. (Dkt. No. 72, Part 4, at 59, 70-71, 83, 220-221 [Ex. A to Finkelstein Decl., attaching transcript of Plf.'s deposition]; Dkt. No. 72, Part 9, at 726 [Ex. A to

Case 7:07-cv-00935-TJM-GJD   Document 38-21   Filed 12/05/08   Page 49 of 74

Howard Decl., attaching Plaintiff's "Progress Notes" dated 4/21/01].)

Regardless of what prompted Defendants Hochstetler and Gardella to stop the hand feeding that they had occasionally been providing to Plaintiff between February and April of 2001, the fact remains that their medical judgment (that Plaintiff did not have to be hand fed, as a matter of medical necessity) was supported by several medical opinions. Granted, Plaintiff's position that he needed hand feeding was also supported by certain medical opinions. However, what those differing medical opinions leave us with is a disagreement regarding what medical care Plaintiff should have appropriately received. As explained above in Part II.A.2. of this Report-Recommendation, such a disagreement is not actionable under the Eighth Amendment.[FN111]Defendants Hochstetler and Gardella were compelled (by Plaintiff's conflicting medical records) to make a professional judgment, and they did so. If that judgment was incorrect, they may conceivably be liable for medical malpractice or negligence. But they are not liable for the sort of criminal recklessness prohibited by the Eighth Amendment. I remind Plaintiff of what the Second Circuit once observed about the level of medical care that is required by the Eighth Amendment (quoted above): "Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff[ ] ... seeks." *Dean,* 804 F.2d at 215.

> FN111.*See, supra,* note 64 of this Report-Recommendation (citing *Chance v. Armstrong.* 143 F.3d 698, 703 [2d Cir.1998] ).

Finally, I note that Plaintiff has failed to offer any argument specifically regarding Defendants Allen and Memheart.[FN112]As explained above in Part II.A.4. of this Report-Recommendation, by not responding to the Corporate Defendants' argument that Plaintiff has failed to allege facts indicating, or adduce evidence establishing, that Defendants Allen and Memheart acted with the requisite state-

of-mind to be liable under the Eighth Amendment, Plaintiff has "consented" to that argument. Thus, the only remaining issue is whether the Corporate Defendants' have met their modest, threshold burden "to demonstrate entitlement to the relief requested" through that argument. I find that the Corporate Defendants have met that modest, threshold burden for the reasons stated in their Memorandum of Law.[FN113]I would add that, even if I were to *sua sponte* scour the record for any proof of a question of fact regarding Plaintiff's claims against Defendants Allen and Memheart, I would reach the same conclusion. I note that various facts asserted by the Corporate Defendants regarding the treatment they provided to Plaintiff (and the services they were not required to provide to him) are supported by the record and are not specifically controverted by Plaintiff.[FN114]

> FN112. To the extent that Plaintiff intended any of his other state-of-mind arguments to implicitly apply to Defendants Allen and Memheart, Plaintiff is advised that I have already considered, and rejected, those arguments above in Part II.A.2. of this Report-Recommendation.

> FN113. (Dkt. No. 73, Part 8, at 2-6 [Corporate Defs.' Mem. of Law].)

> FN114. (*Compare*Dkt. No. 73, Part 7, ¶¶ 12, 13 [Corporate Defs.' Rule 7.1 Statement] *with*Dkt. No. 79, Part 2, ¶¶ 23-32 [Plf.'s Rule 7.1 Response to Corporate Defs.' Rule 7.1 Statement, not specifically controverting Paragraphs 12 and 13 of that Rule 7.1 Statement]; *see also*Dkt. No. 79, Part 2, ¶ 28 [Plf.'s Rule 7.1 Response to Corporate Defs.' Rule 7.1 Statement, not responding to the bulk of the facts asserted in Paragraph 14 of the Corporate Defs.' Rule 7.1 Statement, and only arguing that a product catalogue shows that the bowl provided to him was not " 'specifically designed' to aid him," although the Corporate Defs. did not assert that fact but that

the bowl was "specially shaped" and was "provided ... to assist him"]; Dkt. No. 79, Part 2, ¶ 30 [Plf.'s Rule 7.1 Response to Corporate Defs.' Rule 7.1 Statement, not specifically controverting the fact asserted in Paragraph 16 of the Corporate Defs.' Rule 7.1 Statement with a citation to record evidence, but only offering a legal argument, which is insufficient to create a question of fact].)

**\*20** As a result, I recommend that the Court dismiss Plaintiff's claim against the Corporate Defendants under the Eighth Amendment on the ground that Plaintiff has failed to adduce facts establishing that the Corporate Defendants acted with deliberate indifference to Plaintiff's medical needs. Because I find that the Corporate Defendants' first argument (i.e., regarding deliberate indifference) has merit, I need not, and do not, reach the merits of their second argument (i.e., regarding personal involvement).

## 2. Exhaustion of Administrative Remedies

Essentially, the Corporate Defendants offer a two-part argument with regard to Plaintiff's administrative remedies: (1) administrative remedies were in fact available to Plaintiff at his correctional facility, no Corporate Defendant inhibited Plaintiff's ability to utilize the prison grievance procedures in place at Plaintiff's correctional facility, and no "special circumstances" exist excusing Plaintiff's failure to exhaust his administrative remedies; and (2) Plaintiff attempted to appeal only one grievance to DOCS' Central Office Review Committee, and that grievance was rejected due to Plaintiff's failure to follow the proper procedures.[FN115]Generally, Plaintiff responds that he has in fact exhausted his available administrative remedies, as evidenced by the record documents attached to his Complaint.[FN116]

> FN115. (Dkt. No. 73, Part 8, at 6-9 [Corporate Defs.' Mem. of Law].)

FN116. (Dkt. No. 79, Part 1, at 30 [Plf.'s Mem. of Law, citing pages 22-24, 29 and 31 of Dkt. No. 73, Part 2 (Ex. C to Young Affid.), which does not actually attach the pages but incorporates them by reference to Exhibits 8, 9, 10, 14, and 16 to Plaintiff's Complaint] .)

Because I have found that adequate grounds exist upon which to base a recommendation that the Court dismiss Plaintiff's claims against the Corporate Defendants (*see, supra* and *infra,* Parts II.B. 1., II.B.3., and II.B.4. of this Report-Recommendation), I need not, and I do not, reach the merits of this argument, other than to make the following observation. The Corporate Defendants' summary of Plaintiff's grievances appears accurate and supported by the record. (*Compare*Dkt. No. 73, Part 2, ¶¶ 18-28 [Young Affid.] *with*Dkt. No. 1, Part 2 [Exs. 1-25 to Plf.'s Compl.].) As a result, it appears from the current record that Plaintiff did not in fact exhaust his available administrative remedies with regard to his claims against the Corporate Defendants. (*See generally*Dkt. No. 1, Part 2 [Exs. 1-25 to Plf.'s Compl.].)

## 3. Claim under ADA or RA

The Corporate Defendants next argue that Plaintiff's claim under the ADA and the RA must be dismissed, because (1) individual defendants such as Defendants Hochstetler, Gardella, Allen and Memheart cannot be liable under either the ADA or the RA, (2) Plaintiff fails to allege facts indicating that the Corporate Defendants were motivated by discriminatory animus or ill will due to disability, and (3) Plaintiff fails to allege facts indicating, and/or adduce evidence establishing, that he exhausted his administrative remedies before filing his ADA and RA claim in federal court.[FN117]

> FN117. (Dkt. No. 73, Part 8, at 10-11 [Corporate Defs.' Mem. of Law] .)

Plaintiff responds to only the Corporate Defendants'

*first* and *third* arguments.[FN118]Plaintiff fails to offer any argument regarding the Corporate Defendants' *second* argument. As explained above in Part II.A.4. of this Report-Recommendation, by not responding to the Corporate Defendants' argument that Plaintiff has failed to allege facts indicating that the Corporate Defendants were motivated by discriminatory animus or ill will due to disability, Plaintiff has "consented" to that argument. Thus, the only remaining issue is whether the Corporate Defendants' have met their modest, threshold burden "to demonstrate entitlement to the relief requested" through that argument. I find that the Corporate Defendants have met that modest, threshold burden for the reasons stated in their Memorandum of Law,[FN119] and for the reasons stated above in Part II.A.3. of this Report-Recommendation.

> FN118. (Dkt. No. 79, Part 1, at 30 [Plf.'s Mem. of Law].)

> FN119. (Dkt. No. 73, Part 8, at 10-11 [Corporate Defs.' Mem. of Law] .)

