**EXHIBIT M:**

1. **EXHIBIT M: LETTER FROM THE ABIM TO PLAINTIFF JULU 22, 2003.**



ABIM
AMERICAN
BOARD OF
INTERNAL
MEDICINE

PROMOTING
EXCELLENCE IN
HEALTH CARE

510 Walnut Street
Suite 1700
Philadelphia, PA
19106-3699

Tel: 215-446-3500
Tel: 800-441-2246
Fax: 215-446-3470
E-mail: request@abim.org
www.abim.org

Ralph I. Horwitz, MD
Chair

Troyen A. Brennan, MD
Chair-Elect

James R. Patterson, MD
Secretary-Treasurer

Christine K. Cassel, MD
President

F. Daniel Duffy, MD
Executive Vice President

Lynn O. Langdon, MS
Senior Vice President
Subspecialty Medicine
Chief Program Officer

Henry E. Strozeski, MBA
Senior Vice President
Chief Financial Officer
Chief Administrative Officer

Leslie D. Goode, MHS
Vice President
Communications and
Public Relations

Elizabeth A. Hopkins
Associate Vice President
Registration and Credentials

Muriel Horne
Associate Vice President
Registration and Credentials

July 22, 2003

Dr. C. Earl Grant
P. O. Box 5192
Fairlawn, OH 44334

Dear Dr. Grant:

The Board has recently received information that you were terminated from your training program at the Akron General Medical Center for less than satisfactory performance. Thus, this training cannot be considered for admission to a future Certifying Examination in Internal Medicine. To fulfill the Board's training requirements for admission to a future Certifying Examination in Internal Medicine, you will need to satisfactorily complete an additional twenty-four months of accredited training in internal medicine as a medicine resident at the R-2 and R-3 year level of training responsibility.

Respectfully yours,

Muriel Horne

Muriel Horne

MH/eag

**EXHIBIT N:**

1. **EXHIBIT N: PLAINTIFF'S AFFIDAVIT TO THE OHIO STATE MEDICAL BOARD 31 JANUARY 2005.**

HHC 18th MEDCOM
Unit # 15281, Box # 872
APO, AP 96205-5281
January 31, 2005

State of Ohio Medical Board
77 South High Street, 17th Floor
Columbus, Ohio 43215-6127
**Complaint Line:** 1-800-554-7717
**Phone:** 614-466-3934
**Fax:** 614-728-5946

**Subject: Gross Discrimination, Defamation of Character Unfair Termination**

**To Whom It May Concern:**
I am an active duty US military Officer and have been deployed overseas since August 4, 2003. I am proud to serve my country in peace and war time. I have had some rather unusual experience despite otherwise excellent work ethics and clinical performance during my residency training. I hereby request the assistance of the Ohio State Medical Board to review my case to ensure that I receive proper credit for my residency training at Akron General Medical Center. The details surrounding my case are outlined below.

I completed my internship year at Johns Hopkins Sinai Hospital in Baltimore, MD in June, 2000, and my PGY-2 training at Huron Hospital Cleveland Clinic on June 30, 2001.

I began my PGY-3 training at Akron General Medical Center on July 1, 2001. While registering for the ABIM Certification examination during the fall of 2001, I was informed that a marginal evaluation was submitted to the ABIM by both former Program Directors, and that I would be required to complete an additional 12 months of residency training if the information submitted to the ABIM was not corrected by the registration deadline of February 1, 2002. Based on my knowledge regarding my performance and the evaluations in my files at both programs I have no doubt that my cumulative evaluations were better than satisfactory. In order to prove my case to the ABIM that my clinical evaluations from both previous programs have been at least satisfactory and above, I provided the Dr. James Hodsden, Program Director of the Department of Internal Medicine, Akron General Medical Center, signed authorizations to request my files from both Program Directors. I also requested that a letter be sent by Dr. Hodsden to the Army Medical Education Directorate in support of my request for an additional year extension of my deferment from active duty and to verify the reason for the requested extension.

To my dismay the information was received in a timely manner be Dr. Hodsden, who failed to provide me with the information needed to forward to the ABIM. Similarly, a new and vastly different reason was sent to the Army Medical Education Directorate without my knowledge and this information was kept hidden from my viewing until

February, 2003, after I had requested to see all contents of my file. I was unable to complete the registration for the 2002, ABIM examination despite the information that had been available to the Director since December, 2001. (Please see letter below from Dr. James Hodsden to Ms Dee Pfeiffer, dated December 27, 2001), and other supporting documents. My contract was renewed as a PGY-3 to complete the additional 12 months on June 30, 2003.

Mailed 12/28/01

400 Wabash Avenue
Akron, Ohio 44307
330-344-6000
www.akrongeneral.org

Alan J. Bleyer
President

James E. Hodsden, MD, FACP, FACC
Residency Program Director
Associate Professor of Clinical Internal Medicine

330-344-06140
FAX#: 330-535-9270
E-Mail: jhodsden@agmc.org

December 27, 2001

Ms Pfieffer
Department of Medicine
Department of the Army
HQDA (DASG-ZIIM-GD)
5109 Leesburg Pike
Falls Church, VA 22041-3258

RE: C. Earl Grant

To Whom It May Concern:

Earl Grant is currently a third year resident in the Department of Internal Medicine at Akron General Medical Center. Earl is a M.D., Ph.D. candidate who graduated from the University of Minnesota Medical School.

His first year of Internal Medicine residency was completed at John Hopkins University/Sinai Hospital in Categorical Internal Medicine. He did his second year of Internal Medicine residency at Huron Road Hospital, subsidiary of the Cleveland Clinic Foundation, in Categorical Internal Medicine. This was due to the fact that there were no positions available as stated in his reference letter from Dr. Gary Kerkvliet at Sinai Hospital. No areas of deficiency were identified at Sinai Hospital, nor were there any deficiencies identified at Huron Road Hospital as evidenced in a letter from Dr. Reginald P. Dickerson.

Since he has been at Akron General Medical Center, he has been identified as having clinical deficiencies although he has never been evaluated as unsatisfactory. Both attending and peer evaluations have suggested this as an ongoing problem, such that we have identified areas that we will require further clinical evaluation.

For this reason, I am requesting that his deferment for training be extended to June, 2003, so we can help him remediate some of these areas in question and help him perform as a better physician.

If you require any further information from me, please do not hesitate to contact me.

With kind regards,

James E. Hodsden, MD

Marba 12/28/01

AKRON GENERAL
MEDICAL CENTER
Department of Medicine

400 Wabash Avenue
Akron, Ohio 44307
330-344-6000
www.akrongeneral.org

Alan J. Bleyer
President

James E. Hodsden, MD, FACP, FACC
Residency Program Director
Associate Professor of Clinical Internal Medicine

330-344-6140
FAX: 330-535-9270
E-Mail: jhodsden@agmc.org

December 27, 2001

Reginald P. Dickerson, M.D.
Chairman, Department of Medicine
Program Director, Internal Medicine
Huron Hospital
13951 Terrace Road
E. Cleveland, OH 44112

RE: C. Earl Grant

Dear Dr. Dickerson,

Please find enclosed the written release of information concerning Dr. Grant. I would appreciate receiving copies of his evaluation during his time spent at Huron Road Hospital. These evaluations should help us further identify areas, which will improve Dr. Grant's overall clinical performance.

If you have any further questions, please do no hesitate to contact me.

With kind regards,

James E. Hodsden, MD

Enclosure

Mailed 12/28/01

AKRON GENERAL MEDICAL CENTER
Department of Medicine

400 Wabash Avenue
Akron, Ohio 44307
330-344-6000
www.akrongeneral.org

Alan J. Bleyer
President

James E. Hodsden, MD, FACP, FACC
Residency Program Director
Associate Professor of Clinical Internal Medicine

330-344-6140
FAX: 330-535-9270
E-Mail: jhodsden@agmc.org

December 27, 2001

Gary J. Kerkvliet, M.D.
Associate Program Director
John Hopkins University/Sinai Hospital
2401 West Belvedere Avenue
Hoffberger Professional Center
Suite 56
Baltimore, MD 21215-5271

RE: C. Earl Grant

Dear Dr. Kerkvliet,

Please find enclosed the written release of information concerning Dr. Grant. I would appreciate receiving copies of his evaluation during his time spent at Sinai Hospital. These evaluations should help us further identify areas, which will improve Dr. Grant's overall clinical performance.

If you have any further questions, please do no hesitate to contact me.

With kind regards,

James E. Hodsden, MD



Sinai Hospital
a LifeBridge Health center

Division of General Internal Medicine
Department of Medicine

Johns Hopkins University/Sinai Hospital
Program in Internal Medicine

Gary J. Kerkvliet, M.D.
Associate Program Director

Johns Hopkins University
School of Medicine

Instructor in Medicine

April 26, 2000

To whom it may concern:

I am writing on behalf of C. Earl Grant, M.D., Ph.D., who is applying for a position with your program. In my capacity as Associate Program Director of the Johns Hopkins / Sinai Hospital Internal Medicine Training Program, I have had the opportunity to supervise Dr. Grant's care of patients and to monitor his progress as a physician-in-training.

Dr. Grant has been with our program on a one-year deferment from the military. He was recently granted a full three-year deferment, and is now eligible to continue his civilian residency for a PGY-2 followed by a PGY-3 year. As we do not have any PGY-2 positions available for July, 2000, we would be happy to help facilitate his transfer to your program.

I worked closely with Dr. Grant on the inpatient service early in his internship, and I was impressed with his dedication to his patients and the long hours that he devotes to them. He has an easy and gentle demeanor that his patients appreciate. I also work with Dr. Grant at the Resident Practice Office, where I have seen him practice a considered and thoughtful approach to each and every patient.

Dr. Grant's doctoral work prior to finishing his medical training has given him unique insights into the pathophysiology of his patients. It is my expectation that he will continue to grow in knowledge and clinical experience as he progresses through his training. If you have any questions, please feel free to call me.

Sincerely,

Gary J. Kerkvliet, M.D.

2401 West Belvedere Avenue · Hoffberger Professional Center, Suite 56 • Baltimore, MD 21215-5271
410-601-8256, 410-601-5638 fax · E-mail: gkerkvli@sinai-balt.com



Reginald P. Dickerson, MD, FACC
*Chairman, Department of Medicine*
*Program Director, Internal Medicine Residency*

June 30, 2001

**RE: C. EARL GRANT**

To Whom It May Concern:

Dr. Grant completed his second year of Internal Medicine Residency at Huron Hospital on June 30, 2001.

Dr. Grant has been an enthusiastic and positive resident. He is a hardworking, dependable, and motivated physician. Thoughtful and caring, Dr. Grant's interpersonal skills are good and he works well with patients and the healthcare team. In addition, he has strong humanistic qualities and practices medicine with the highest ethical standards.

If you would like to speak further regarding the qualifications of Dr. C. Earl Grant, please contact me at 216-761-7984.

Sincerely,

Reginald P. Dickerson, MD

*13951 Terrace Road*
*East Cleveland, Ohio 44112*
*(216) 761-2820*
*Fax 216-761-7579*

HURON HOSPITAL
CLEVELAND CLINIC HEALTH SYSTEM

Keyvan Ravakhah, M.D.
*Associate Program Director*
*Director, Medical Clerkships*

*Assistant Clinical Professor of Medicine,*
*Case Western Reserve University*

June 30, 2001

To Whom It May Concern:

I am writing on behalf of Dr. C. Earl Grant who I have known for one year while he was a resident in our program. He completed one year of internal medicine training at the second year level on June 30, 2001. Throughout this one year of training, I found Dr. Grant to be a very hard working, enthusiastic and compassionate physician. He loves medicine. He is a very caring physician with a special interest in geriatric medicine. He is respectful and confident. He is very determined to achieve his goals.

Please do not hesitate to call me at 216-761-2820 if you need to talk to me regarding Dr. Grant's qualifications.