*21 In the alternative, I find that Plaintiff has also consented (rather expressly) to the Corporate Defendants' *first* argument (i.e., that individual defendants such as Defendants Hochstetler, Gardella, Allen and Memheart cannot be liable under either the ADA or the RA).[FN120] Furthermore, with regard to that argument, the Corporate Defendants have met their modest, threshold burden for the reasons stated in their Memorandum of Law.[FN121]*See also Atkins v. County of Orange,* 251 F.Supp.2d 1225, 1233 (S.D.N.Y.2003) ( "Because ... the ADA [and the RA] provide[ ] redress to disabled individuals for discrimination by a public entity, individuals may not be sued [under those statutes].") [citations omitted]. As a result, an additional, independent ground exists for dismissing Plaintiff's ADA and RA claim against Defendants Hochstetler, Gardella, Allen and Memheart.

> FN120. (Dkt. No. 79, Part 1, at 30 [Plf.'s Mem. of Law].)

> FN121. (Dkt. No. 73, Part 8, at 10 [Corporate Defs.' Mem. of Law].)

As a result, I recommend that the Court dismiss Plaintiff's claim against the Corporate Defendants under the ADA and the RA on the ground that Plaintiff has failed to allege facts indicating that the Corporate Defendants violated either the ADA or RA. I note that a similar conclusion (that Plaintiff's ADA and RA factual allegations fail to state a claim) was reached by the Southern District of New York in *Shomo v. Myers,* 03-CV-10213, 2005 WL 7564834, at *6 (S.D . N.Y. Apr. 4, 2005) ("I decline to adopt the statute of limitations analysis ... for [Plaintiff's claim under the ADA and RA], ... because Shomo clearly lacks a cause of action under either statute.").

### 4. Claim Under 42 U.S.C. § 1981

Finally, the Corporate Defendants argue that Plaintiff's claim under 42 U.S.C. § 1981 must be dismissed because (1) Plaintiff fails to allege facts indicating that the Corporate Defendants discriminated against him because of his race, and (2) Plaintiff fails to allege facts indicating, and/or adduce evidence establishing, that he exhausted his administrative remedies before filing his Section 1981 claim in federal court.[FN122]

> FN122.(*Id.* at 11.)

Plaintiff responds to only the Corporate Defendants' *second* argument.[FN123] Plaintiff fails to offer any argument regarding the Corporate Defendants' *first* argument. As explained above in Part II.A.4. of this Report-Recommendation, by not responding to the Corporate Defendants' argument that Plaintiff has failed to allege facts indicating that the Corporate Defendants discriminated against him because of his race, Plaintiff has "consented" to that argument. Thus, the only remaining issue is whether the Corporate Defendants' have met their modest, threshold burden "to demonstrate entitlement to the relief requested" through that argument. I find that the Cor-

porate Defendants have met that modest, threshold burden for the reasons stated in their Memorandum of Law.[FN124]

> FN123. (Dkt. No. 79, Part 1, at 30 [Plf.'s Mem. of Law].)

> FN124. (Dkt. No. 73, Part 8, at 11 [Corporate Defs.' Mem. of Law].)

Moreover, even if I were to examine the Corporate Defendants' argument in depth, and I were to independently scour the record for any proof of a factual dispute, I am confident that I would reach the same conclusion. The Corporate Defendants are indeed correct that 42 U.S.C. § 1981 prohibits only discrimination that is motivated by *racial* animus,[FN125] and I have found no allegation that any of the Corporate Defendants took adverse actions against Plaintiff because of his race.[FN126]

> FN125.*See* 42 U.S.C. § 1981(a) ("All persons ... shall have the same right to ... equal benefit of all laws ... as is enjoyed by white citizens ....").

> FN126. (*See generally* Dkt. No. 1 [Plf.'s Compl.].)

**\*22** As a result, I recommend that the Court dismiss Plaintiff's claim against the Corporate Defendants under 42 U.S.C. § 1981 on the ground that Plaintiff has failed to allege facts indicating that the Corporate Defendants discriminated against him because of his race.

**5. Claims Under 42 U.S.C. §§ 1984, 1985, 1986, and 2000d**

Finally, for the reasons stated above in Part II.A.5. of this Report-Recommendation, I recommend that the Court *sua sponte* dismiss Plaintiff's other civil rights claims against the Corporate Defendants (i.e., those claims occurring under 42 U.S.C. §§ 1984, 1985, 1986, and 2000d) on the ground that Plaintiff has failed to allege facts indicating that the Corpor-

ate Defendants violated any of those civil rights statutes.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's request to file a sur-reply with regard to Defendants' motions for summary judgment (Dkt. No. 88) is **DENIED,** and the Clerk's Office is directed to **STRIKE** from the docket pages 2 through 5 of Plaintiff's request, which attaches his sur-reply (Dkt. No. 88); and it is further

**RECOMMENDED** that the State Defendants' motion for summary judgment (Dkt. No. 72) be **GRANTED;** and it is further

**RECOMMENDED** that the Court *sua sponte* dismiss Plaintiff's claim against the State Defendants under 42 U.S.C. §§ 1984, 1985, 1986 and 2000d on the ground that Plaintiff has failed to allege facts indicating that the State Defendants violated any of those statutes; and it is further

**RECOMMENDED** that the Corporate Defendants' motion for summary judgment (Dkt. No. 73) be **GRANTED;** and it is further

**RECOMMENDED** that the Court *sua sponte* dismiss Plaintiff's claim against the Corporate Defendants under 42 U.S.C. §§ 1984, 1985, 1986 and 2000d on the ground that Plaintiff has failed to allege facts indicating that the Corporate Defendants violated any of those statutes.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2007.

Shomo v. New York Dept. of Correctional Services
Not Reported in F.Supp.2d, 2007 WL 2580509
(N.D.N.Y.)

END OF DOCUMENT

**TAB 8**

Slip Copy

Slip Copy, 2006 WL 3377592 (S.D.N.Y.)
**(Cite as: 2006 WL 3377592 (S.D.N.Y.))**

Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Leticia TAMONDONG, Plaintiff,
v.
GMAC COMMERCIAL CREDIT LLC, Corbyn
Westerlow and Charles Busuttil, Defendants.
**No. 06 Civ. 770(SAS).**

Nov. 17, 2006.

Leticia Tamondong, Springfield Gardens, NY, Plaintiff pro se.
Michele C. Horan, Horan & Horan L.L.P., White Plains, NY, for Defendants.

*OPINION AND ORDER*

SCHEINDLIN, J.

I. INTRODUCTION [FN1]

> FN1. The relevant facts are drawn from this Court's earlier Opinion and Order, familiarity with which is presumed. *See Tamondong v. GMAC Commercial Credit LLC*, No. 06 Civ. 770, 2006 WL 2019755 (S.D.N.Y. July 11, 2006). I repeat here only those facts that pertain to this particular motion.

**\*1** Leticia Tamondong filed this pro se action against GMAC Commercial Credit LLC ("GMAC"), Corbyn Westerlow, and Charles Busuttil, alleging various federal and state law claims of employment discrimination, wrongful termination, and denial of benefits.[FN2] On July 11, 2006, this Court dismissed all claims against GMAC, but directed Tamondong to show cause why her case against the individual defendants should not be dismissed.[FN3] For the following reasons, Tamondong's claims are dismissed as to the individual defendants.

> FN2. Tamondong alleges that GMAC, Westerlow, and Busuttil: (1) discriminated against her due to a disability caused by work related injuries; (2) denied her reasonable accommodations; (3) created a hostile work environment; (4) wrongfully terminated her employment while she was out on leave; and (5) denied her long-term disability ("LTD") and profit-sharing benefits. *See* Complaint ("Compl.") at 2-4.

> FN3. *See Tamondong*, 2006 WL 2019755, at \*1.

II. BACKGROUND

In January 1999, Tamondong sustained multiple injuries during the installation of electrical sockets in her work area while employed by the Bank of New York.[FN4] Westerlow, Tamondong's immediate supervisor, was employed as an Assistant Vice President and Busuttil was the Senior Vice President of Human Resources.[FN5] Tamondong claims that Westerlow and Busuttil, as employees and officers of GMAC, carried out GMAC's discriminatory and wrongful employment policies.[FN6]

> FN4. *See* Compl. at 1. Tamondong's injuries included herniated discs, cord compression, and cervical radiculopathy. *See id.* These injuries caused Tamondong to be out of work from January 27, 1999 to February 23, 1999, during which time she received workers' compensation benefits. *See id.*

> FN5. *See id.*

> FN6. *See* Plaintiff's Opposition to Opinion and Order ("Opp. Mem .") at 1.