Sincerely,

Keyvan Ravakhah, MD

*13951 Terrace Road*
*East Cleveland, Ohio 44112*
*216-761-7940*
*Fax 216-761-7579*

HURON HOSPITAL
CLEVELAND CLINIC HEALTH SYSTEM

Department of Medicine

**C. Earl Grant, M.D.**
**R-II Rotations, 2000-2001**

| | |
|---|---|
| July | Emergency Room |
| August | GIM-Consulting Service |
| September | Gastroenterology (Emmanuel Okafor, MD) |
| October | Cardiology |
| November | Pulmonary (Donald Epstein, MD) |
| December | Service B: Floor (Lawrence Gray, MD) |
| January | Vacation |
| February | Pulmonary (Donald Epstein, MD) |
| March | Coronary Care Unit |
| April | Service C: Night Float (Keyvan Ravakhah, MD) |
| May | Service E: South Pointe (Michael Kalus, MD) |
| June | Service D: Hillcrest (Hassan Tahsildar, MD) |

C. Earl Grant, M.D. — Date: 7/4/2001

Reginald P. Dickerson, M.D. — Date: 7/4/01

13951 Terrace Road
East Cleveland, Ohio 44112
(216) 761-2820
Fax (216) 761-7579


July 5, 2001

C. Earl Grant, Ph.D., MD

Dear Dr. Grant:

On behalf of the Department of Medical Education, congratulations on your residency selection with Akron General Medical Center! The medical staff, residents, and our department are excited to have you aboard and we are looking forward to your arrival this June.

In an effort to make your employment to Akron General "official" – and to accomplish this in a structured, organized manner – please find the following documents enclosed for your careful review and follow-up:

- ✓ Your contract for the 2001-02 academic year, please sign and date the contract and return it in the enclosed postage-paid envelope. After the Chairman of Medical Education signs your contract, a copy will be mailed to you.
- ✓ The 2001-02 House Officer Manual: please read through this manual, sign page three and return along with your contract.
- ✓ A checklist of items needed for you personnel file – please complete this checklist as instructed and return along with your contract and house officer manual receipt form. ***Please note that your employment cannot be processed until your file is complete.***
- ✓ A $1,000.00 moving allowance is permitted with no payback, providing that you supply the Department of Medical Education with original receipts.
- ✓ A Hobart Loan Application form – you may request up to $1,000.00. This loan is interest free and paid back through payroll deduction your first year of residency. *Please allow two to three weeks for processing.*
- ✓ Information packet from our CorpCare/Employee Health Department – please review this information *thoroughly* and make special note of the items required at the time of your pre-employment physical examination.
- ✓ The premiums for health care coverage are free of charge. Enclosed you will find information provided from our Human Resources Department. Please review this material before attending orientation in order to make the process easier when choosing a health care plan. Contact the Human Resources Department @ (330) 344-6090 with any questions.
- ✓ State Medical Board of Ohio Training Certificate Application *(If you have already mailed disregard, if not please mail ASAP)*

Please include a ***recent, original photograph*** in your return envelope. This photo will be included in our 2001-02 House Staff Composite.

New House Officer Orientation had been scheduled for June 28 and 29, 2001. If you have not provided us with a copy of your Medical School Diploma, please bring one with you to orientation. *(Attendance is mandatory)*. Also, if you have not yet received an ACLS certificate, please note that a special course had been scheduled for Wednesday, June 27, 2001 at Akron General medical Center in the Conference Center Auditorium. To request registration for this course, please check the appropriate box on you checklist and complete the enclosed registration form *(lavender)* and return in the appropriate postage-paid envelope to the attention of Paramedic Education. A complete orientation schedule and checklist of items required for orientation will be sent to you under separate cover.

We have enjoyed getting acquainted with you these past months and look forward to continuing our assistance by making your move to Akron a positive experience. If you have any questions at any time, please do not hesitate to contact me at (800) 732-2852. Once again, WELCOME to Akron General☺

Sincerely,

Christine E Mayes

Christine E. Mayes
Residency Coordinator, Graduate Medical Education

/cm

Enclosures



COPY

**AKRON GENERAL MEDICAL CENTER**
**HOUSE OFFICER CONTRACT**

I hereby accept a residency position in **Categorical Internal Medicine** at the **third** level of training at the Akron General Medical Center for the period of time from June 1, 2001 June 30, 2002.

I acknowledge responsibility for satisfactory performance of my duties as assigned and evaluated by the Department Chairman and/or Program Director.

I acknowledge responsibility to participate in safe, effective and compassionate patient care under supervision.

I acknowledge responsibility to participate in the educational activities of the **Categorical Internal Medicine Residency Training Program** as assigned, and assume responsibility for teaching and supervising other residents and students as required by the Chairman and/or Program Director.

I further agree to abide by the rules, regulations, policies and procedures of the Medical Staff in effect at Akron General Medical Center, as well as all rules, regulations, policies and procedures set forth in the terms and conditions of appointment as described in the House Officer Manual of Akron General Medical Center. I acknowledge and agree that Akron General Medical Center may make any reasonable amendment or alteration to the House Officer Manual at its discretion provided no such amendment or alteration conflicts with the language in the contract.

Akron General Medical Center agrees to provide me with **$39,000.00** per annum at the **third** level of training as stipulated in the House Officer Manual and subject to the terms and conditions described therein.

**NAME: Carrol Earl Grant, MD**

**SIGNATURE** Carrol Earl Grant

**DATE** 07-09-2001

For Akron General Medical Center:

James Dougherty KB

James Dougherty, MD, FACEP
Chairman of Medical Education



AKRON GENERAL
MEDICAL CENTER

Department of Medicine

400 Wabash Avenue
Akron, Ohio 44307
330-344-6000
akrongeneral.org

Alan J. Bleyer
President

James E. Hodsden, MD, FACP, FACC
Residency Program Director
Associate Professor of Clinical Internal Medicine

330-344-6140
FAX: 330-535-9270
E-Mail: [illegible]

April 11, 2002

To Whom It May Concern:

This letter is to verify that C. Earl Grant, M.D. is currently a third year Internal Medicine resident in our program at Akron General Medical Center. He is scheduled to graduate June 30, 2003.

Should you require any additional information, please feel free to contact me.

Sincerely,

James E Hodsden

James Hodsden, M.D., FACP, FACC

 400 Wabash Avenue
Akron, Ohio 44307
330-344-6000
akrongeneral.org

Alan J. Bleyer
President

James Dougherty, MD, FACEP
Chairman, Department of Medical Education
Professor of Emergency Medicine
330-344-6050
1-800-732-2852
FAX#. 330-344-1529
E-Mail: jdougherty@agmc.org

April 19, 2002

James E. Hodsden, MD
Program Director, IM

Dear Jim,

I am in receipt of your letter dated April 4, 2002 requesting that Dr. Earl Grant remain at a PGY-3 status.

We would be happy to accommodate this request and feel that your plan for continued testing as well as remediation appears appropriate.

Please let me know if there is anything additional that this department can do to assist you with Dr. Grant's education.

Sincerely,

James Dougherty, MD
Director, Medical Education

Jacob file

JD/tc

DATE: 2002-06-19
(YEAR/MONTH/DAY)

**ARMY SPECIALTY DELAY TRAINING PROGRAM ENROLLMENT VERIFICATION FORM**

Ms. Delores Pfeiffer
GME/FAP Program Manager
ATTN: DASG-PSZ-MG
Skyline 6, Suite 691
5109 Leesburg Pike
Falls Church, Virginia 22041-3258

This is to certify that GRANT (LAST NAME) CARROL (FIRST NAME) EARL (MI) is officially enrolled as a resident in INTERNAL MEDICINE (SPECIALTY) and he/she is currently in good standing at AKRON GENERAL MEDICAL CENTER (TRAINING INSTITUTION)

I also verify that at the beginning of the academic year (i.e. July 2002) he/she is projected to enter residency training at the (circle which applies) PGY-1/PGY-2/PGY-3/PGY-4/PGY-5/ PGY-6/ PGY-7/PGY-8 level and that the exact beginning and ending dates of the training year for this individual are 7/1/2001 (BEGIN – MONTH/DAY/YEAR) to 6/30/2003 (END - MONTH/DAY/YEAR).

Is he/she participating in a residency training program at your training institution beyond the PGY-1 level (circle which applies) YES/NO. If yes, indicate the projected graduation date of his/her entire program 06/30/2003 (MONTH/DAY/YEAR).

[signature]
(Dept Chief/Chairman/Program Director's Signature)-(circle which applies)

James E. Hodsden
(Print or Type Name)

(STAMP OFFICIAL SEAL HERE)

330-344-6140
(Telephone Number)

400 Wabash Ave
(Training Institution Street Address)

Akron, OH 44307
(City/State/Zip Code)

*Direct questions or inquiries to Department of the Army (703) 681-4804/0627 or 1-877-MED-ARMY; fax number is (703) 681-8044.*

During a meeting with the Director on October 19, 2001, the Director indicated that he had received communication regarding a diagnosis of ADD, and also mentioned that the Clinical Competency had raised comments regarding my performance, but no specifics were mentioned except that I was spending too much time with the patients in the out-patient clinic. My schedule was subsequently changed by adding one extra afternoon clinic session each week. Other senior residents had one out-patient clinic session per week with an average of 3 - 4 patients per clinic session. I had similar number of patients scheduled on Tuesday and Friday afternoons each week.

On several occasions I was scheduled for overnight on-call responsibilities followed by regular clinical duties and responsibilities between 7:00 A.M. and 1:30 P.M. and out-patient clinic from 1:30 to 4:30 P.M. the following day. On several occasions I had been awake since 5:30 A.M. the previous morning and had gotten no sleep in between, and was extremely tired and fatigued by 1:30 P.M. During one such very afternoon clinic sessions in April, 2002, I was attacked by an irate attending, who in addition to his use of profanity, suggested that I should have a "thyroid function check-up or something because you are taking up too much time with the patients." He also advised me then that 'if you don't speed up you might not be able to graduate, this is coming from the top," and mentioned the Department Chairman.

I subsequently met with the Director and two other physicians at the out-patient clinic, and discussed the incident, and objectively decided to restart medication for treatment of ADD. I also requested to have one afternoon clinic session each week instead of two, and this was denied. I was referred by the Director to see another clinician about starting medication for ADD. It had become evident that much of the emphasis on timing me in regard to out-patient clinic activities and comments from the Director regarding concerns of the Clinical Competency Committee had to do with fact that information had circulated throughout the department in regard to the diagnosis and label of ADD. I maintained a respectable and honest professional relationship with almost everyone, and treated my patients and their loved ones in a proficient, caring and respectable manner in all clinical settings. To date I have not lost a single patient under my care and management, owing to negligence, or inappropriate management.

As mentioned in the Director's letter to Ms. Pfeifer on December 27, 1002, "he has been identified as having clinical deficiencies although he has never been evaluated as unsatisfactory." To date have not been informed ad to what these clinical deficiencies are and as late as February 5, 2003, during a discussion with the Director, I specifically asked him to explain the clinical deficiencies that he claimed the Committee was concerned about and was told "I don't know. I guess it's because you don't see as many patients." I was never placed on any suspension, and there was never a remediation plan to my knowledge. During the months of July and August, 2002, I was scheduled on several overnight calls with out-patient clinic the following afternoon. On August 9, 2002, spoke with the Chief resident and requested to have my overnight calls not be scheduled on Mondays or Thursdays whenever possible. I received a phone call while in the out-patient clinic that afternoon and was informed that "Off-call requests are due in

the office by the 5th of each month. My first call on the September 2002, schedule was on a Monday, followed by out-patient clinic on Tuesday afternoon.