When Tamondong returned to work on February 24, 1999, she requested a lower terminal for her computer keyboard to alleviate some of the discom-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

fort caused by her injuries.[FN7]The request was denied.[FN8]Tamondong alleges that Westerlow created a hostile work environment by "angrily pull[ing] out a right drawer in plaintiff's desk[,] slamm[ing] her keyboard and order[ing] her to place the keyboard on it while the monitor was located on the left side of her desk."[FN9]Tamondong also requested a reduced work schedule, but Westerlow responded "that the plaintiff's job was a full time job."[FN10]

FN7.*See id.*

FN8.*See id.*

FN9. Opp. Mem. at 5.

FN10.*Id.* at 5-6.

Tamondong also states that she made numerous requests for LTD benefits from Busuttil and GMAC's Human Resources department, but was repeatedly ignored.[FN11] In a letter to Busuttil dated March 11, 2001, Tamondong specifically requested a LTD application.[FN12]Busuttil failed to respond to Tamondong's requests.[FN13]Tamondong was eventually informed that her employment would be terminated unless she applied for short-term disability benefits ("STD").[FN14] Tamondong alleges that she was unable to apply for STD benefits because she was receiving workers' compensation benefits and that she provided GMAC's Human Resources department with all of the appropriate documentation in support of her workers' compensation claim.[FN15]GMAC terminated Tamondong's employment on February 7, 2001.[FN16]

FN11.*See id.* at 3.

FN12.*See* Letter from Tamondong to Busuttil, Ex. F. to Opp. Mem., at 1.

FN13.*See* Opp. Mem. at 4.

FN14.*See* Compl. at 2.

FN15.*See id.*

FN16.*See id.* at 4.

III. LEGAL STANDARD

A. Motion to Dismiss

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a motion to dismiss should be granted only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." ' [FN17] The task of the court in ruling on a Rule 12(b)(6) motion is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."[FN18]The Second Circuit has held that all complaints "must be read liberally; dismissal on the pleadings never is warranted unless the plaintiff's allegations are doomed to fail under any available legal theory." [FN19]When deciding a motion to dismiss, courts must accept all factual allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor.[FN20]A complaint " 'need not set out in detail the facts upon which the claim is based." ' [FN21] Thus, a complaint may not " 'be dismissed on the ground that it is conclusory or fails to allege facts." ' [FN22] However, although " 'the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice." ' [FN23]

FN17. *Nechis v. Oxford Health Plans, Inc.,* 421 F.3d 96, 100 (2d Cir.2005) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

FN18. *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,* 375 F.3d 168, 176 (2d Cir.2004) (quotation marks and citation omitted).

FN19. *Phillips v. Girdich.* 408 F.3d 124, 128 (2d Cir.2005) (emphasis omitted).

FN20.*See Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Net-*

works Corp., 369 F.3d 27, 30 (2d Cir.2004), cert. denied, 543 U.S. 1050 (2005) (quotation marks and citation omitted).

FN21. Leibowitz v. Cornell Univ., 445 F.3d 586, 591 (2d Cir.2006) (citing Twombly v. Bell Atl. Corp., 425 F.3d 99, 107 (2d Cir.2005) (quoting Conley, 355 U.S. at 47)).

FN22. In re Initial Pub. Offering Sec. Litig., 241 F.Supp.2d 281, 323 (S.D.N.Y.2003) (quoting Higgs v. Carver, 286 F.3d 437, 439 (7th Cir.2002)).

FN23. Law Offices of Curtis V. Trinko, L.L.P., v. Bell Atl. Corp., 309 F.3d 71, 74 (2d Cir.2002) (quoting Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir.1996)).

*2 Courts generally do not consider matters outside the pleadings but may consider documents attached to, referenced in, or integral to the pleadings.[FN24] In addition, because plaintiff is appearing pro se, the factual allegations in her Opposition Memorandum and attached exhibits will be treated as part of her Complaint.[FN25]Because "most pro se plaintiffs lack familiarity with the formalities of pleading requirements, [courts] must construe pro se complaints liberally, applying a more flexible standard to evaluate their sufficiency."[FN26]

FN24.See Subaru Distribs. Corp. v. Subaru of Am., Inc., 425 F.3d 119, 122 (2d Cir.2005) (citing International Audiotext Network, Inc. v. AT & T Co., 62 F.3d 69, 72 (2d Cir.1995)).

FN25.See Gill v. Mooney, 824 F.2d 192, 195 (2d Cir.1987) (considering pro se plaintiff's affidavit in opposition to defendant's motion to dismiss in reviewing district court's dismissal of claim).

FN26. Lerman v. Board of Elections in the City of N.Y., 232 F.3d 135, 140 (2d

Cir.2000) (citing Hughes v. Rose, 449 U.S. 5, 9-10 (1980) and Haines v. Kerner, 404 U.S. 519, 520-21 (1972)).

B. Claims Brought Under the Americans with Disability Act ("ADA")

A plaintiff may bring a claim against an employer in federal district court under the ADA after filing a timely charge with the United States Equal Employment Opportunity Commission.[FN27]However, the Second Circuit has held that the ADA imposes no personal liability on individual defendants, even if they have supervisory control over the plaintiff.[FN28]

FN27.See LeProvost v. New York, No. 03 Civ. 2544, 2004 WL 32860, at *7 (S.D.N.Y. Jan. 6, 2004) (citing Butts v. City of N.Y. Dep't. of Hous. Pres. and Dev., 990 F.2d 1397, 1401 (2d Cir.1993), superseded by statute on other grounds as stated in Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684, 693 (2d Cir.1998)).

FN28.See Corr v. MTA Long Island Bus, 199 F.3d 1321, 1321 (2d Cir.1999).

C. Claims Brought Under the Employment Retirement Income Security Act ("ERISA")

ERISA authorizes civil actions against: (1) an administrator of an employee benefits plan for failure to comply with a request to provide information; and (2) against plan fiduciaries for breach of fiduciary duties.[FN29]A plan fiduciary is one who either exercises discretionary authority or control over the management of the plan or disposition of its assets; renders investment advice for compensation with respect to money or property of the plan, or has authority to do so; or has discretionary authority in the administration of such plan.[FN30]"[T]he 'management or disposition' language in ERISA refers to the common transactions in dealing with a pool of assets: selecting investments, exchanging

one instrument or asset for another, and so on."[FN32] However, "an individual cannot be liable as an ERISA fiduciary solely by virtue of [his] position as a corporate officer, shareholder, or manager."[FN32]

FN29. *See generally* 29 U.S.C. § 1132.

FN30. *See id.* § 1002(21)(A).

FN31. *Harris Trust and Sav. Bank v. John Hancock Mut. Life Ins. Co .,* 302 F.3d 18, 28 (2d Cir.2002) (citation omitted).

FN32. *Sasso v. Cervoni,* 985 F.2d 49, 50 (2d Cir.1993).

Further, as required by ERISA, an employee benefits plan must provide its participants with a reasonable opportunity to obtain a "full and fair review" after denial of a claim.[FN33] The doctrine of exhaustion of administrative remedies rests on the principle " 'that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." ' [FN34] "It is well settled that timely exhaustion of plan remedies is a prerequisite to suit in federal court and that, absent appropriate equitable considerations, court action is barred absent such exhaustion." [FN35] A claimant is "required to exhaust even if she [i]s ignorant of the proper claims procedure." [FN36] If a plaintiff fails to allege that he or she has exhausted administrative remedies, the claim must be dismissed.[FN37] Failure to exhaust remedies may be excused on the grounds of futility "only 'where claimants make a *clear and positive showing* that pursuing available administrative remedies would be futile." ' [FN38]

FN33. *Id.* § 1133(2).

FN34. *Kennedy v. Empire Blue Cross and Blue Shield,* 989 F.2d 588, 592 (2d Cir.1993) (quoting *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50-51 (1938)).

FN35. *Sanfilippo v. Provident Life and Cas. Ins. Co.,* 178 F.Supp.2d 450, 458 (S.D.N.Y.2002). *Accord Denton v. First Nat'l Bank of Waco, TX.* 765 F.2d 1295, 1300 (5th Cir.1985).

FN36. *Davenport v. Harry N. Abrams, Inc.,* 249 F.3d 130, 134 (2d Cir.2001).

FN37. *See Benaim v. HSBC Bank USA,* 94 F.Supp.2d 518, 519 (S.D.N.Y.2000).

FN38. *Davenport,* 249 F.3d at 133 (quoting *Kennedy,* 989 F.2d at 594).