Between July and November, 2002, for unexplained reason individuals namely, the Chief Resident, Dr. Candido Anaya and Dr. Meredith Gerard an out-patient clinic attending made enormous efforts to document and report negative information to the Department Chairman, the Director and a mysterious Clinical Competency Committee. On August 5, 2002, I submitted a request to the Department via the Chief Resident for a one-week vacation written as 9/16/02 to 9/21/02. I also requested and reminded the Dr. Anaya not to schedule to schedule for overnight call on the night prior to the start of my vacation. The September schedule was made available during the last week of August and as shown below, I was scheduled placed on an ICU call on the night of 9/15/2002. I immediately pointed this out to Dr. Anaya and switched that call with the resident that was scheduled for ICU call in 9/14/2002. Following this we both informed Dr. Anaya of the switch which also required an additional form to be filled out and signed by each individual agreeing to the change. Residents were also required to submit vacation requests 6 weeks in advance in order that the Department can provide adequate notice to various departments and arrange appropriate coverage of patient care and other activities.

Usually, a signed copy of the form is returned to the resident prior to beginning the vacation. On September 15, 2002, post-call ICU, I spoke with Dr. Anaya on the telephone and reminded him that I had not received a signed copy of the vacation request and was reassured that my vacation was approved and it was ok. Unfortunately, I had the flue, felt very ill, and spent the entire time Sunday through Friday afternoon in my apartment without even going through the door. Apparently, Dr. Anaya had not turned in my vacation request to the Department. On Tuesday, September 17, 2002, I received a telephone call from the Residency Coordinator who informed me that "everyone was worried because I had not shown up for work on Monday, and that I was scheduled to see patients that afternoon in the out-patient clinic. I informed her that I was ill, and reminded her that I was on vacation and was too ill to travel. She informed me then that there was no paper work in the office regarding my request for vacation. She then assured me that she would get the paper work from Dr. Anaya.

Upon my return to work on September 23, Dr. Anaya verbally stated to me "you messed-up, your vacation was approved for August, but you instead took vacation in September." He further added that "Dr. Gardner and Dr. Hodsden are extremely upset with you for taking unauthorized vacation." "Everyone in the out-patient clinic is also very upset with you because you abandoned your patients and no arrangement was made for coverage while you were gone." The signed vacation request form was retrieved from my mail box at the hospital later that afternoon of September 23, 2002. (See document below). The dates originally written as 9/16/02 and 9/21/02 were fraudulently changed to read 8/16/02 and 8/21/02, in support of the claim that I was approved for vacation in August, and I had forgotten and took vacation in September.

My two sons birthdays are on September 19th and 21st and my birthday is on September 16th. The facts are:

1) I did not request vacation for August 16 through 21;

2) My request would have been rejected owing to inadequate time between the date submitted and the time of an intend vacation beginning August 16th only 11 days from the date of submission;

3) September schedule was made recognizing the 16th through 21st per my request, in that no call was scheduled between those dates by Dr. Anaya who made the on-call list each month;

4) for the same dates in August, 2002, on the 16th I had out-patient clinic that afternoon, on Monday the 19th I fulfilled my CCU over-night call responsibilities followed by out-patient clinic activities the afternoon on the 20th a regular combination to insure documentation of slowness in the out-patient clinic;

5) the vacation request form was signed by Dr. Anaya on 9/2/02, by Dr. Hodsden on 9/6/02 and by the Medical Education personnel on 9/9/02, and could not have been intended for approval of the period August 16 to 21;

6) Despite the foregoing facts a meeting was held on September 27, 2002, by a "Clinical Competency Committee" that unanimously decided and recommended that "Dr. Grant must be immediately terminated and not be given credit for his third year of training, based upon his ability to perform his duties and un-professionalism which encompassed abandonment of patients and taking unauthorized vacation. I was not informed of these charges formally other than, by the grossly inaccurate accusations presented to me by Dr. Anaya;

7) I questioned the inaccuracy of several documents that were placed in my file and the prior to, and after I had reviewed the contents of my file in November 2002. Also, if there were no paper work in the Department on September 17, 2002, when were the signatures added, and why were there so much effort to ensure my failure as well as ruin my career in the manner attempted??

8) Is there any moral or ethical obligation or accountability for these fraudulent, conducts and acts of grossly damaging unprofessional behavior?

AKRON GENERAL MEDICAL CENTER
DEPARTMENT OF MEDICAL EDUCATION

**REQUEST FOR EXCUSED ABSENCE**

NAME: C. EARL GRANT

DEPARTMENT: Medicine | ROTATION: Elective | DATE: 8/5/02

**REASON FOR ABSENCE**

- [x] VACATION
- [ ] ILLNESS
- [ ] LEAVE OF ABSENCE
- [ ] EDUCATIONAL
- [ ] OTHER:
- [ ] MEETING (SPECIFY)

**DATES REQUESTED** (INCLUDE WEEKENDS NOT WORKED)

FROM: 8/16/02

THROUGH: 8/21/02

**HOUSE OFFICER ASSUMING YOUR PATIENT RESPONSIBILITIES**

| INPATIENT | ON CALL |
|---|---|
| CLINIC | FP OR IM UNIT |

**PLEASE INITIAL & DATE APPROVAL WHERE APPLICABLE:**

DEPARTMENT: [signature] CHIEF RESIDENT — DATE 9/2/02

[signature] DEPT. CHAIRMAN — DATE 9/6/02

MEDICAL EDUCATION: [signature] — DATE 9/9/02

SERVICE ASSIGNMENTS: (TO BE SIGNED WHEN ROTATING OUTSIDE OF YOUR SPECIALTY)

CHIEF RESIDENT ______ DATE ______

DEPT. CHAIRMAN ______ DATE ______

TOTAL VACATION YEAR TO DATE ______

[illegible] PM

# August 2002 Medicine Schedule

| Date | ICU_senior | ICU_intern | CCU_senior | CCU_intern | Admitting_senio | Gen_Med_intern | Subspecialty_In | Senior_beeper | Intern_backup | |
|---|---|---|---|---|---|---|---|---|---|---|
| Thu, 08/01 | Tsutkiridze, Ivan | Akhtar, Jabir | Fischer, Alicia | Citea, Daniela | Navik, Nayna | Blakeslee, Dustin | Elder-Arrington, J | Gleason, Danielle | Gurney, Kevin | |
| Fri, 08/02 | Stephen, Jacob | Suresh, Preetham | Ooi, SayTat | Shah, Sonia | Milkovich, Michell | Lee, Benjamin | Hric, Timothy | McGee, Scott | Williams, Jamila | |
| Sat, 08/03 | Eisenberg, Micha | Arveladze, David | Cockrell, Erin | Blakeslee, Dustin | Gleason, Danielle | Karam, Anthony | Wedding, Christo | Rouse, Kelly | Melville, John | |
| Sun, 08/04 | Fischer, Alicia | Citea, Daniela | Grant, C | McGrath, Tory | Brown, Daniel | Blakeslee, Dustin | Soin, Amol | McGee, Scott | Elder-Arrington, J | |
| Mon, 08/05 | Brar, Inderjeet | Hric, Timothy | Milkovich, Michell | Padiyar, Nandita | Navik, Nayna | Melville, John | ★ | Stephen, Jacob | Williams, Jamila | |
| Tue, 08/06 | Eisenberg, Micha | Shah, Sonia | Fischer, Alicia | Suresh, Preetham | McGee, Scott | Gurney, Kevin | Arveladze, David | Ooi, SayTat | McGrath, Tory | |
| Wed, 08/07 | Brown, Daniel | Wedding, Christo | Cockrell, Erin | Blakeslee, Dustin | Tsutkiridze, Ivan | Azarov, Nikolay | Karam, Anthony | Milkovich, Michell | Soin, Amol | |
| Thu, 08/08 | Rouse, Kelly | Lee, Benjamin | Grant, C | Williams, Jamila | Navik, Nayna | Gurney, Kevin | Melville, John | Fischer, Alicia | Padiyar, Nandita | |
| Fri, 08/09 | Gleason, Danielle | Citea, Daniela | Stephen, Jacob | Soin, Amol | Brar, Inderjeet | Arveladze, David | McGrath, Tory | Eisenberg, Micha | Suresh, Preetham | |
| Sat, 08/10 | Tsutkiridze, Ivan | Azarov, Nikolay | Milkovich, Michell | Akhtar, Jabir | Fischer, Alicia | Hric, Timothy | ★ | Brown, Daniel | Melville, John | |
| Sun, 08/11 | Navik, Nayna | Soin, Amol | Ooi, SayTat | Elder-Arrington, J | Eisenberg, Micha | Suresh, Preetham | Wedding, Christo | Saleh, Ali | Padiyar, Nandita | |
| Mon, 08/12 | Gleason, Danielle | Akhtar, Jabir | Cockrell, Erin | Gurney, Kevin | Brown, Daniel | Azarov, Nikolay | Williams, Jamila | Fischer, Alicia | McGrath, Tory | |
| Tue, 08/13 | Milkovich, Michell | Blakeslee, Dustin | Tsutkiridze, Ivan | Karam, Anthony | Grant, C | Lee, Benjamin | Arveladze, David | Ooi, SayTat | Suresh, Preetham | |
| Wed, 08/14 | Navik, Nayna | McGrath, Tory | Eisenberg, Micha | Melville, John | Brar, Inderjeet | Hric, Timothy | Elder-Arrington, J | Brown, Daniel | Wedding, Christo | |
| Thu, 08/15 | Fischer, Alicia | Azarov, Nikolay | McGee, Scott | Akhtar, Jabir | A | Soin, Amol | Suresh, Preetham | Tsutkiridze, Ivan | Arveladze, David | |
| Fri, 08/16 | Brown, Daniel | Lee, Benjamin | Cockrell, Erin | Padiyar, Nandita | Saleh, Ali | Williams, Jamila | Blakeslee, Dustin | Eisenberg, Micha | Elder-Arrington, J | |
| Sat, 08/17 | Brar, Inderjeet | McGrath, Tory | Drab, Lynn | Hric, Timothy | Fortunato, Martin | Gurney, Kevin | ★ | Tsutkiridze, Ivan | Citea, Daniela | |
| Sun, 08/18 | Eisenberg, Micha | Melville, John | Stephen, Jacob | Arveladze, David | McGee, Scott | Akhtar, Jabir | Azarov, Nikolay | Saleh, Ali | Karam, Anthony | |
| Mon, 08/19 | Cockrell, Erin | Soin, Amol | Grant, C | Suresh, Preetham | Rouse, Kelly | Blakeslee, Dustin | Lee, Benjamin | Fortunato, Martin | Citea, Daniela | |
| Tue, 08/20 | Saleh, Ali | Elder-Arrington, J | Ooi, SayTat | Wedding, Christo | Milkovich, Michell | Karam, Anthony | Hric, Timothy | Navik, Nayna | Padiyar, Nandita | |
| Wed, 08/21 | Drab, Lynn | Azarov, Nikolay | Brown, Daniel | Williams, Jamila | Eisenberg, Micha | ★ | Gurney, Kevin | Fortunato, Martin | Arveladze, David | |
| Thu, 08/22 | Rouse, Kelly | Lee, Benjamin | Stephen, Jacob | Elder-Arrington, J | Brar, Inderjeet | McGrath, Tory | Akhtar, Jabir | Cockrell, Erin | Soin, Amol | |
| Fri, 08/23 | Ooi, SayTat | Hric, Timothy | Grant, C | Melville, John | Fortunato, Martin | Wedding, Christo | Karam, Anthony | Fischer, Alicia | Citea, Daniela | |
| Sat, 08/24 | Stephen, Jacob | Azarov, Nikolay | Milkovich, Michell | Shah, Sonia | Navik, Nayna | Suresh, Preetham | Gurney, Kevin | Rouse, Kelly | Arveladze, David | |
| Sun, 08/25 | Saleh, Ali | Williams, Jamila | Fortunato, Martin | Soin, Amol | Tsutkiridze, Ivan | Lee, Benjamin | Akhtar, Jabir | A | Wedding, Christo | |
| Mon, 08/26 | Brown, Daniel | Suresh, Preetham | Ooi, SayTat | Padiyar, Nandita | Brar, Inderjeet | Elder-Arrington, J | Melville, John | Grant, C | Karam, Anthony | |
| Tue, 08/27 | Rouse, Kelly | Gurney, Kevin | Milkovich, Michell | McGrath, Tory | Navik, Nayna | Hric, Timothy | Wedding, Christo | Drab, Lynn\Fisch | Azarov, Nikolay | |
| Wed, 08/28 | Tsutkiridze, Ivan | Karam, Anthony | Eisenberg, Micha | Arveladze, David | Saleh, Ali | Soin, Amol | Williams, Jamila | Brar, Inderjeet | Melville, John | |
| Thu, 08/29 | McGee, Scott | Blakeslee, Dustin | Fortunato, Martin | Suresh, Preetham | A | Akhtar, Jabir | Elder-Arrington, J | Grant, C | McGrath, Tory | |
| Fri, 08/30 | Navik, Nayna | Melville, John | Brar, Inderjeet | Wedding, Christo | Tsutkiridze, Ivan | Gurney, Kevin | Azarov, Nikolay | Stephen, Jacob | Shah, Sonia | |
| Sat, 08/31 | Fortunato, Martin | Arveladze, David | Brown, Daniel | Williams, Jamila | Rouse, Kelly | McGrath, Tory | Karam, Anthony | Cockrell, Erin | Akhtar, Jabir | |