## IV. DISCUSSION

### A. Tamondong Has Failed to State a Claim for Employment Discrimination Under the ADA

**\*3** Because it is well established that individuals may not be held liable for damages under the ADA, Tamondong has not stated a legally cognizable claim for relief against Westerlow and Busuttil. Defendants' motion to dismiss Tamondong's claims of disability discrimination and failure to accommodate is granted.

### B. Tamondong Has Failed to Allege a Claim for Denial of Benefits Under ERISA

Tamondong has raised no facts suggesting that Westerlow or Busuttil acted as administrators of any employee benefits plans. Tamondong has also not alleged that either defendant was a plan fiduciary. Further, even if defendants are plan fiduciaries or administrators, Tamondong has failed to exhaust administrative remedies under the Fidelity Corporate Plan for Retirement [FN39] and the First Unum Life Insurance Company Plan.[FN40] Therefore, her claims against the individual defendants for denial of LTD benefits are barred and must be dismissed.

FN39. The Fidelity Corporate Plan for Retirement covers GMAC's 401(k) and Profit

Sharing Plan. It prescribes the remedies available to a person asserting a claim under the plan. *See* GMAC's 401(k) and Profit Sharing Plan governed by Fidelity Corporate Plan for Retirement at 82. Once a claim is denied or deemed denied-either because the employee receives written notice of the denial or ninety days have passed since the employee made a request for benefits-the employee has sixty days to request review of that denial by the plan administrator. *See id.*

FN40. The First Unum Life Insurance Company Plan prescribes the administrative remedies that must be exhausted when LTD benefits are denied. *See*GMAC's Group Insurance Policy governed by First Unum Life Insurance Company at 42. When Tamondong's LTD claim was denied, she had sixty days to appeal and request a review. *See id.*

C. The Court Lacks Jurisdiction Over Tamondong's State Claims

When a plaintiff has not alleged diversity jurisdiction and her federal claims fail as a matter of law, courts generally decline to exercise supplemental jurisdiction over remaining state law claims.[FN41]There is no reason to depart from that general rule here.[FN42]Thus, Tamondong's state law claims for hostile work environment and wrongful termination are dismissed without prejudice.

FN41.*See*28 U.S.C. § 1367(c)(3) (district court may decline to exercise supplemental jurisdiction over a claim if, *inter alia,*"the district court has dismissed all claims over which it has original jurisdiction").*See also Martinez v. Simonetti,* 202 F.3d 625, 636 (2d Cir.2000) (directing dismissal of state law claims when no federal claims remained).

FN42.*See Adams v. Intralinks, Inc.,* No. 03 Civ. 5384, 2004 WL 1627313, at *8 (S.D.N.Y. July 20, 2004) ("In the usual case in which all federal law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state law claims.") (quotation and citation omitted).

V. CONCLUSION

For the foregoing reasons, Tamondong's claims against the individual defendants are dismissed. The Clerk of the Court is directed to close this motion (docket # 24) and this case.

SO ORDERED:

S.D.N.Y.,2006.
Tamondong v. GMAC Commercial Credit LLC
Slip Copy, 2006 WL 3377592 (S.D.N.Y.)

END OF DOCUMENT

**TAB 9**

Not Reported in N.W.2d                                                         Page 1
Not Reported in N.W.2d, 2006 WL 3772316 (Minn.App.)
**(Cite as: 2006 WL 3772316 (Minn.App.))**

C

Only the Westlaw citation is currently available.

NOTICE: THIS OPINION IS DESIGNATED AS
UNPUBLISHED AND MAY NOT BE CITED EX-
CEPT AS PROVIDED BY MINN. ST. SEC.
480A.08(3).

Court of Appeals of Minnesota.
Jose H. TORI, Appellant,
v.
UNIVERSITY OF MINNESOTA, Respondent.
**No. A06-205.**

Dec. 26, 2006.

**Background:** Medical student who suffered from
attention-deficit-hyperactivity disorder (ADHD)
and dyslexia brought action against state university,
claiming that the university denied his requests for
a reasonable accommodation of his disabilities and
dismissed him because of his disabilities or in re-
taliation for his requests for a reasonable accom-
modation. The District Court, Hennepin County,
granted university's motion for summary judgment,
and student appealed.

**Holdings:** The Court of Appeals, Willis, J., held that:
(1) university made reasonable accommodation of
student's disabilities;
(2) university did not discriminate against medical
student because of his when it dismissed him from
residency program; and
(3) there was no evidence that university dismissed
student from residency program in retaliation for
his requests for a reasonable accommodation.

Affirmed.

**[1] Civil Rights 78 ☞1069**

78 Civil Rights
    78I Rights Protected and Discrimination Prohib-
ited in General
        78k1059 Education
            78k1069 k. Disabled Students. Most Cited
Cases
State university made reasonable accommodation
of psychiatry student's attention-defi-
cit-hyperactivity disorder (ADHD) and dyslexia,
under the ADA, the Rehabilitation Act, and the
Minnesota Human Rights Act, although psychiatry
department did not waive its written mandatory at-
tendance policy as student requested, where uni-
versity was willing to allow student to tape-record
lectures and to move around during lectures. Re-
habilitation Act of 1973, § 504, 29 U.S.C.A § 794;
Americans with Disabilities Act of 1990, §
102(b)(5)(A), 42 U.S.C.A. § 12112(b)(5)(A);
M.S.A. § 363A.08, subd. 6.

**[2] Civil Rights 78 ☞1069**

78 Civil Rights
    78I Rights Protected and Discrimination Prohib-
ited in General
        78k1059 Education
            78k1069 k. Disabled Students. Most Cited
Cases
State university's refusal to waive its mandatory at-
tendance policy for medical student who suffered
from attention-deficit-hyperactivity disorder
(ADHD) and dyslexia, its consideration of placing
student on probation for failure to attend lectures
and psychotherapy sessions, and faculty members'
remarks about student's "boundary violations" and
"sense of entitlement" did not establish discriminat-
ory animus required for a prima facie case under
the ADA, the Rehabilitation Act, or the Minnesota
Human Rights Act. Rehabilitation Act of 1973, §
504, 29 U.S.C.A § 794; Americans with Disabilities
Act of 1990, § 102(b)(5)(A), 42 U.S.C.A. §
12112(b)(5)(A); M.S.A. § 363A.08, subd. 6.

**[3] Civil Rights 78 ☞1069**

78 Civil Rights

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

781 Rights Protected and Discrimination Prohibited in General
78k1059 Education
78k1069 k. Disabled Students. Most Cited Cases

Medical student's failure to attend a significant number of psychiatry-department lectures, his inappropriate interaction with female peers, his failure to appear for emergency-room shifts and unprofessional communication with a chief resident, and report that he improperly discontinued patient's pain medication as punishment represented legitimate, nondiscriminatory reasons for his dismissal from residency program, which did not violate the ADA, the Rehabilitation Act, or the Minnesota Human Rights Act. Rehabilitation Act of 1973, § 504, 29 U.S.C.A § 794; Americans with Disabilities Act of 1990, § 102(b)(5)(A), 42 U.S.C.A. § 12112(b)(5)(A); M.S.A. § 363A.08, subd. 6.

**[4] Civil Rights 78 ☞1069**

78 Civil Rights
781 Rights Protected and Discrimination Prohibited in General
78k1059 Education
78k1069 k. Disabled Students. Most Cited Cases

State university did not dismiss student from residency program in retaliation for his requests for a reasonable accommodation for his attention-deficit-hyperactivity disorder (ADHD) and dyslexia, in violation of the ADA, the Rehabilitation Act, or the Minnesota Human Rights Act, in light of legitimate, nondiscriminatory reasons proffered for his dis-

**Colleges and Universities 81 ☞9.35(3.1)**

81 Colleges and Universities
81k9 Students
81k9.35 Curriculum, Degrees, Grades, and Credits
81k9.35(3) Academic Expulsion, Suspension, or Probation
81k9.35(3.1) k. In General. Most Cited Cases

missal. Rehabilitation Act of 1973, § 504, 29 U.S.C.A § 794; Americans with Disabilities Act of 1990, § 102(b)(5)(A), 42 U.S.C.A. § 12112(b)(5)(A); M.S.A. § 363A.08, subd. 6.

State university did not dismiss student from residency program in retaliation for his requests for a reasonable accommodation for his attention-deficit-hyperactivity disorder (ADHD) and dyslexia, in violation of the ADA, the Rehabilitation Act, or the Minnesota Human Rights Act, in light of legitimate, nondiscriminatory reasons proffered for his dismissal. Rehabilitation Act of 1973, § 504, 29 U.S.C.A § 794; Americans with Disabilities Act of 1990, § 102(b)(5)(A), 42 U.S.C.A. § 12112(b)(5)(A); M.S.A. § 363A.08, subd. 6.