★ = Single Intern, Cap @ 5   A = ANAYA

Call it problems

Revision #2

# September 2002

| Date | ICU_senior | ICU_Intern | CCU_senior | CCU_Intern | Admitting_senio | Gen_Med_intern | Subspecialty_in | Senior_beeper | Intern_backup |
|---|---|---|---|---|---|---|---|---|---|
| Sun, 09/01 | Macken | Cecilio, Michael | Navik, Nayna | Williams, Jamila | Brar, Inderjeet | Jackson, Paul | Mallah, Albert | Cockrell, Erin | Holsenback, Stev |
| Mon, 09/02 | Grant | Padiyar, Nandita | Ooi, SayTat | Ciltea, Daniela | Rouse, Kelly | Suresh, Preetham | Ayoub, Anna | Drab, Lynn | Cerveny, K. |
| Tue, 09/03 | Brown | Holsenback, Stev | Tsutkiridze, Ivan | Campwala, Khoze | McGee, Scott | Paquelet, Stephe | Hric, Timothy | Brar, Inderjeet | Elder-Arrington, J |
| Wed, 09/04 | Macken | Ciltea, Daniela | Rouse, Kelly | Azarov, Nikolay | Gleason, Danielle | Madu, Clara | Arveladze, David | Fischer, Alicia | Ayoub, Anna |
| Thu, 09/05 | Drab, Lynn | Jackson, Paul | Brar, Inderjeet | Cecilio, Michael | Navik, Nayna | Kim, Eugene | Suresh, Preetham | Tsutkiridze, Ivan | Hric, Timothy |
| Fri, 09/06 | Chandurkar, Rohi | Holsenback, Stev | Saleh, Ali | Cerveny, K. | Cockrell, Erin | Mallah, Albert | Paquelet, Stephe | Ooi, SayTat | Padiyar, Nandita |
| Sat, 09/07 | Tsutkiridze, Ivan | Azarov, Nikolay | ~~Gleason, Danielle~~ | Elder-Arrington, J | Fischer, Alicia | Ayoub, Anna | Madu, Clara | Navik, Nayna | Ciltea, Daniela |
| Sun, 09/08 | Cecilio, Michael | Padiyar, Nandita | Grant | Hric, Timothy | Chan, Choon | Macken | Chandurkar, Rohi | Ooi, SayTat | Macken |
| Mon, 09/09 | Cerveny, K. | Kim, Eugene | Saleh, Ali | Mallah, Albert | Brar, Inderjeet | Holsenback, Stev | Arveladze, David | Fischer, Alicia | Suresh, Preetham |
| Tue, 09/10 | Madu, Clara | Jackson, Paul | Brown | Williams, Jamila | Ooi, SayTat | Cecilio, Michael | Elder-Arrington, J | Navik, Nayna | Azarov, Nikolay |
| Wed, 09/11 | Macken | Ayoub, Anna | McGee, Scott | Chandurkar, Rohi | Grant | Paquelet, Stephe | Kim, Eugene | Brar, Inderjeet | Campwala, Khoze |
| Thu, 09/12 | Hric, Timothy | Cerveny, K. | Fischer, Alicia | Mallah, Albert | Navik, Nayna | Arveladze, David | Madu, Clara | Gleason, Danielle | Cecilio, Michael |
| Fri, 09/13 | Suresh, Preetham | Azarov, Nikolay | Stephen, Jacob | Holsenback, Stev | Rouse, Kelly | Jackson, Paul | Williams, Jamila | Grant | Elder-Arrington, J |
| Sat, 09/14 | ~~Tsutkiridze, Ivan~~ | Padiyar, Nandita | Ooi, SayTat | Kim, Eugene | Drab, Lynn | Chandurkar, Rohi | Ayoub, Anna | ~~Fischer, Alicia~~ | Mallah, Albert |
| Sun, 09/15 | Grant | Arveladze, David | Navik, Nayna | Elder-Arrington, J | Gleason, Danielle | Campwala, Khoze | Paquelet, Stephe | Chan, Choon | Hric, Timothy |
| Mon, 09/16 | ~~Ayoub, Anna~~ | Cerveny, K. | McGee, Scott | Suresh, Preetham | Brown | Azarov, Nikolay | Jackson, Paul | Stephen, Jacob | Williams, Jamila |
| Tue, 09/17 | Kim, Eugene | Mallah, Albert | Fortunato, Martin | Chandurkar, Rohi | Ooi, SayTat | Hric, Timothy | Holsenback, Stev | Drab, Lynn | Macken |
| Wed, 09/18 | Ciltea, Daniela | Azarov, Nikolay | Chan, Choon | Cecilio, Michael | Tsutkiridze, Ivan | Elder-Arrington, J | Madu, Clara | Drab, Lynn | Campwala, Khoze |
| Thu, 09/19 | Suresh, Preetham | Williams, Jamila | Gleason, Danielle | Cerveny, K. | Cockrell, Erin | Ayoub, Anna | Arveladze, David | Fortunato, Martin | Paquelet, Stephe |
| Fri, 09/20 | Stephen, Jacob | Jackson, Paul | Chan, Choon | Chandurkar, Rohi | Brown | Kim, Eugene | Hric, Timothy | Brar, Inderjeet | Madu, Clara |
| Sat, 09/21 | Suresh, Preetham | Mallah, Albert | McGee, Scott | Paquelet, Stephe | Fortunato, Martin | Macken | Cecilio, Michael | Ooi, SayTat | Azarov, Nikolay |
| Sun, 09/22 | Madu, Clara | Campwala, Khoze | Saleh, Ali | Elder-Arrington, J | Tsutkiridze, Ivan | Cerveny, K. | Williams, Jamila | Rouse, Kelly | Chandurkar, Rohi |
| Mon, 09/23 | Cecilio, Michael | Arveladze, David | Stephen, Jacob | Holsenback, Stev | Chan, Choon | Azarov, Nikolay | Hric, Timothy | Grant | Padiyar, Nandita |
| Tue, 09/24 | Williams, Jamila | Ayoub, Anna | Cockrell, Erin | Suresh, Preetham | Brar, Inderjeet | Chandurkar, Rohi | Paquelet, Stephe | ~~McGee, Scott~~ | Madu, Clara |
| Wed, 09/25 | Kim, Eugene | Mallah, Albert | ~~Brown~~ [illegible] | Jackson, Paul | Rouse, Kelly | Hric, Timothy | Cerveny, K | Saleh, Ali | Ciltea, Daniela |
| Thu, 09/26 | Holsenback, Stev | Williams, Jamila | ~~Chan, Choon~~ [illegible] | Madu, Clara | Stephen, Jacob | Elder-Arrington, J | Azarov, Nikolay | McGee, Scott | Chandurkar, Rohi |
| Fri, 09/27 | Macken | Arveladze, David | Rouse, Kelly | Paquelet, Stephe | Navik, Nayna | Ayoub, Anna | Cecilio, Michael | Gleason, Danielle | Suresh, Preetham |
| Sat, 09/28 | Chandurkar, Rohi | Jackson, Paul | Cockrell, Erin | Kim, Eugene | Saleh, Ali | Holsenback, Stev | Campwala, Khoze | Fortunato, Martin | Cerveny, K. |
| Sun, 09/29 | Madu, Clara | Azarov, Nikolay | Tsutkiridze, Ivan | Hric, Timothy | Brown | Suresh, Preetham | Paquelet, Stephe | Chan, Choon | Cecilio, Michael |
| Mon, 09/30 | Arveladze, David | Cerveny, K. | Fortunato, Martin | Williams, Jamila | Navik, Nayna | Mallah, Albert | Elder-Arrington, J | Chan, Choon | Chandurkar, Rohi |

9) On October 1, 2002, I informed Dr. Anaya that I needed to have my out-of State driver's license updated during the lunch hour, and requested that he made himself available in case there was any concern or question from any member of my in-patient team while I was gone. Later that afternoon Dr. Anaya made up another grossly inaccurate report to the Director and Department Chairman including accusations that I have not seen the patients on my service that morning or rounded with my team of two interns and three medical students. The patients had seen and issues were addressed, following which everyone met with the teaching attending at 9:00 A.M. and rounded as a group. By 11:00 A.M. all patients on the service had been seen, and the interns and medical students had begun working on specific assigned topics to be discussed during rounds the next morning.

On October 3, 2002, I had a brief discussion with the Director in his office. I explained to him regarding the erroneous information conveyed by Dr. Anaya. The Director informed me then, that he was considering having me complete my training in December, 2002, instead of June 2003, because he was satisfied that I had fulfilled more than adequate requirements for my residency. He also explained that this would allow me to resume my military duties at an earlier date. I reminded the Director of the 12-month requirement indicated by the ABIM, and he promised to follow-up with the ABIM and get back to me. At that time, I had only been at Akron General Medical Center for a total of one year, three months and 5 days (July 1, 2001 to October 5, 2002). I have had very limited interaction with Dr. Gerard in the past, and there had not been any problems with my admissions, nor have I had any unusual remarks or interaction with Dr. Gerard in the past.

With one exception, during the summer of 2002, I admitted a patient who presented to the ER with complain of GI pain, nausea, anorexia, vomiting and dehydration. Symptoms had begun several days prior to admission. The patient had taken several doses of "Tums" without relief. Lab work was positive for hypercalcemia, hypokalemia, etc., and signs of infection. After discussed the H & P and pertinent lab findings, differential diagnosis and plan with the intern, I wrote the admission orders, while awaiting a return call from Dr. Gerard the attending. The intern wrote the H & P and discussed the case with Dr. Gerard while I went to one of the medical floors and attended to another problem that I thought would be best handled directly. Apparently, it was discovered a dew days later that the term milk alkali syndrome or hypercalcemia was not written among the differentials. Although Dr. Gerard complemented me on having written the correct orders and initiated appropriate management, she accused me later of doing a poor job with the H & P because the term hypercalcemia was not included. Dr. Gerard knew exactly who wrote the H & P.

On the morning of October 5, 2002, I was verbally accused by Dr. Gerard, after asking the other residents to leave the room, who claimed that she had been having problems with my admissions for the past 2 ½ years. She informed me then that she would communicate directly with the interns regarding patients on my team that were being followed by the General Medicine Teaching Service.

I inadvertently overslept on the morning of October 16, and reported to work late (after 10:00 A.M.). Following my out-patient clinic on the evening of October 15, I went to the hospital and checked on the patients that were being managed by my team owing to the fact that the intern had not signed out to me prior to leaving. I left the hospital around midnight.