Hennepin County District Court, File No. EM 04-6584.
Richard T. Wylie, Minneapolis, MN, for appellant.
Mark B. Rotenberg, General Counsel, Brian J. Slovut, Associate General Counsel, University of Minnesota, Office of General Counsel, Minneapolis, MN, for respondent.

Considered and decided by ROSS, Presiding Judge; WILLIS, Judge; and CRIPPEN, Judge.[FN*]

FN* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**UNPUBLISHED OPINION**

WILLIS, Judge.
*1 Appellant sued respondent university for alleged violations of the Americans with Disabilities Act, 42 U.S.C. §§ 12101-213 (2000); the Rehabilitation Act, 29 U.S.C. § 794 (2000); and the Minnesota Human Rights Act, Minn.Stat. §§ 363A.01-.40 (2004); claiming that respondent denied his requests for a reasonable accommodation of his disabilities and dismissed him because of his disabilities or in retaliation for his requests for a reasonable

Case 0:07-cv-00096-RHK-JJK Document 38-21   Filed 12/05/08   Page 63 of 74

accommodation. Appellant challenges the district court's grant of summary judgment to respondent. Because we conclude that there are no genuine issues of material fact precluding summary judgment and that the district court correctly applied the law, we affirm.

## FACTS

Appellant Jose Tori graduated from the University of Minnesota Medical School and was enrolled in the University's combined family-practice and psychiatry residency training program from 1997 until June 2002. Tori has been diagnosed with attention-deficit-hyperactivity disorder (ADHD) and dyslexia. He claims that because of his disabilities, "he cannot sit and concentrate in a controlled, academic setting for very long."

Tori began psychiatry rotations in the spring of 1998. In March 1998, the psychiatry department implemented a course-attendance policy that requires residents to attend 75% of the lectures in each course. The department did not excuse Tori from this requirement. In March 1998, Tori received a memorandum outlining the attendance policy. In February 1999 and again in June 2000, Tori received notices that he had missed an unacceptable number of lectures. In July 2000, Tori received a letter stating that "certain residency program requirements [had] not been met," most notably, required attendance at lectures. The letter advised Tori that if he required accommodation of a disability, he should contact the University's disability-services office and that until the residency-program administrators received direction from that office regarding a specific need for an accommodation, Tori was required to attend lectures. The letter also instructed that in order for Tori to "make up" missed lectures, according to the attendance policy, he must submit a plan for doing so before the date provided. Tori failed to submit a plan.

On several occasions, Tori requested accommodation of his disabilities. He initially met with a spe-

cialist in the University's disability-services office in June 2000. Tori provided the specialist with a letter from Tori's psychiatrist documenting his disabilities, and Tori and the specialist began to discuss potential accommodation. In August 2000, Tori requested, through his psychiatrist, to be allowed to tape-record lectures and not to be required to sit for long periods of time. In November 2000, Tori requested to be excused from attending lectures and to be allowed instead to learn the material through independent reading. In February 2001, Tori requested that the University accommodate his disabilities further by allowing him to substitute for lectures four to five weekly psychoanalytic sessions and by providing "multiple psychotherapy supervisors who could compensate for issues not covered in his own psychoanalysis [and][t]wo or three highly experienced psychiatrists" to cover case materials from the classes Tori is unable to attend and to role play as patients to replicate the interactive component of some classes. Approximately a week later, the disability-services specialist contacted Tori with a proposal for an accommodation that included allowing Tori to tape-record lectures and move around the room during lectures. When Tori persisted with his requests for a more extensive accommodation, she explained that his requests were unreasonable.

*2 On March 21, 2001, Tori met with representatives from the residency program and the disability-services specialist. The University's representatives explained that the University would accommodate Tori's disabilities only by allowing him to tape-record and move around during lectures. The disability-services specialist continued to work with Tori and the psychiatry department in an attempt to reach an agreement until the psychiatry department notified her that Tori was being dismissed from the residency program.

The University learned in April 2001 that a complaint was pending against Tori with the Minnesota Board of Medical Ethics, alleging that Tori had engaged in a sexual relationship with a former psychi-

Case 0:07-cv-01596-PJM-JJG Document 38-21 Filed 12/05/08 Page 64 of 74

atric patient, which violates the American Medical Association's Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry (the ethics principles). The University investigated the allegations and reviewed Tori's entire residency record. As a result of that review, the University informed Tori that seven disciplinary charges would be brought against him. Two of the charges were later dismissed. The remaining charges were: (1) engaging in a sexual relationship with a patient; (2) disregard of the welfare of three female peers; (3) failure to attend required lectures after being warned in writing of attendance deficiencies; (4) failure to appear for two emergency-room shifts and communicating unprofessionally and disrespectfully with a chief resident; and (5) improperly punishing a patient by withdrawing medications. A two-hour meeting was held on September 4, 2001, to allow Tori to respond to the charges. Tori, his attorney, and eight physicians from the family-practice and psychiatry departments attended. After that meeting, the physicians who had been present voted to recommend Tori's dismissal from the combined residency program.

On December 6, 2001, Tori met with a scholastic-standing committee from the family-practice department and with representatives of the psychiatry department to respond to a letter and subsequent report detailing the result of the September 4 meeting. The group present at the December 6 meeting voted unanimously to recommend Tori's dismissal from the combined residency program. The chairs of the family-practice and psychiatry departments then made the final decision to dismiss Tori, concluding that Tori's actions "represent a pattern of inappropriate and unprofessional conduct by [Tori] while in the training program."Tori challenged his dismissal, and a hearing was held before a University of Minnesota Hearing Panel. The panel was composed of two medical-school faculty members and a resident physician. At the hearing, Tori was represented by counsel and was able to cross-examine each of the 15 witnesses. The panel issued findings and conclusions, ruling that Tori's dis-

missal was appropriate.

Tori filed suit against the University, alleging that the University violated the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-213 (2000), the Rehabilitation Act, 29 U.S.C. § 794 (2000), and the Minnesota Human Rights Act (MHRA), Minn.Stat. §§ 363A.01-.40 (2004), when it failed to provide a reasonable accommodation of his disabilities and discriminatorily dismissed him because of his disabilities or in retaliation for his accommodation requests. The University moved for summary judgment, and the district court granted the University's motion, concluding that the University had offered Tori a reasonable accommodation sufficient to comply with the ADA's and the MHRA's accommodation requirements and that there was no evidence that Tori's dismissal was motivated by his disability status or in retaliation for his accommodation requests. The district court reasoned, "Without evidence of an ADA-prohibited retaliatory motive, it cannot be established that these non-academic bases for dismissal were based on Tori's ADA- and MHRA-protected disabilities. Therefore, the University's dismissal of Tori as a resident was valid and appropriate on all grounds."This appeal follows.

## DECISION

*3 When reviewing a district court's decision to grant summary judgment, this court asks two questions: (1) whether there are any genuine issues of material fact and (2) whether the district court erred in its application of the law. *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990). No genuine issue of material fact exists when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *DLH, Inc. v. Russ,* 566 N.W.2d 60, 69 (Minn.1997) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Only disputes of facts that affect the outcome of the suit properly preclude a grant of summary judgment. *Id.* at 71."[T]he party resisting

Not Reported in N.W.2d, 2006 WL 3772316 (Minn.App.)
(Cite as: 2006 WL 3772316 (Minn.App.))

summary judgment must do more than rest on mere averments" to establish that a genuine issue for trial exists. *Id.* at 69-71.

Tori asserted claims against the University under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-213 (2000); the Rehabilitation Act, 29 U.S.C. § 794 (2000); and the Minnesota Human Rights Act (MHRA), Minn.Stat. §§ 363A.01-.40 (2004). Because the statutes use similar language and promote the same purpose, Minnesota courts have relied on interpretations of the ADA, the Rehabilitation Act, and the MHRA to construe one another; when the provisions of the three statutes are alike, the analyses of them are practically interchangeable. *See Hinneberg v. Big Stone County Hous. & Redev. Auth.,* 706 N.W.2d 220, 226 n. 5 (Minn.2005) (noting that the reasonable-accommodation provisions in the ADA and the Rehabilitation Act are "substantively identical"); *Kolton v. County of Anoka,* 645 N.W.2d 403, 408, 410 (Minn.2002) (concluding that because the purposes and language of the MHRA and ADA are similar, analyses of the ADA can be used to construe the MHRA); *State by Cooper v. Hennepin County,* 441 N.W.2d 106, 110 (Minn.1989) (relying on interpretations of the Rehabilitation Act to construe the MHRA); *see also* 29 U.S.C. § 794(d) (providing that the "standards used to determine whether this section [of the Rehabilitation Act] has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under [the ADA]"). Because the provisions of the ADA, the Rehabilitation Act, and the MHRA that guide our decision here are sufficiently similar, we proceed under a single analysis.