On the morning of October 26, 2002, a very ill patient was admitted by another senior who had discussed the case with Dr. Gerard and sent the patient to the general medicine floor service for which I was responsible, instead of to the MICU. I arrived to work very early that morning and rounded on all my patients including the new admission. I called Dr. Gerard at approximately 8:40 A.M. and discussed the new admission. She agreed that the patient should have been admitted to the MICU, and reassured me that she was in the process of consulting the MICU to have the patient transferred. I specifically asked her if the case was discussed with her prior to the patient being sent to the floor and she and she acknowledged that she had spoken with the resident around 3:00 or 4:00 A.M. Upon reviewing my file in November, 2002, Dr. Gerard had sent a letter to the Director and complained that I had poor clinical judgment because I had not recognized how critically ill that patient was. She made no mention of the white resident, who inappropriately admitted the patient to the general medicine floor. She also did not mention the fact that I had called and brought it to her attention that the patient's condition was too unstable to be managed on the general medicine floor.

Without verifying the accuracy these types of information, the clinical Competency Committee and the Director of Internal Medicine used biased and prejudiced information to label me as incompetent in order to justify their plan to terminate my training prior to June30, 2003.

On November 2, 2002, while at home on my day-off, I was called by Dr. Gerard to see a consult patient. I informed her that I was not expected to be at work that day. According to the working policy, I was scheduled for on-call duties on Sunday, November 3, and was entitled to have that Saturday as my day-off for that week. She insisted that I call her after I saw the patient. I promised her that I would see the patient and call her. I inadvertently fell back asleep shortly after talking to Dr. Gerard and awoke several hours later. By then Dr. Gerard had seen the consult. I went to work on Sunday, November 3, 2002, and fulfilled my on-call clinical responsibilities which included several admissions without any question regarding my clinical ability, skills or judgment, or medical knowledge.

On Monday, November 4, 2002, I was called to see the Director because Dr. Gerard and Dr. Anaya had reported the incident regarding the consultation that I missed on Saturday. The Director informed me that he wanted me have a complete evaluation by my primary care physician to insure that I did not have an underlying illness that might account for the face that I had fallen asleep on Saturday, after talking to Dr. Gerard, and having overslept on the morning of October 16, 2002. I reassured the Director that I was not ill or felt ill, and that I was merely tired and exhausted on both occasions. I did not sleep on

Friday night, November 1, 2002. I had stayed up all night until 7:300 A.M. on Saturday morning catching up on bills and paper work that had accumulated during the months of October while running a busy inpatient service. I did not expect that the resident work policy that required a resident to have at least one day-off from clinical duties and responsibilities, would not be applicable to me, especially, since I had worked every day that week and was assigned to on-call duties on Sunday, November 3, 2002.
The Director informed me then not to continue the consult service rotation, until after evaluation the evaluation by my PCP. I followed up with his recommendation end insure that this was done in a timely manner. During this time received a call from the Residency Coordinator who informed me of appointments that had been scheduled for me to have psychiatric and psychological evaluations. I was never provided with the reason for these appointments and was told that the Director wanted me to have these evaluations.

A thorough evaluation by the PCP concluded that there was no abnormal finding. Upon fulfilling the appointment in the Department I was asked the reason for the referral. I replied, I did not know. I then asked what reason was given for scheduling the appointments and was told. "We were told that you have been having a lot of problems." I was not having any problem and had not felt ill since experiencing the flue symptoms during my vacation period in September, 2002. A letter of referral from Dr. James Hodsden to Dr. Jeffrey L. Moore, Chairman, Department of Psychiatry, dated November 7, 2002, stated:

> **"The Clinical Competency Committee has recommended that Dr. Earl Grant have a psychological evaluation as part of his overall physical and mental evaluation to determine his overall health assessment."**
>
> **"The Committee is specifically interested in any barriers that Dr. Grant may have relative to his duties as a resident physician."**
>
> **"If you require any further information, please call me at 330-344-6140."**

A report from the Dr. Lori Pittinger, Department of Psychiatry, on November 25, 2002, clearly stated:

> **"I have completed a psychiatric evaluation on Earl Grant. In my opinion he is not experiencing a psychiatric or emotional disorder, that would impair his clinical functioning. Cognitively he is generally intact as demonstrated by my basic exam."**

I had no reason to believe that I needed to have any psychological of psychiatric evaluation.

Between November 4, 2002 and February 17, 2003 I was subjected to a number of harassing requests from the Director, which he claimed were recommendations from the Clinical Competency Committee. These included a list of recommendations presented to me by the Director on January 7, 2003, for a complete reevaluation by PCP, neuro-

psychiatric and psychological reevaluation and a lumbar puncture to rule out the possibility of Multiple Sclerosis. The Director and the Clinical Competency Committee concluded their request by stating that, **"The Committee felt that if Dr. Grant refused to have this evaluation, Dr. Grant would be subject to termination from his position in the Department of Medicine with the appropriate appeals process through the Department of Medical Education."** In that letter I was informed that "The Committee will not give recommendation for him to sit for the American Board of Internal Medicine" examination. Additionally, I was informed by Dr. Hodsden that the Committee does not decide who sits for the ABIM exam, and that decision is made by himself, the Department Chairman and the Chairman of Medical Education.

There was no basis for these recommendations by the Director or the Clinical Competency Committee other than as a form of harassment and unfair punishment for not having seen a consult patient on November 2, 2002.
Despite the inappropriateness of those recommendations I followed up with the appointment with my PCP and the Neurologist. No other appointment was scheduled. Again there was no abnormal finding by the PCP or the Neurologist to substantiate claims by the Director and the Clinical Competency Committee that the evaluations were intended to **"exclude possible and likely organic cause for his progressive deterioration over the past several years."** Several days after the Neurologist had completed his evaluation and had concluded that there was no finding to justify the request for a lumbar puncture, and after he had spoken with the Director, the Neurologist called and recommended that I had the lumbar puncture done **"even if it's just to silence the critics."** I declined the recommendation to undergo an invasive procedure for which there was absolutely no indication.

The Director requested documentation for the diagnosis of ADD, and I provided him with a signed authorization to obtain the record from a specific physician who had treated me in the past and had kept records. Instead of obtaining the records requested and for which the signed authorization was provided, my medical file was obtained and the contents which did not include any information in regard to the diagnosis and/or treatment of ADD was passed around in the Department of Medicine and used as a basis for ridicule, unsubstantiated claims and harassment by the Director and the Clinical Competency Committee.

In November, 2002 I had difficulty registering on line for the August 2003, ABIM Certification examination. During a telephone conversation with an ABIM representative I was informed that the reason for my difficulty registering on line resulted from the fact that the Program Director had submitted a marginal grading for my PGY-3 evaluation. I recently reviewed the available contents of my file earlier in November including the evaluations from my monthly clinical rotations. I had no reason to believe that a marginal evaluation was correct or warranted and reassured the ABIM representative that it had to have been an inadvertent error, and that I would inform the Director and have him forward to correct information. I informed the Director and provided him a facsimile number for the ABIM to make the appropriate correction on time before the late registration deadline of February 1, 2003. I had reviewed contents of my file and found

several inappropriate documents including the document suspected to have been submitted to the ABIM, but which the Director informed me was only for internal purpose. The document had the word "marginal" written on it and appeared to be partially filled out. He also denied that he had submitted a marginal evaluation to the ABIM.

On several occasions either during discussions with the Director in his office or messages left with his secretary, or the Residency Coordinator I reminded Dr. Hodsden to have the corrected information submitted to the ABIM, after verifying with the ABIM representative that the correction had not been submitted by the Department. At the time I reviewed the contents of my file in November, 2002 I was not aware that there had been recommendation for my termination on September 27, 2002. I was also not aware that several documents had been intentionally withheld from my viewing. Including information that was available since December, 2001, that was necessary for the ABIM registration then, and also to verify fulfillment of residency training requirements by June, 2002.

During a meeting with the Director on February 5, 2003, I reminded the Director that the correction needed to be made in order for me to complete my registration for the ABIM examination. The Director explained that the problem I had with registering was not from his evaluation but instead, from my previous evaluations. He also added **"I told you I was more than happy to give you credit for what you have completed here."** (On tape, February 5, 2003). The correction was never made to the marginal evaluation submitted to the ABIM. The director has refused to acknowledge credit for my Residency training at Akron General Medical Center.

When I asked the Director about the marginal rating submitted to the ABIM in regard to the attending evaluations in my file he explained **"in all fairness I agree with you, I don't see that."** (On tape, February 5, 2003). The correction was never made to the marginal evaluation submitted to the ABIM. I was unable to register for my examination.

When I asked about the Committees claims regarding incompetence and whether or not he could recall any circumstance in which I had misdiagnosed, or inappropriately treated or mismanaged any patient, either from personal observation or report, his reply was **"Clearly No. Clearly No."** (On tape, February 5, 2003).

When asked what criteria the Committee uses to conclude that I am not competent, the reply was "I guess it's because you don't see as many patients in the outpatient clinic as compared to other senior." Seniors are scheduled and average of 3 to 4 patients each clinic session. I had two clinic days each week, with 3 to four patients scheduled per session

The February 5, 2003, meeting with the Director concluded shortly after I was asked whether or not I had completed all the recommended evaluations. I informed him that I had declined to undergo an invasive lumbar puncture for which there was no indication.

He then informed me that he would speak to Dr. Gardner, Chairman of the Department, and get back in touch with me.

On February 17, 2003, I was called to meet with the Director and the Chairman at which time I was presented the termination letter.

I requested to review the documents in my file in order to prepare my case for the appeals review panel. Contents of my file were made available to me several days later. I provided my attorney with the contents of my file and the audio tape of the February 5, meeting and discussion with the Director. Several documents placed in the file by the Director reflected gross inaccuracies in regard to what was actually discussed and what was documented. On several occasions the Director denied having and knowledge of the diagnosis of ADD prior to May 2002. The Director's memorandum dated October 19, 2001, clearly indicated that he has had knowledge of the diagnosis or label shortly after my arrival at AGMC. To quote this memo **"I had meeting with Earl today because he had come up in the Clinical Competence discussion relative to his deficiency in clinical skills. He apparently has attention deficit disorder diagnosed and was given extra time to take his in-service examination. At this point I told Earl that I thought it was important that we perform some evaluation to determine whether he in fact had recognized deficiencies in his clinical competency."**

The Clinical Competency Committee and the Director decided to discriminate against me based on perceptions regarding the label of ADD, and claimed that I had clinical deficiencies that no one bothered to point out to me.

Although it was claimed that I was placed on probation and underwent remediation without improvement, no one informed me of this probation or the supposed remediation plan.

The monthly evaluations from my clinical rotations do not reflect tie Committee or the Director's opinions or conclusions in regard to their planned failure, and intent to terminate my career. (See attached monthly evaluations 2001 to 2002).

**Questions:**
1. What clinical deficiency was identified by any member of the Clinical Competency Committee?
2. It is claimed that I was placed on probation in an effort to remediate clinical deficiencies. Again what deficiencies were identified and what were the goals of remediation plan?
3. Despite the tremendous resources and opportunities that were available to promote professional growth and development why was there no effort made to recognize or document my demonstrated skills and abilities?
4. Why was there so much effort to document negative information intended to defame my character, especially, between August and November 2002?

5. Why was the information obtained from my previous residency programs in December 2001, not presented to me or the ABIM between December 2001 and February 1, 2002?

6. Despite the evaluations in my file that reflected an overall above satisfactory rating, why was it decided that a marginal evaluation must be submitted to the ABIM.

7. On October 3, 2002, I Informed me that he was satisfied that I had fulfilled more than adequate requirements for my residency training, and was willing to have me complete my training in December 2002.  What crime did I commit between then and February 17, 2003, that made me become incompetent and therefore a danger to patient care?

8. Why was it necessary for the Clinical Competency Committee to make decisions detrimental to my character, career and reputation without verifying the accuracy of and sources of information used.