Title I of the ADA, 42 U.S.C. §§ 12111-117, governs equal opportunity for individuals with disabilities in the context of employment. Title II of the ADA, 42 U.S.C. §§ 12131-165, ensures equal opportunity for individuals with disabilities to participate in the "services, programs, or activities" of public entities. 42 U.S.C. § 12132. Public colleges and universities are "public entities" within the

meaning of Title II. *See Doe v. Univ. of Md. Med. Sys. Corp.,* 50 F.3d 1261, 1264 n. 8 (4th Cir.1995). Tori's relationship with the University is a hybrid; he is both an employee and a student. *See Ross v. Univ. of Minn.,* 439 N.W.2d 28, 32-33 (Minn.App.1989) (determining that a psychiatry resident should be classified as a student but noting that the distinction "depends on the context in which the question (and a cause of action) arises"), *review denied* (Minn. July 12, 1989). Here, the contexts in which the issues arise are mixed-Tori's failure-to-accommodate claim arises out of his coursework, but his wrongful-dismissal claim raises employment issues. But because the relevant provisions of Title I and Title II of the ADA, the Rehabilitation Act, and the MHRA use similar language and demand the same outcome, we need not determine whether Tori should be characterized as an employee or as a student.

*\*4 The ADA, the Rehabilitation Act, and the MHRA prohibit discrimination *because of a disability* against "qualified" disabled persons. 42 U.S.C. §§ 12112(a), 12132; 29 U.S.C. § 794(a); Minn.Stat. § 363A.08, subds. 2, 6. In the employment context, a person is "qualified" if he "meets the necessary prerequisites for the job, such as education, experience, training, and the like" *and* can perform the "essential functions" of his position with or without a "reasonable accommodation." 42 U.S.C. § 12111(8); Minn.Stat. § 363A.03, subd. 36(1); *Benson v. NW Airlines, Inc.,* 62 F.3d 1108, 1111-12 (8th Cir.1995). And with respect to the services of public entities, a person is "qualified" if he meets the "essential eligibility requirements" of the public-service program with or without "reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services." 42 U.S.C. § 12131(2); Minn.Stat. § 363A.03, subd. 36(2). To "discriminate" includes to not make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A); *see also* Minn.Stat. §

363A.08, subd. 6 (providing that failure to make a reasonable accommodation is an unfair employment practice).

Tori claims that genuine issues of material fact exist regarding whether the University discriminated against him because of his disabilities when it (1) failed to reasonably accommodate his disabilities; (2) dismissed him from the residency program because of his disabilities; and (3) dismissed him from the residency program in retaliation for his requests for a reasonable accommodation.

## I.

[1] Tori claims first that the University discriminated against him because it failed to reasonably accommodate his disabilities. To establish a prima facie failure-to-accommodate claim, Tori must offer evidence that shows (1) that he is a qualified person with a disability; (2) that the University knew of his disability; and (3) that the University failed to make a reasonable accommodation of his disability. *Hoover v. Norwest Private Mortgage Banking,* 632 N.W.2d 534, 547 (Minn.2001).

Although the University does not dispute that Tori is disabled under the applicable statutes, it asserts that because Tori is not a "qualified person," he cannot satisfy the first prong of a prima facie case. Tori argues that he is qualified because he "met the minimal, objective qualifications for the job"-he was accepted into the program, succeeded in the family-practice portion of the program academically, and received favorable clinical evaluations. The University does not dispute that Tori met the necessary prerequisites to be accepted into the residency program, but it argues that Tori was not performing the "essential functions" of being a resident at the time he was dismissed and was therefore not qualified to be a resident. The University contends that the "basic and essential responsibilities" of a resident include those outlined in the residency agreement that Tori signed, which requires that residents conduct themselves ethically and provide

safe and effective care for patients. The University argues that there is no genuine dispute for a jury to decide here because Tori had clear obligations as a resident and clearly failed to fulfill those obligations. And because the issues that made Tori unqualified were unrelated to his disabilities, the University argues, no reasonable accommodation of his disabilities could have made Tori qualified.

**\*5** We are persuaded by the University's argument and are inclined to defer to its judgment, as an academic institution, regarding the basic requirements of its residency program. But the "essential functions" set forth in the residency agreement are too subjective to serve as the basis for a qualification determination without raising genuine issues of material fact. *See Legrand v. Trs. of the Univ. of Ark. at Pine Bluff,* 821 F.2d 478, 481 (8th Cir.1987) (determining that the plaintiff unqualified because he was "unreliable" involved too subjective a standard to preclude establishment of a prima facie case). Because we reach the ultimate conclusion that a grant of summary judgment to the University was appropriate, we will assume that Tori was a "qualified" disabled person and proceed to the remaining elements of his failure-to-accommodate claim.

There is no dispute regarding the fact that Tori requested an accommodation of his disabilities, which put the University on notice of Tori's disabilities, satisfying the second prong of Tori's prima facie case. There is also no dispute about the fact that the University was willing to allow Tori to tape-record lectures and to move around during lectures to accommodate his disabilities but was not willing to exempt him from the requirements of the course-attendance policy. The University is required to provide only a reasonable accommodation, and it did, so Tori's prima facie case fails on the third prong.

Although it was required to reasonably accommodate Tori's disabilities, the University was not required to provide the precise accommodation that Tori requested. *Hankins v. The Gap, Inc.,* 84 F.3d

Case 0:07-cv-00099-RHK-JSM Document 38-21 Filed 12/05/08 Page 67 of 74

797, 800-01 (6th Cir.1996). The district court correctly concluded that the University's offer to allow Tori to tape-record lectures and to move around during lectures fulfilled its accommodation obligation. Public universities are not required to make accommodations that "substantially alter the nature of the program" that they operate. *Amir v. St. Louis Univ.,* 184 F.3d 1017, 1028 (8th Cir.1999). Tori's requested accommodation was unreasonable because the psychiatry department had determined that lecture attendance was an essential element of its program-Tori's requested accommodation would have required the University to substantially alter the nature of its program. Tori argues that the University failed to show undue hardship, but the University is required to demonstrate undue hardship only if the accommodation that it refuses to make is reasonable. In light of the fact that the University offered a reasonable accommodation that Tori rejected and the fact that the University determined that lecture attendance was an essential element of its academic program, Tori's requested accommodation was unreasonable.

Tori maintains that the University was statutorily required to accommodate him further by waiving its attendance policy and making his requested accommodation. Tori asserts (1) that the district court erred in assuming that the attendance policy was "written in stone"; (2) that the district court failed to consider the fact that the University presented no evidence that the requirements of the National Resident Review Committee, on which the attendance policy was based, would preclude the accommodation that Tori requested; and (3) that the district court failed to consider that the attendance policy permitted alternative arrangements with faculty, including independent study.

*6 Tori's arguments are unpersuasive and are unsupported by authority. First, the attendance policy may not have been "written in stone," but it *was written,* and it was distributed in a memorandum to all residents, including Tori. The University was not required to make exceptions to an evenly enforced academic policy to accommodate Tori's disabilities. Courts generally defer to the judgment of colleges and universities regarding academic matters. *Amir,* 184 F.3d at 1028. A university "is not required by the Rehabilitation Act or the ADA to lower its academic standards for a professional degree."*Mershon v. St. Louis Univ.,* 742 F.3d 1069, 1076 (8th Cir.2006). Accordingly, the University's psychiatry department is entitled to deference to its determination that lecture attendance is an essential part of its program and that a variance from its attendance policy would have been an unreasonable accommodation. Tori's allegation that the lecture-attendance policy was discriminatory because it was implemented in response to his requests for an accommodation rests on "mere assertion." There is simply no evidence that this was the case.

Regarding Tori's second argument, he fails to explain why it matters whether the National Resident Review Committee would authorize Tori's attendance-policy exemption. Whether the psychiatry department was *required* to implement the attendance policy is irrelevant; it *did* implement the policy based on its own judgment regarding the importance of class attendance, and there is no evidence that it enforced the policy in a discriminatory manner.