9. Why was my medical record obtained from the hospital instead of the specific records requested?

10. Is there a code of ethics governing the professionalism or unethical behavior of Program Directors or other physician?

**Monthly Clinical Evaluations At Akron General Medical Center**

[illegible]

[illegible]
[illegible]
[illegible]

[illegible] PGY [illegible]

CLINICAL JUDGMENT

MEDICAL KNOWLEDGE

CLINICAL SKILLS

[illegible]

[illegible]

ATTITUDE AND PROFESSIONAL BEHAVIOR

OVERALL CLINICAL JUDGMENT

[illegible]

Akron General Medical Center
Department of Medicine
Teaching Attending Evaluation of Resident/Intern

Resident Grant PGY 3 Rotation Gen Med III

Attending Klatt Date of Rotation 10/16-31/01

**CLINICAL JUDGMENT**

1 2 3 Unsatisfactory 4 5 (6) Satisfactory 7 8 9 Superior

**MEDICAL KNOWLEDGE**

1 2 3 Unsatisfactory 4 5 (6) Satisfactory 7 8 9 Superior

**CLINICAL SKILLS**

1 2 3 Unsatisfactory 4 5 (6) Satisfactory 7 8 9 Superior

**HUMANISTIC ATTRIBUTES**

1 2 3 Unsatisfactory 4 5 6 Satisfactory (7)→(8) 9 Superior

**MEDICAL CARE INCLUDING UTILIZATION OF LAB TESTS AND DIAGNOSTIC PROCEDURES**

1 2 3 Unsatisfactory 4 (5) 6 Satisfactory 7 8 9 Superior

**ATTITUDE AND PROFESSIONAL BEHAVIOR**

1 2 3 Unsatisfactory 4 5 6 Satisfactory 7 (8) 9 Superior

**OVERALL CLINICAL JUDGMENT**

1 2 3 Unsatisfactory 4 5 (6) Satisfactory 7 8 9 Superior

COMMENTS (1) Recommend documenting consistently in progress notes reasons for specific orders / treatments
2) Recommend checking attending orders + ordering same day

PLEASE RETURN TO: Internal Medicine Residency Office
Akron General Medical Center
Akron, OH 44307
Fax 330-535-9270

ATTENDING SIGNATURE [signature]

RESIDENT/INTERN SIGNATURE [signature]

Please note: attendings must review evaluations with resident prior to submission to the residency office.

Akron General Medical Center
Department of Medicine
Teaching Attending Evaluation of Resident/Intern

Resident Earl Grant PGY 3 Rotation ICU

Attending ICPA Date of Rotation Nov 01

**CLINICAL JUDGMENT**

1 2 3 Unsatisfactory 4 5 6 Satisfactory 7 8 9 Superior

**MEDICAL KNOWLEDGE**

1 2 3 Unsatisfactory 4 5 6 Satisfactory 7 8 9 Superior

**CLINICAL SKILLS**

1 2 3 Unsatisfactory 4 5 6 Satisfactory 7 8 9 Superior

**HUMANISTIC ATTRIBUTES**

1 2 3 Unsatisfactory 4 5 6 Satisfactory 7 8 9 Superior

**MEDICAL CARE INCLUDING UTILIZATION OF LAB TESTS AND DIAGNOSTIC PROCEDURES**

1 2 3 Unsatisfactory 4 5 6 Satisfactory 7 8 9 Superior

**ATTITUDE AND PROFESSIONAL BEHAVIOR**

1 2 3 Unsatisfactory 4 5 6 Satisfactory 7 8 9 Superior

**OVERALL CLINICAL JUDGMENT**

1 2 3 Unsatisfactory 4 5 6 Satisfactory 7 8 9 Superior

D.

Grant: Average. He at times seems to focus on small details at the expense of missing the overall picture. worked hard difficult to evaluate knowledge base

Darell Beuchman, D.O.

Grant- not a strong leader of the interns, slightly below average academic knowledge, seems to have a strong level of interest and feel he can "get it" , but should really do an extra year of IM to be where he should be to graduate at this point, needs more instruction and experience in procedures to be proficient on a senior level. Good personality, kind person, good to staff and patients and families

# AKRON GENERAL MEDICAL CENTER
## INTERNAL MEDICINE RESIDENT EVALUATION FORM

Attending Evaluation of Resident/Intern

Resident's Name: Grant    Rotation Name: Pulmonary

Attending's Name: Dr. White    Rotation Period: Dec, 2001    Evaluation Date: ________

In evaluating the resident's performance, use as your standard the level of knowledge, skills and attitudes expected from the clearly satisfactory resident at this stage of training. **For any component that needs attention or is rated a 4 or less, please provide specific comments and recommendations on the back of the form.** Be as specific as possible, including reports of critical incidents and/ or outstanding performance. Global adjectives or remarks, such as "good resident," do not provide meaningful feedback to the resident.

| | Unsatisfactory / Satisfactory / Superior | |
|---|---|---|
| **1. Patient Care**<br>Incomplete, inaccurate medical interviews, physical examinations, and review of other data; incompetent performance of essential procedures; fails to analyze clinical data and consider patient preferences when making medical decisions<br>❑ Insufficient contact to judge | 1 2 3 4 5 (6) 7 8 9<br>❑ Performance needs attention | Superb, accurate, comprehensive medical interviews, physical examinations, review of other data, and procedural skills; always makes diagnostic and therapeutic decisions based on available evidence, sound judgment, and patient preferences |
| **2. Medical Knowledge**<br>Limited knowledge of basic and clinical sciences; minimal interest in learning; does not understand complex relations, mechanisms of disease<br>❑ Insufficient contact to judge | 1 2 3 4 5 6 (7) 8 9<br>❑ Performance needs attention | Exceptional knowledge of basic and clinical sciences; highly resourceful development of knowledge; comprehensive understanding of complex relationships, mechanisms of disease |
| **3. Practice- Based Learning Improvement**<br>Fails to perform self- evaluation; lacks insight, initiative; resists or ignores feedback; fails to use information technology to enhance patient care or pursue self- improvement<br>❑ Insufficient contact to judge | 1 2 3 4 5 6 7 (8) 9<br>❑ Performance needs attention | Constantly evaluates own performance, incorporates feedback into improvement activities; effectively uses technology to manage information for patient care and self-improvement |
| **4. Interpersonal and Communication Skills**<br>Does not establish even minimally effective therapeutic relationships with patients and families; does not demonstrate ability to build relationships through listening, narrative or nonverbal skills; does not provide education or counseling to patients, families, or colleagues | 1 2 3 4 5 6 7 (8) 9<br>❑ Performance needs attention<br>❑ Insufficient contact to judge | Establishes a highly effective therapeutic relationship with patients and families; demonstrates excellent relationship building through listening, narrative and nonverbal skills; excellent education and counseling of patients, families, and colleagues, always "interpersonally" engaged |

| | Unsatisfactory / Satisfactory / Superior | |
|---|---|---|
| **5. Professionalism** Lacks respect, compassion, integrity, honesty; disregards need for self- assessment; fails to acknowledge errors; does not consider needs of patients, families, colleagues; does not display responsible behavior<br>❑ Insufficient contact to judge | 1 2 3 4 5 6 7 (8 circled) 9<br>❑ Performance needs attention | Always demonstrates respect, compassion, integrity, honesty; teaches/ role models responsible behavior; total commitment to self-assessment; willingly acknowledges errors; always considers needs of patients, families, colleagues |
| **6. System- Based Learning** Unable to access/ mobilize outside resources; actively resists efforts to improve systems of care; does not use systematic approaches to reduce error and improve patient care<br>❑ Insufficient contact to judge | 1 2 3 4 5 6 7 (8 circled) 9<br>❑ Performance needs attention | Effectively accesses/ utilizes outside resources; effectively uses systematic approaches to reduce errors and improve patient care; enthusiastically assists in developing systems' improvement |
| **Resident's Overall Clinical Competence in Internal Medicine on Rotation** | 1 2 3 4 5 6 7 8 9<br>❑ Performance needs attention | |

**Attending's Comments**

The last 2 wks of the Imed. rotation Earl did a lot of reading and his patient care decisions improved as his fund of knowledge expanded. The last 2 wks of the rotation he did a very good job in the diagnosis and management of his patients and his consultations in the last 2 wks were more comprehensive, esp his history taking

Signatures: Resident's ____________________ Attending's [signature]

**Akron General Medical Center**
**Department of Medicine**
**Teaching Attending Evaluation of Resident/Intern**

Resident Grant PGY____ Rotation CCU

Attending Hodgden Date of Rotation Jan, 2002

**CLINICAL JUDGMENT**

1 2 Unsatisfactory 3 — 4 (5) Satisfactory 6 — 7 8 Superior 9

**MEDICAL KNOWLEDGE**

1 2 Unsatisfactory 3 — 4 5 Satisfactory (6) — 7 8 Superior 9

**CLINICAL SKILLS**

1 2 Unsatisfactory 3 — 4 5 Satisfactory (6) — 7 8 Superior 9

**HUMANISTIC ATTRIBUTES**

1 2 Unsatisfactory 3 — 4 5 Satisfactory (6) — 7 8 Superior 9

**MEDICAL CARE INCLUDING UTILIZATION OF LAB TESTS AND DIAGNOSTIC PROCEDURES**

1 2 Unsatisfactory 3 — 4 (5) Satisfactory 6 — 7 8 Superior 9

**ATTITUDE AND PROFESSIONAL BEHAVIOR**

1 2 Unsatisfactory 3 — 4 5 Satisfactory 6 — (7) 8 Superior 9

**OVERALL CLINICAL JUDGMENT**

1 2 Unsatisfactory 3 — 4 5 Satisfactory (6) — 7 8 Superior 9

COMMENTS average - probably could be better seen

PLEASE RETURN TO: Karen Robinette
Internal Medicine Residency Office
Akron General Medical Center
400 Wabash Avenue
Akron, OH 44307
Fax 330-535-9270

ATTENDING SIGNATURE [signature]

RESIDENT/INTERN SIGNATURE R. Earl Grant

*Please note: attendings must review evaluations with resident prior to submission to the residency office.

Akron General Medical Center
Department of Medicine
Teaching Attending Evaluation of Resident/Intern

Resident Grant PGY____ Rotation Endocrinology

Attending Moattari Date of Rotation March 02

CLINICAL JUDGMENT

1 2 Unsatisfactory 3 4 (5) Satisfactory 6 7 8 Superior 9

MEDICAL KNOWLEDGE

1 2 Unsatisfactory 3 4 (5) Satisfactory 6 7 8 Superior 9

CLINICAL SKILLS

1 2 Unsatisfactory 3 4 (5) Satisfactory 6 7 8 Superior 9

HUMANISTIC ATTRIBUTES

1 2 Unsatisfactory 3 4 5 Satisfactory 6 (7) 8 Superior 9

MEDICAL CARE INCLUDING UTILIZATION OF LAB TESTS AND DIAGNOSTIC PROCEDURES

1 2 Unsatisfactory 3 4 (5) Satisfactory 6 7 8 Superior 9

ATTITUDE AND PROFESSIONAL BEHAVIOR

1 2 Unsatisfactory 3 4 5 Satisfactory (6) 7 8 Superior 9

OVERALL CLINICAL JUDGMENT

1 2 Unsatisfactory 3 4 (5) Satisfactory 6 7 8 Superior 9

COMMENTS____________________

PLEASE RETURN TO: Internal Medicine Residency Office, Akron General Medical Center, Akron, OH 44307, Fax 330-535-9270

ATTENDING SIGNATURE [signature]

RESIDENT/INTERN SIGNATURE R. Carl Grant, M.D.

*Please note: attendings must review evaluations with resident prior to submission to the residency office.