Finally, the alternative arrangements authorized in the attendance policy are authorized only as a means for "making up" classes, and they are suggested only as a possibility: "If a resident misses 3 or more sessions in a 12 week course ... the resident will be required to talk with the course leader about the possibility of 'making up' the missed sessions. The 'make up' work could take many different forms," including independent reading. Again, we defer to the academic judgment of the University in its decision to maintain such alternative arrangements as an exception to the rule requiring lecture attendance.

Because there is no genuine issue of material fact regarding the accommodation that the University offered to provide and that accommodation was

reasonable, summary judgment was appropriate on Tori's failure-to-accommodate claim.

## II.

[2] Tori next claims that the University discriminated against him because it dismissed him from the residency program because of his disabilities. In the absence of direct evidence of discrimination, discriminatory-dismissal claims are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973).*Mershon*, 442 F.3d at 1074 (utilizing the *McDonnell Douglas* framework to review a grant of summary judgment). In the first step, the plaintiff must establish a prima facie case of discrimination. *Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1071 (8th Cir .1998) (applying *McDonnell Douglas* to an ADA claim); *Hoover*, 632 N.W.2d at 542 (applying *McDonnell Douglas* to a disability-discrimination claim brought under the MHRA). A prima facie case of discriminatory dismissal includes showing that the plaintiff "was disabled, was qualified to perform the essential functions of [his or] her job with or without a reasonable accommodation, and was terminated under circumstances that raise an inference of unlawful disability discrimination." *Mole v. Buckhorn Rubber Prods., Inc.*, 165 F.3d 1212, 1216 (8th Cir.1999). After the plaintiff has established a prima facie case, the burden shifts to the employer to provide some legitimate, nondiscriminatory reason for the challenged employment action. *Christopher*, 137 F.3d at 1072. Finally, in order to prevail on his discrimination claim, the plaintiff must offer sufficient evidence to show that the "employer's articulated reason for the adverse employment action was false and that discrimination was the real reason."*Id.* A plaintiff may prevail if he or she shows that "his or her disability was a 'motivating factor' in the decision made, 'even though other factors also motivated' the employer's decision."*See Pedigo v. P.A.M. Transp., Inc.*, 60 F.3d 1300, 1301 (8th Cir .1995) (quoting 42 U.S.C. § 2000e-2(m) (2000)). Here, there is

simply no evidence that Tori's dismissal was motivated in any way by his disability.

*7 The University does not dispute that Tori is disabled, and, as discussed earlier, we will assume that Tori is qualified. But Tori fails to provide any evidence that raises an inference of discrimination, which precludes the establishment of a prima facie case. Tori attempts to establish "animus" on the part of the University by referring to the fact that the University continued to insist that Tori attend lectures and considered placing Tori on probation in February 2001 because of his failure to attend lectures and to attend supervised psychotherapy sessions. He also points to comments made by certain faculty members regarding the fact that they had never had a student "question or challenge" the curriculum so working with Tori had "felt like a struggle," and regarding their perception of Tori's "boundary violations" and his having a "sense of entitlement," which a faculty member described as "feeling like you don't need to go to an emergency room shift or actually the lecture schedule ... not showing up when it is required to show up."This "evidence" of animus is unrelated to Tori's disabilities and is consistent with the reasons that the University gave Tori for his dismissal. Tori fails to raise even a slight inference of discrimination, so he cannot establish a prima facie case of discriminatory dismissal.

[3] Even if Tori could establish a prima facie case, the University sets forth several legitimate, nondiscriminatory reasons for Tori's dismissal, and Tori fails to offer evidence that casts sufficient doubt on the University's asserted reasons or sustains his ultimate burden of proving that disability discrimination was the actual reason for his dismissal.

The University's first asserted nondiscriminatory reason for Tori's dismissal is his unethical sexual relationship with a female psychiatry patient. Tori's residency agreement demands that the resident conduct himself "ethically," and that the resident care for patients in a "safe, effective, and compassionate" manner, and the ethics principles specifically

Case 0:07-cv-03970-PJS-JJG Document 38-21 Filed 12/05/08 Page 69 of 74

prohibit sexual activity with patients. Tori does not dispute the facts underlying this disciplinary charge but argues that the University could not have based its dismissal decision on his relationship with a former patient, and that this proffered reason was therefore a pretext for discrimination because the University made the decision to dismiss him before it learned of the relationship.

There is evidence that a residency-program director informed the disability-services specialist on April 3, 2001, the date on the disability-services special-ist's notes, that Tori "was no longer in the program [due] to some ethical issues."The University did not contact Tori until April 6 to inquire about the com-plaint that had been filed against him with the Min-nesota Board of Medical Practice, and it was not until April 11 that the University learned that the complaint arose out of Tori's sexual relationship with a former patient. Although there appears to be substantial evidence supporting the University's as-sertion that the apparent timing discrepancy is due to a clerical error by the disability-services special-ist, we must view the evidence in the light most fa-vorable to Tori and conclude that there is a genuine issue of material fact regarding whether Tori's sexual relationship with a patient was an actual mo-tivation for his dismissal. But this factual issue does not warrant reversal of summary judgment because the University had other legitimate, nondiscriminat-ory reasons for dismissing Tori about which there are no issues of disputed fact.

*8 Tori does not dispute the fact that he failed to at-tend a significant number of psychiatry-department lectures, which is the University's second articu-lated nondiscriminatory reason for his dismissal, but he argues that his attendance failures cannot be among the University's legitimate reasons for dis-missing him from the residency program because those attendance failures were caused by the Uni-versity's failure to accommodate his disabilities. Because we concluded earlier that the University offered to reasonably accommodate Tori's disabilit-ies, we also conclude that it was permissible for the University to base Tori's dismissal in part on his consistent failure to attend lectures.

Similarly, because we concluded earlier that the University offered to reasonably accommodate Tori's disabilities, we are not persuaded by Tori's assertion that the University precipitated the events on which Tori's dismissal was based when it failed to accommodate his disabilities and allow him to study the course material independently. He asserts that his "problems during residency did not begin until the psychiatry program administration refused to accommodate his well documented disabilities," and he asserts that the reason he did not know that a sexual relationship with a former patient is unethic-al is that he was unable to attend the ethics course because of his disabilities, and the University did not accommodate his disabilities and allow him to learn the course material independently. But Tori admittedly had a copy of the ethics principles, so the University did not prevent him from learning the ethics materials independently. And even if an accommodation would have excused Tori's failure to attend lectures and would have allowed Tori to learn the ethics principle regarding sexual relation-ships with patients, which, arguably, Tori should have familiarized himself with even without having taken a course, Tori fails to explain how his reques-ted accommodation would have prevented the other events on which his dismissal was based.

The University's next articulated nondiscriminatory reason for Tori's dismissal is that Tori interacted in-appropriately with female peers. Tori argues these allegations "were put to rest over two years before they were resurrected as bases for [his] dis-missal."He does not challenge the allegations them-selves but instead argues that they are too remote in time from his dismissal to have contributed to it. And Tori argues that the allegations that he failed to appear for emergency-room shifts and commu-nicated unprofessionally with a chief resident were groundless because he "did appear for work at the ER" and his "only infraction was to be sharp with the chief resident who did not inform [him] that his

schedule had changed."The University points out that Tori does not actually challenge the facts involved, but, at most, he challenges the seriousness of the charges.

Regarding the allegation that Tori inappropriately punished a patient by withdrawing pain medication, Tori argues that he withdrew only a sleeping aid and nicotine aids from the patient in question, that he did so for the safety of the patient, and that his actions were taken with the approval of the attending physician. Further, Tori argues, this allegation was also too remote in time from his dismissal to have been an actual reason for it. The issue is not whether the University was necessarily correct as to each of the offenses but whether the University *believed* that Tori had committed the offenses when it used them as bases for his dismissal. *Wilking v. County of Ramsey,* 153 F.3d 869, 873 (8th Cir.1998) (stating that a court does not sit as a "super-personnel department" that decides whether an employer's decisions are "wise, fair, or even correct"; rather, the issue is whether the employer was honest about its reasons for its decision). The fact that a faculty physician reported that Tori had improperly discontinued a pain reliever supports the University's contention that this action by Tori served as a basis for his dismissal, even if Tori is correct that the faculty physician was mistaken.

*9 Even if Tori had established a prima facie case, which he has not, he fails to offer sufficient evidence to show that four of the University's five legitimate, nondiscriminatory reasons for his dismissal were pretextual, and he fails to satisfy the third step of *McDonnell Douglas* and point to any evidence, let alone "substantial evidence," that discrimination because of his disabilities was the true motivation for his dismissal. *See Christopher,* 137 F.3d at 1072; *DLH, Inc.,* 566 N.W.2d at 70 (noting that a genuine issue for trial must be established by "substantial evidence").