Akron General Medical Center
Department of Medicine
Teaching Attending Evaluation of Resident/Intern

Resident Grant PGY____ Rotation Hem/Onc

Attending Relmus Date of Rotation May, 02

**CLINICAL JUDGMENT**

1 2 Unsatisfactory 3 | 4 (5) Satisfactory 6 | 7 8 Superior 9

**MEDICAL KNOWLEDGE**

1 2 Unsatisfactory 3 | 4 (5) Satisfactory 6 | 7 8 Superior 9

**CLINICAL SKILLS**

1 2 Unsatisfactory 3 | 4 5 Satisfactory (6) | 7 8 Superior 9

**HUMANISTIC ATTRIBUTES**

1 2 Unsatisfactory 3 | 4 5 Satisfactory 6 | 7 (8) Superior 9

**MEDICAL CARE INCLUDING UTILIZATION OF LAB TESTS AND DIAGNOSTIC PROCEDURES**

1 2 Unsatisfactory 3 | 4 (5) Satisfactory 6 | 7 8 Superior 9

**ATTITUDE AND PROFESSIONAL BEHAVIOR**

1 2 Unsatisfactory 3 | 4 5 Satisfactory (6) | 7 8 Superior 9

**OVERALL CLINICAL JUDGMENT**

1 2 Unsatisfactory 3 | 4 (5) Satisfactory 6 | 7 8 Superior 9

COMMENTS Should spend at least another month on Hem Onc

PLEASE RETURN TO: Internal Medicine Residency Office, Akron General Medical Center, Akron, OH 44307, Fax 330-535-9270

ATTENDING SIGNATURE [signature]

RESIDENT/INTERN SIGNATURE C. Earl Grant

Please note: attendings must review evaluations with resident prior to submission to the residency office.

26/2002 THU 12:58 FAX 330 867 6160 CRYSTAL ARTHR CNTR 001
.9/24/02 TUE 15:25 FAX 330 535 9270 AGMC IM RESIDENCY 002

**Akron General Medical Center**
**Department of Medicine**
**Teaching Attending Evaluation of Resident/Intern**

**Resident** Earl Grant **PGY** __ **Rotation** Rheumatology

**Attending** Dr. Gooke **Date of Rotation** June, 02

**CLINICAL JUDGMENT**

1 2 Unsatisfactory 3 — 4 5 Satisfactory 6 — (7) 8 Superior 9

**MEDICAL KNOWLEDGE**

1 2 Unsatisfactory 3 — 4 5 Satisfactory (6) — 7 8 Superior 9

**CLINICAL SKILLS**

1 2 Unsatisfactory 3 — 4 5 Satisfactory (6) — 7 8 Superior 9

**HUMANISTIC ATTRIBUTES**

1 2 Unsatisfactory 3 — 4 5 Satisfactory 6 — 7 (8) Superior 9

**MEDICAL CARE INCLUDING UTILIZATION OF LAB TESTS AND DIAGNOSTIC PROCEDURES**

1 2 Unsatisfactory 3 — 4 5 Satisfactory 6 — (7) 8 Superior 9

**ATTITUDE AND PROFESSIONAL BEHAVIOR**

1 2 Unsatisfactory 3 — 4 5 Satisfactory 6 — 7 (8) Superior 9

**OVERALL CLINICAL JUDGMENT**

1 2 Unsatisfactory 3 — 4 5 Satisfactory 6 — (7) 8 Superior 9

COMMENTS ____________________

PLEASE RETURN TO: Karen Robinette, Internal Medicine Residency Office, Akron General Medical Center, 400 Wabash Avenue, Akron, OH. 44307, Fax 330-535-9270

ATTENDING SIGNATURE [signature]

RESIDENT/INTERN SIGNATURE E. Earl Grant, MD

Please note: attendings must review evaluations with resident prior to submission to the residency office.

**Akron General Medical Center**
**Department of Medicine**
**Teaching Attending Evaluation of Resident/Intern**

Resident: Grant PGY___ Rotation: Neurology

Attending: Miller Date of Rotation: August, 02

**CLINICAL JUDGMENT**

1 2 3 (Unsatisfactory) 4 5 (6) (Satisfactory) 7 8 9 (Superior)

**MEDICAL KNOWLEDGE**

1 2 3 (Unsatisfactory) 4 5 6 (Satisfactory) (7) 8 9 (Superior)

**CLINICAL SKILLS**

1 2 3 (Unsatisfactory) 4 5 6 (Satisfactory) (7) 8 9 (Superior)

**HUMANISTIC ATTRIBUTES**

1 2 3 (Unsatisfactory) 4 5 6 (Satisfactory) 7 (8) 9 (Superior)

**MEDICAL CARE INCLUDING UTILIZATION OF LAB TESTS AND DIAGNOSTIC PROCEDURES**

1 2 3 (Unsatisfactory) 4 5 6 (Satisfactory) (7) 8 9 (Superior)

**ATTITUDE AND PROFESSIONAL BEHAVIOR**

1 2 3 (Unsatisfactory) 4 5 6 (Satisfactory) (7) 8 9 (Superior)

**OVERALL CLINICAL JUDGMENT**

1 2 3 (Unsatisfactory) 4 5 6 (Satisfactory) (7) 8 9 (Superior)

COMMENTS: Needs to continue to read.

PLEASE RETURN TO:
Karen Robinette
Internal Medicine Residency Office
Physician's Office Building
224 W. Exchange St. Ste 210
Akron, OH 44302
Fax 330-535-9270

ATTENDING SIGNATURE [signature]

RESIDENT/INTERN SIGNATURE R. Earl Grant, M.D.

*Please note: attendings must review evaluations with resident prior to submission to the residency office.

**AKRON GENERAL MEDICAL CENTER**
**INTERNAL MEDICINE RESIDENT EVALUATION FORM**
**Attending Evaluation of Resident**

Requested 2nd side to be sent.

Resident's Name: Grant Rotation: Gen Med 3

Attending's Name: Raniol Rotation Period: 10/1- 10/15/03 Evaluation Date:

In evaluating the resident's performance, use as your standard the level of knowledge, skills and attitudes expected from the clearly satisfactory resident at this sate of training. **For any component that needs attention or is rated a 4 or less, please provide specific comments and recommendations on the back of the form. Be as specific as possible,** including reports of critical incidents and/or outstanding performance. Global adjectives or remarks, such as "good resident," do not provide meaningful feedback to the resident.

| | Unsatisfactory / Satisfactory / Superior | |
|---|---|---|
| **1. Patient Care**<br>Incomplete, inaccurate medical interviews, physical examinations, and review of other data; incompetent performance of essential procedures; fails to analyze clinical data and consider patient preferences when making medical decisions | 1 2 3 4 5 6 7 8 9<br>Performance needs attention (circle if applicable)<br>Insufficient contact to judge (circle if applicable) | Superb, accurate, comprehensive medical interviews, physical examinations, review of other data, and procedural skills,; always makes diagnostic and therapeutic decisions based on available evidence, sound judgment, and patient preferences |
| **2. Medical Knowledge**<br>Limited knowledge of basic and clinical sciences; minimal interest in learning; does not understand complex relations, mechanisms of disease | 1 2 3 (4) 5 6 7 8 9<br>Performance needs attention (circle if applicable)<br>Insufficient contact to judge (circle if applicable) | Exceptional knowledge of basic and clinical sciences; highly resourceful development of knowledge; comprehensive understanding of complex relationships, mechanisms of disease |
| **3. Practice-Based Learning Improvement**<br>Fails to perform self-evaluation; lacks insight, initiative; resists or ignores feedback; fails to use information technology to enhance patient care or pursue self-improvement | 1 2 3 4 (5) 6 7 8 9<br>Performance needs attention (circle if applicable)<br>Insufficient contact to judge (circle if applicable) | Constant evaluates own performance, incorporates feedback into improvement activities; effectively uses technology to manage information for patient care and self-improvement |
| **4. Interpersonal and Communicaiton Skills**<br>Does not establish even minimally effective therapeutic relationships with patients and families; does not demonstrate ability to build relationships through listening, narrative or nonverbal skills; does not provide education or counselling to patients, families, or colleagues | 1 2 3 4 (5) 6 7 8 9<br>Performance needs attention (circle if applicable)<br>Insufficient contact to judge (circle if applicable) | Establishes a highly effective therapeutic relationship with patients and families; demonstrates excellent relationship building through listening, narrative and nonverbal skills; excellent education and counseling of patients, families, and colleagues; always "interpersonally" engaged |

# AKRON GENERAL MEDICAL CENTER
# INTERNAL MEDICINE RESIDENT EVALUATION FORM

Attending Evaluation of Resident/Intern

Resident's Name Grant　　Rotation Name Nephrology

Attending's Name Jon　　Rotation Period Aug. 2001　　Evaluation Date ________

In evaluating the resident's performance, use as your standard the level of knowledge, skills and attitudes expected from the clearly satisfactory resident at this stage of training. **For any component that needs attention or is rated a 4 or less, please provide specific comments and recommendations on the back of the form. Be as specific as possible, including reports of critical incidents and/ or outstanding performance. Global adjectives or remarks, such as "good resident," do not provide meaningful feedback to the resident.**

| | Unsatisfactory / Satisfactory / Superior | |
|---|---|---|
| **1. Patient Care**<br>Incomplete, inaccurate medical interviews, physical examinations, and review of other data; incompetent performance of essential procedures; fails to analyze clinical data and consider patient preferences when making medical decisions<br>☐ Insufficient contact to judge | 1 2 3 4 [5] 6 7 8 9<br>☐ Performance needs attention | Superb, accurate, comprehensive medical interviews, physical examinations, review of other data, and procedural skills, always makes diagnostic and therapeutic decisions based on available evidence, sound judgment, and patient preferences |
| **2. Medical Knowledge**<br>Limited knowledge of basic and clinical sciences; minimal interest in learning; does not understand complex relations, mechanisms of disease<br>☐ Insufficient contact to judge | 1 2 [3 4] 5 6 7 8 9<br>☒ Performance needs attention | Exceptional knowledge of basic and clinical sciences; highly resourceful development of knowledge; comprehensive understanding of complex relationships, mechanisms of disease |
| **3. Practice- Based Learning Improvement**<br>Fails to perform self- evaluation; lacks insight, initiative; resists or ignores feedback; fails to use information technology to enhance patient care or pursue self- improvement<br>☐ Insufficient contact to judge | 1 2 3 4 [5] 6 7 8 9<br>☐ Performance needs attention | Constantly evaluates own performance, incorporates feedback into improvement activities; effectively uses technology to manage information for patient care and self-improvement |
| **4. Interpersonal and Communication Skills**<br>Does not establish even minimally effective therapeutic relationships with patients and families; does not demonstrate ability to build relationships through listening, narrative or nonverbal skills; does not provide education or counseling to patients, families, or colleagues | 1 2 3 4 5 6 [7] 8 9<br>☐ Performance needs attention<br>☐ Insufficient contact to judge | Establishes a highly effective therapeutic relationship with patients and families; demonstrates excellent relationship building through listening, narrative and nonverbal skills; excellent education and counseling of patients, families, and colleagues; always "interpersonally" engaged |

**AKRON GENERAL MEDICAL CENTER**
**INTERNAL MEDICINE RESIDENT EVALUATION FORM**
**Attending Evaluation of Resident**

Requested 3rd site to be sent.