**III.**

[4] Finally, Tori claims that the University dismissed him from the residency program in retaliation for his requests for a reasonable accommodation. A prima facie case for retaliatory dismissal consists of: "(1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two." *Hubbard v. United Press Int'l, Inc.,* 330 N.W.2d 428, 444 (Minn.1983). As with a discriminatory-dismissal claim, the burden-shifting framework of *McDonnell Douglas Corp.* dictates that after the plaintiff has established a prima facie case of retaliatory dismissal, the burden shifts to the employer to provide some legitimate, nondiscriminatory reason for the challenged employment action. *Hoover,* 632 N.W.2d at 548-49. Then, in order to prevail on his discrimination claim, the plaintiff must show that the employer's articulated reason is a pretext for retaliation and that retaliation was the actual reason for the plaintiff's dismissal. *Id* at 549.

There is no dispute that Tori engaged in statutorily protected conduct when he requested an accommodation for his disabilities, and there is also no dispute that Tori's dismissal from the residency program was an adverse employment action. But Tori cannot establish the third prong of his prima facie case for retaliatory dismissal because there is simply no evidence that would allow a reasonable jury to find a causal connection between his requests for an accommodation and his dismissal. The fact that he was in the process of negotiating an accommodation with the University when he was dismissed is not sufficient-a mere temporal connection alone does not raise an inference of discrimination. *See Mershon,* 442 F.3d at 1075 (noting that short proximity, in this case, supports university's action). And even if Tori could assert facts that raise an inference of retaliation and establish a prima facie case of retaliatory dismissal, he cannot show that the University's articulated nondiscriminatory reasons were pretextual, and he cannot satisfy his ultimate burden of showing that retaliation was the actual reason for his dismissal, as discussed above. His retaliatory-dismissal claim fails for the same

reasons that his discriminatory-dismissal claim fails.

No genuine issue of material fact exists when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *DLH, Inc.,* 566 N.W.2d at 69 (quoting *Matsushita Elec. Indus. Co.,* 475 U.S. at 587). Here, no reasonable jury could determine that Tori was dismissed because of his disabilities or his requests for an accommodation. There is no evidence to support such a conclusion. And the undisputed facts show that the University offered to reasonably accommodate Tori's disabilities. The district court appropriately granted summary judgment to the University.

**\*10 Affirmed.**

Minn.App.,2006.
Tori v. University of Minnesota
Not Reported in N.W.2d, 2006 WL 3772316 (Minn.App.)

END OF DOCUMENT

**TAB 10**

Slip Copy
Slip Copy, 2008 WL 4326525 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 2008 WL 4326525 (C.A.2 (N.Y.)))

**H**
Only the Westlaw citation is currently available. This case was not selected for publication in the Federal Reporter.

United States Court of Appeals, Second Circuit.
David Van WORMER, Plaintiff-Appellant,
v.
CITY OF RENSSELAER, Frederick M. Fusco,
James Frankowski, Mark Pratt, Maureen Nardacci,
Margaret Van Dyke, Lynn Ganance, Defendants-Appellees.
No. 07-1641-cv.

Sept. 22, 2008.

Appeal from the United States District Court for the Northern District of New York (Kahn, J.).

Sue H.R. Adler, Albany, NY, for Appellant.
Daniel J. Stewart, Brennan & White, L.L.P., Queensbury, NY, Matthew J. Kelly, Roemer Wallens & Mineaux, LLP, Albany, NY, for Appellees.

Present ROSEMARY S. POOLER, ROBERT D. SACK, Circuit Judges, JED S. RAKOFF,[FN1] Judge.

> FN1. The Honorable Jed S. Rakoff, United States District Judge of the United States District Court for the Southern District of New York, sitting by designation.

**SUMMARY ORDER**

**\*1 ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of said District Court be and it hereby is **AFFIRMED.**

Plaintiff David G. Van Wormer appeals from a judgment of the United States District Court for the Northern District of New York (*Kahn, J.*), filed March 22, 2007, granting defendants' motions to dismiss and dismissing all of his claims. We assume the parties' familiarity with the facts, the proceedings below, and the specification of issues on appeal.

This Court reviews de novo a district court's grant of a motion to dismiss, "construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002) (citation omitted). To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1964 (2007), "only enough facts to state a claim to relief that is plausible on its face," *id.* at 1974.

The applicable statute of limitations is the New York State three-year statute of limitations for personal injury actions. *See Ormiston v. Nelson,* 117 F.3d 69, 71 (2d Cir.1997). Van Wormer filed this suit on April 8, 2005. Van Wormer's claims are therefore time-barred unless they accrued on or after April 8, 2002. The disciplinary charges, which proposed Van Wormer's termination, were filed on September 21, 2001, and an arbitration hearing on those charges took place on February 14, 2002. Van Wormer was found guilty of the disciplinary charges in an arbitration award dated April 9, 2002, and he was terminated shortly thereafter.

"While state law supplies the statute of limitations for claims under § 1983, federal law determines when a federal claim accrues. The claim accrues when the plaintiff knows or has reason to know of the harm." *Eagleston v. Guido,* 41 F.3d 865, 871 (2d Cir.1994) (citation and internal quotation marks omitted). The district court, relying on *Washington v. County of Rockland,* 373 F.3d 310 (2d Cir.2004), ruled that Van Wormer's action was untimely because he knew or had reason to know of the retaliation when the disciplinary charges were filed in 2001.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Washington involved a claim of retaliatory discipline, whereas Van Wormer asserts a claim of retaliatory discharge. Nonetheless, we conclude that Van Wormer's claims are time-barred because he had notice of his proposed termination before April 8, 2002, and he alleges no unconstitutional act after that date. As counsel conceded at oral argument, Chief Fusco and Deputy Chief Frankowski took no retaliatory action after they filed the disciplinary charges. Although Van Wormer alleges that the Board of Public Safety defendants "approved and ratified the arbitration award and terminated" him after April 8, 2002, he does not allege that these acts were intentionally retaliatory, as required for a First Amendment retaliation claim under 42 U.S.C. § 1983. See Chardon v. Fernandez, 454 U.S. 6, 8 (1981) (per curiam) ("The fact of termination is not itself an illegal act."). That the effects of retaliation are continuing does not make the retaliatory act itself a continuing violation. Therefore, Van Wormer's retaliation claims are time-barred.

*2 The district court dismissed Van Wormer's due process claim on the ground that the complaint failed to provide "a short and plain statement of the claim" as required by Federal Rule of Civil Procedure 8(a)(2). A Rule 8(a)(2) dismissal without leave to amend is rarely warranted. See Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir.1988). Van Wormer's complaint alleged that he held a property interest in his job, that he could be removed only in accordance with the Collective Bargaining Agreement ("CBA"), that the defendants circumvented the CBA requirements, and that the defendants deprived him of his position without due process of law. These allegations, although not detailed, were probably sufficient to provide "fair notice of what the claim is and the grounds upon which it rests." Erickson v. Pardus, 127 S.Ct. 2197, 2200 (2007) (per curiam) (citations, internal quotation marks, and ellipsis omitted).

Nonetheless, this Court is "free to affirm an appealed decision on any ground which finds support in the record, regardless of the ground upon which

the trial court relied." See United States v. Yousef, 327 F.3d 56, 156 (2d Cir.2003) (internal quotations omitted). In his reply brief, Van Wormer argues that the defendants violated the CBA by filing false charges against him in retaliation for his protected activity, while ignoring misconduct by other officers. Van Wormer has failed to identify any inadequacy in the process that he was due and received after the disciplinary charges were brought. See Adams v. Suozzi, 517 F.3d 124, 128 (2d Cir.2008) (collecting cases holding that pre-deprivation notice and adequate grievance procedures provided by a CBA are sufficient to satisfy due process). Van Wormer had pre-deprivation notice through the arbitration hearing, and had the opportunity to challenge that decision in a post-deprivation hearing before the New York State Supreme Court. Leave to amend would be futile under the circumstances. See Ellis v. Chao, 336 F.3d 114, 127 (2d Cir.2003) ("[L]eave to amend a complaint need not be granted when amendment would be futile."). Because Van Wormer has failed to identify a basis for finding a due process violation, we affirm dismissal of the due process claim.

For these reasons, we AFFIRM the judgment of the district court.

C.A.2 (N.Y.),2008.
Wormer v. City of Rensselaer
Slip Copy, 2008 WL 4326525 (C.A.2 (N.Y.))

END OF DOCUMENT