Resident's Name: Grant Rotation: Gen Med 3

Attending's Name: Raniol Rotation Period: 10/1- 10/15/02 Evaluation Date: ____________

In evaluating the resident's performance, use as your standard the level of knowledge, skills and attitudes expected from the clearly satisfactory resident at this sate of training. **For any component that needs attention or is rated a 4 or less, please provide specific comments and recommendations on the back of the form.** Be as specific as possible, including reports of critical incidents and/or outstanding performance. Global adjectives or remarks, such as "good resident," do not provide meaningful feedback to the resident.

| | Unsatisfactory / Satisfactory / Superior | |
|---|---|---|
| **1. Patient Care**<br>Incomplete, inaccurate medical interviews, physical examinations, and review of other data; incompetent performance of essential procedures; fails to analyze clinical data and consider patient preferences when makiing medical decisions | 1 2 3 4 5 (6) 7 8 9<br>Performance needs attention (circle if applicable)<br>Insufficient contact to judge (circle if applicable) | Superb, accurate, comprehensive medical interviews, physical examinations, review of other data, and procedural skills,; always makes diagnostic and therapeutic decisions based on available evidence, sound judgment, and patient preferences |
| **2. Medical Knowledge**<br>Limited knowledge of basic and clinical sciences; minimal interest in learning; does not understand complex relations, mechanisms of disease | 1 2 3 (4)/5 6 7 8 9<br>Performance needs attention (circle if applicable)<br>Insufficient contact to judge (circle if applicable) | Exceptional knowledge of basic and clinical sciences; highly resourceful development of knowledge; comprehensive understanding of complex relationships, mechanisms of disease |
| **3. Practice-Based Learning Improvement**<br>Fails to perform self-evaluation; lacks insight, initiative; resists or ignores feedback; fails to use information technology to enhance patient care or pursue self-improvement | 1 2 3 4 (5) 6 7 8 9<br>Performance needs attention (circle if applicable)<br>Insufficient contact to judge (circle if applicable) | Constant evaluates own performance, incorporates feedback into improvement activities; effectively uses technology to manage information for patient care and self-improvement |
| **4. Interpersonal and Communicaiton Skills**<br>Does not establish even minimally effective therapeutic relationships with patients and families; does not demonstrate ability to build relationships through listening, narrative or nonverbal skills; does not provide education or counselling to patients, families, or colleagues | 1 2 3 4 (5) 6 7 8 9<br>Performance needs attention (circle if applicable)<br>Insufficient contact to judge (circle if applicable) | Establishes a highly effective therapeutic relationship with patients and families; demonstrates excellent relationship building through listening, narrative and nonverbal skills; excellent education and counseling of patients, families, and colleagues; always "interpersonally" engaged |

**AKRON GENERAL MEDICAL CENTER**
**INTERNAL MEDICINE RESIDENT EVALUATION FORM**
**Attending Evaluation of Resident**

Resident's Name: Grant  Rotation: Gen Med 3

Attending's Name: Klatt  Rotation Period: 10/16 - 10/31/02  Evaluation Date: 12/4/02 → see back

In evaluating the resident's performance, use as your standard the level of knowledge, skills and attitudes expected from the clearly satisfactory resident at this sate of training. **For any component that needs attention or is rated a 4 or less, please provide specific comments and recommendations on the back of the form.** Be as specific as possible, including reports of critical incidents and/or outstanding performance. Global adjectives or remarks, such as "good resident," do not provide meaningful feedback to the resident.

| | Unsatisfactory / Satisfactory / Superior | |
|---|---|---|
| **1. Patient Care** Incomplete, inaccurate medical interviews, physical examinations, and review of other data; incompetent performance of essential procedures; fails to analyze clinical data and consider patient preferences when making medical decisions | 1 2 3 (4)* 5 6 7 8 9<br>(Performance needs attention) (circle if applicable)<br>Insufficient contact to judge (circle if applicable)<br>needs more detailed pt histories & presentations - pt currently are not comprehensive for his level of training see back side | Superb, accurate, comprehensive medical interviews, physical examinations, review of other data, and procedural skills,, always makes diagnostic and therapeutic decisions based on available evidence, sound judgment, and patient preferences |
| **2. Medical Knowledge** Limited knowledge of basic and clinical sciences; minimal interest in learning; does not understand complex relations, mechanisms of disease | 1 2 3 4 (5) 6 7 8 9<br>Performance needs attention (circle if applicable)<br>Insufficient contact to judge (circle if applicable) | Exceptional knowledge of basic and clinical sciences; highly resourceful development of knowledge; comprehensive understanding of complex relationships, mechanisms of disease<br>Basic sciences knowledge excellent value of strength of clinical knowledge - see back side - may be less than expected for 3RD yr resident |
| **3. Practice-Based Learning Improvement** Fails to perform self-evaluation: lacks insight, initiative, resists or ignores feedback; fails to use information technology to enhance patient care or pursue self-improvement | 1 2 3 4 (5) 6 7 8 9<br>Performance needs attention (circle if applicable)<br>Insufficient contact to judge (circle if applicable) | Constant evaluates own performance, incorporates feedback into improvement activities; effectively uses technology to manage information for patient care and self-improvement |
| **4. Interpersonal and Communicaiton Skills** Does not establish even minimally effective therapeutic relationships with patients and families; does not demonstrate ability to build relationships through listening, narrative or nonverbal skills; does not provide education or counselling to patients, families, or colleagues | 1 2 3 4 5 6 (7)* 8 9<br>Performance needs attention (circle if applicable)<br>Insufficient contact to judge (circle if applicable)<br>(*except nurses noted concerns regarding EG availability on case staff) → see back | Establishes a highly effective therapeutic relationship with patients and families; demonstrates excellent relationship building through listening, narrative and nonverbal skills; excellent education and counseling of patients, families, and colleagues *always "interpersonally" engaged |

# RESIDENT EVALUATION CHECKLIST

NAME______C. EARL GRANT, MD [signature]

DATES:______July, 2001 – June, 2002__________

ROTATION EVALULATION CHECKLIST 2001-2002

| MONTH | ROTATION | ATTENDING | SENT | RECEIVED |
|---|---|---|---|---|
| | | | | |
| JUL | | | | |
| AUG | NEPHROLOGY | TAN 1/14/03 | | m 11/28/01 1/8/03 |
| AUG | NEPHROLOGY | RAY/KAYANI | | ✓ |
| SEP | ID | BOLLIN | E 1/14/03 | m 11/28/01 |
| OCT | GEN MED III | RANIOL | | ✓ |
| OCT | GEN MED III | KLATT | | ✓ |
| NOV | ICU | ICPA | | ✓ |
| DEC | ELECTIVES Pulmonary | White | m 1/8/03 | ✓ |
| DEC | ELECTIVES | N/A | — | — |
| JAN | Hodsden | CCU | | ✓ |
| FEB | AMB I | — | | |
| MAR | Endocrine | Mattai/King | | ✓ |
| APR | CAR | — | | |
| MAY | Rehman | | | ✓ |
| JUN | Gerber | | | ✓ |
| | | | | |
| | | | | |
| | | | | |

CEG/

# RESIDENT EVALUATION REVIEW

NAME Grant, Earl

DATES July, 2002 – June, 2003

**Missing Rotation Evaluations**

| MONTH | ROTATION | TEACHING ATTENDING | DATE SENT/ RECEIVED |
|---|---|---|---|
| JULY | Research | Interna | ✓ |
| AUGUST | Neurology | Miller | ✓ |
| SEPTEMBER | Elective/Cardiology | Cardiology | ✓ ?? |
| OCTOBER | Gen Med 3 | Rand / Klatt | ✓ / ✓ |
| NOVEMBER | CAR | ?? | ?? |
| DECEMBER | ~~Elective Rot~~ | Research / Radiology | ✓ |
| JANUARY | ~~Hem/Onc~~ | Research | ✓ |
| FEBRUARY | Amb 2 | | |
| MARCH | CCU | | |
| APRIL | CCU / Elective | | |
| MAY | Gen Med 2 | | |
| JUNE | ICU | | |
| | | | |

Initials C.E.G.

Date

**Summary**

I was unable to register for the ABIM examination for the August, 2002 and 2003 dates despite having done my work.

Concerted effort was made by AGMC Program Director and its Clinical Competency Committee to maliciously ruin my career after having established a better than satisfactory performance record.

The Director Deliberately withheld pertinent that was need to prove that the marginal evaluations submitted to the ABIM were grossly incorrect, unprofessional and falsified information intended to deny my pursuit of a career in medicine.

On October 3, 2002, the Director informed me that he was satisfied that I had fulfilled more than adequate requirements for residency training and that he would have me complete my training in December 2002, instead of June 2003.

The Director had knowledge of the facts from both past and current records and deliberately submitted a marginal evaluation to the ABIM.

He also initially denied that he had submitted a marginal evaluation, refused to correct the information submitted although on February 5, 2003, he admitted that he "was more than willing to give me credit for my training at AGMC, and that from his review of my file he did not see marginal grading. He also admitted during that conversation, that from his personal observation he could not recall any circumstance in which I had carried out my duties and responsibilities in an incompetent manner.

Based on documents in my file, the Clinical Competency Committee on December 2, 2002, "unanimously recommended immediate termination, and denial of credit for his third year of training, based on unprofessional behavior and inability to perform his duties."

The Committee and the Director knowingly created and used falsified information without my input, and completely ignored my need for rest on my day-off on Saturday, November 2, 2002. Between November 4, 2002, and February 17, 2003, I was removed from clinical duties and assigned to research duties and requested to undergo several harassing evaluations and reevaluation including a lumbar puncture to be evaluated for Multiple Sclerosis although there was absolutely no reason or indication.

My training was terminated on February 17, shortly after the Director was informed that I declined to undergo the lumbar puncture procedure.

Grossly inaccurate and falsified document were deliberately placed in my file, and including fraudulent modification and misrepresentation of the facts, by the Director, Dr. Anaya, and Dr. Gerard.

Despite the goals of the training program, the guidelines for residency training and professional development, grave efforts were made to defame my character, and destroy my career, efforts made to create and subject me to a more stressful environment by scheduling multiple overnight calls and next-day afternoon outpatient clinic.

The impact of sleep deprivation performance has been very well documented.

It is also a known violation of the training guidelines to require that a resident be assigned and be responsible for ongoing regularly scheduled patient care responsibilities beyond noon on such post-call days.

Specific efforts were made to document how much time I spent with each patient during these clinic sessions, can used as a basis for the Committee's claims of incompetence. This was not done in regard to residents, and no other PGY-2 or PGY-3 resident was assigned two out=patient clinic sessions per week.

Despite guidelines established to evaluate competency no one on the Clinical Competency Committee or the Director followed any guidelines to evaluate my competency, or even inform me of the areas simply because they did not have a reason. They were all aware of my performance evaluations in my file as shown above. To the contrary, the Director has sent communication to the ABIM in July 2003, indicating that I was terminated owing to poor performance. The Director has refused to issue me a certificate of completion for my training at Akron General Medical Center

I hereby request that the Ohio State Medical Board as the governing authority conduct an investigation into the matter in order that I may rightfully obtain my certificate of completion for my training at Akron General Medical Center, Department of Internal Medicine.

The US military has invested much time and financial resources in my medical school and residency training. I have done my best to ensure that I fulfill my obligations at the highest level of competency and professionalism. I look forward to your full support in addressing the above matter and arriving at an amicable agreement.

Thank you.

Sincerely,

C. Earl Grant, M.D., Ph.D., MAJ MC
DCS Force Health Protection, US Army

cc: The Surgeon General
US Army

MAIL
UNITED STATES POSTAL SERVICE
www.usps.c
U.S. POSTAGE PAID
FORT BELVOIR,VA
22060
FEB 11,'09
AMOUNT
$23.60
00075669-05
EXTREMELY URGENT
Please Rush To Addressee
EXPRESS MAIL
UNITED STATES POSTAL SERVICE
Addressee Copy 811
Post Office To Addressee
DELIVERY (POSTAL USE ONLY)
ORIGIN (POSTAL SERVICE USE ONLY)
CUSTOMER USE ONLY
NO DELIVERY
PRESS HARD. YOU ARE MAKING 3 COPIES.
FROM: (PLEASE PRINT)
TO: (PLEASE PRINT)
FOR PICKUP OR TRACKING
Visit www.usps.com
Call 1-800-222-1811
Immediately upon receipt, please telephone:
Name:
DuPont™ Tyvek®
Protect What's Inside.™
This packaging is the property of the U.S. Postal Service and is provided solely for use in sending Express Mail.
Misuse may be a violation of federal law.